# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE<br>425 East 100 South<br>Salt Lake City, Utah 84111,<br><br>NATURAL RESOURCES DEFENSE COUNCIL<br>40 West 20th Street, 11th Floor<br>New York, New York 10011,<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 North Main Avenue<br>Tucson, Arizona 85701,<br><br>LIVING RIVERS<br>P.O. Box 466<br>Moab, Utah 84532,<br><br>   Plaintiffs,<br><br>     v.<br><br>DAVID BERNHARDT, Secretary<br>U.S. Department of Interior<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>WILLIAM PERRY PENDLEY, Acting Director<br>Bureau of Land Management<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>KENT HOFFMAN, Deputy State Director<br>Bureau of Land Management's Utah State Office<br>440 West 200 South, Suite 500<br>Salt Lake City, Utah 84101,<br><br>   Defendants. | Civ. No. _____ |

## INTRODUCTION

1.       This lawsuit challenges a decision by the United States Department of the Interior's Bureau of Land Management ("BLM") to offer, sell, and issue an oil and gas lease located within public lands that are now federally protected as the Labyrinth Canyon Wilderness in southeastern Utah.

2.       BLM sold the lease at issue in this litigation (referred to herein as the "Twin Bridges Lease") to Twin Bridges Resources LLC ("Twin Bridges") at its online December 2018 competitive oil and gas lease sale.

3.       BLM then issued the lease to the company on March 1, 2019, after the John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act") was passed by both chambers of Congress and just days before the Dingell Act was signed into law. Pub. L. 116-9, 133 Stat 580 Mar. 12, 2019). Among its provisions, the Dingell Act designated the lands encompassing the Twin Bridges Lease as the Labyrinth Canyon Wilderness.

4.       The Labyrinth Canyon Wilderness is located in the San Rafael Desert region of southeastern Utah. This is one of the most sublime and least traveled areas of federal public lands in the nation. A stunning and remote redrock landscape, it lacks any sign of human development. The overwhelming silence is broken only by the wind or the call of a circling raven. There are no buildings or fixed lights to detract from the natural form of the cliffs, canyons, and plateaus.



(Labyrinth Canyon Wilderness. The Twin Bridges Lease is located in the area highlighted by the red box.)

5.      Now, despite congressional Wilderness designation, and with time quickly

running out on the Trump administration, BLM is racing to authorize development of this lease.

Based upon information and belief, the Office of the Secretary of the Department of the Interior

is directing BLM to expedite the so-called "Twin Bridges Bowknot Bend Helium Project" and

environmental assessment (referred to herein as the "Twin Bridges Drilling Project") which

involves the drilling of up to seven wells, road construction and widening, and installation of

several pipelines. Further, based on information and belief, Twin Bridges will immediately

commence surface disturbing activities once BLM authorizes the project, on or around

December 23. Initial roadbuilding and well pad construction may only take a day or two, but the

damage from these activities to lands and resources within or immediately adjacent to the newly-

designated Wilderness will be permanent.

3

6.      BLM violated the law when it issued the Twin Bridges Lease; a decision made possible only by Interior Department policies issued from Washington, D.C. intended to facilitate the President's "energy dominance" agenda. The construction and development activities—including, but not limited to, road construction, well pad construction, drilling, and production—will result in greenhouse gas ("GHG") emissions such as carbon dioxide, methane, and nitrous oxide. Moreover, activities occurring after production will also result in reasonably foreseeable GHG emissions through pipeline and infrastructure leaks. BLM failed to analyze and disclose the environmental impacts of issuing this lease for development, as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347. Instead, the agency prepared a Determination of NEPA Adequacy ("DNA") to support the sale and issuance of this lease, which is not a NEPA document, and does not contain NEPA analysis.

7.      Consequently, BLM did not analyze the direct, indirect, or cumulative impacts of the GHG emissions from its leasing decision to climate change. BLM's failure to take the required "hard look" at these impacts violated NEPA, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706; and the regulations and policies that implement these laws.

8.      Plaintiffs seek a declaration that BLM's decision to sell and issue the Twin Bridges Lease was "arbitrary, capricious, . . . or otherwise not in accordance with law," or that the decision was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Plaintiffs also seek injunctive relief and an order vacating the issuance of this lease.[1]

---

[1] Plaintiffs anticipate they will amend this Complaint to challenge development activities undertaken pursuant to the lease once BLM authorizes the Twin Bridges Drilling Project. As discussed above, this will likely occur on or around December 23, 2020.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 (federal question). This Court also can provide relief under 28 U.S.C. § 2201 (declaratory

judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 553, 702 and 706 (APA).

10.     The challenged agency actions are final and subject to judicial review pursuant to

5 U.S.C. §§ 702, 704, & 706.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants

David Bernhardt and, on information and belief, William Perry Pendley reside in Washington,

D.C. Additionally, Plaintiffs Southern Utah Wilderness Alliance, Natural Resources Defense

Council, and Center for Biological Diversity each maintain an office in Washington, D.C.

## PARTIES

12.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE (the "Alliance") is a

non-profit environmental membership organization dedicated to the preservation of outstanding

wilderness found throughout Utah, including in the San Rafael Desert and Labyrinth Canyon

Wilderness, and the management of wilderness-quality lands in their natural state for the benefit

of all Americans. The Alliance has long maintained an office in Washington, D.C. in light of the

fact that many agency decisions that affect public lands in Utah are actually made in the nation's

capital, where the Department of Interior is headquartered.. The Alliance has roughly 16,000

members across the nation, including members in Washington, D.C. The Alliance's members use

and enjoy federal public lands in and around the Labyrinth Canyon Wilderness for a variety of

purposes, including solitude, wildlife viewing, cultural appreciation, hiking and backcountry

recreation, and aesthetic appreciation. The Alliance promotes national recognition of the region's

unique character through research and public education and supports administrative and

legislative initiatives to permanently protect the federal public lands in Utah's wildest places. The Alliance brings this action on its own behalf and on behalf of its members.

13. Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a non-profit environmental membership organization that uses law, science, and the support of more than two million members and activists throughout the United States to protect wildlife and wild places and to ensure a safe and healthy environment for all living things. NRDC has long maintained an office in Washington, D.C. NRDC has a long-established history of working to protect public lands in Utah including the Labyrinth Canyon Wilderness and San Rafael Desert. NRDC members use and enjoy the public lands affected by BLM's decision to offer, sell and issue the Twin Bridges Lease. Such use and enjoyment has been and will continue to be adversely affected by BLM's decision. NRDC brings this action on its own behalf and on behalf of its members.

14. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit environmental organization with over 81,000 members. The Center maintains an office in Washington D.C. The Center uses science, policy, and law to advocate for the conservation and recovery of species on the brink of extinction and the habitats they need to survive. The Center has advocated and continues to advocate for increased protections for species and their habitats in Utah. The Center regularly comments on and protests oil and gas lease sale decisions by BLM, including the sale at issue here. The Center brings this action on its own behalf and on behalf of its members.

15. Plaintiff LIVING RIVERS is a non-profit environmental membership organization, based in Moab, Utah. Living Rivers promotes river restoration and seeks to revive natural habitat and the spirit of rivers by undoing the extensive damage done by dams,

diversions, and pollution on the Colorado Plateau. Living Rivers articulates a conservation ethic of achieving ecological restoration balanced with meeting human needs. Living Rivers regularly comments on and protests proposed BLM activities, including oil and gas lease sales including the sale at issue in this litigation. Living Rivers' members benefit from BLM's compliance with federal laws, including NEPA and the APA. Living Rivers brings this action on its own behalf and on behalf of its members.

16.     Plaintiffs are collectively referred to herein as "SUWA."

17.     SUWA members frequently visit and enjoy the Labyrinth Canyon Wilderness and San Rafael Desert region, the federal public lands at issue in this case. For decades, Mr. Ray Bloxham, an employee and member of the Alliance, as well as a member of NRDC, the Center, and Living Rivers has visited and enjoyed the public lands encompassed by and surrounding the Twin Bridges Lease. Specifically, Mr. Bloxham first visited this area in 1999 and has continued to do so dozens of times over the next twenty years. His most recent visit was in October 2020. Mr. Bloxham has plans to return to this area within the next six months, and intends to continue to visit the Labyrinth Canyon Wilderness and San Rafael Desert for years to come. Mr. Bloxham particularly enjoys the scenic views and largely untrammeled nature of the area, including its clean air, natural quiet, untrammeled vistas, and solitude. Mr. Bloxham also appreciates and enjoys the area's abundant wildlife and cultural and archaeological resources.

18.     SUWA's and its members' interests have been impaired and irreparably harmed, and continue to be affected and permanently harmed, by BLM's decisions to illegally offer, sell, and issue the Twin Bridges Lease. SUWA's members also have a substantial interest in ensuring that BLM complies with its procedural and substantive legal obligations and policies. SUWA's members benefit from BLM's compliance with federal laws, including NEPA. SUWA's

members expect that BLM will comply with all federal environmental laws including NEPA and its action forcing mechanisms in order to make informed decisions. SUWA's members' interests will also be affected and irreparably harmed by BLM's imminent approval of the Twin Bridges Drilling Project which will authorize permanent, irreparable harm to the federal public lands surrounding and immediately adjacent to the Labyrinth Canyon Wilderness. These development activities include, but are not limited to, clearing and construction of access roads and well pads, long-term if not permanent destruction of native soils and vegetation, noise and GHG emissions from vehicles and drill rigs, and industrialization of this remote area that will cause immediate, as well as sustained and prolonged damage to the environment. This will impair SUWA's members' use and enjoyment of this area, as well as adjacent public lands. The relief sought herein will redress these resulting harms.

19.     Defendant DAVID BERNHARDT is sued in his official capacity as Secretary of the United States Department of the Interior. In that capacity, he is responsible for ensuring that the agencies within the Department, including BLM, comply with all applicable laws and regulations, including NEPA and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787. Based on information and belief, direction to expedite approval of the Twin Bridges Drilling Project and development of the Twin Bridges Lease, is coming from Secretary Bernhardt himself or from his assigns at his direction. Secretary Bernhardt is ultimately responsible for the decision challenged here.

20.     Defendant WILLIAM PERRY PENDLEY is sued in his official capacity as de facto Acting Director of BLM.[2] In that capacity, he is responsible for managing publicly owned

---

[2] In 2020, the United States District Court for the District of Montana held that Mr. Pendley has been unlawfully serving as the agency's acting Director. *See Bullock v. U.S. Bureau of Land Mgmt.*, No. 4:20-cv-00062-BMM, ECF No. 25 (D. Mont. Sept. 25, 2020). In response, Mr.

lands and minerals in accordance with federal law. BLM is the agency that manages and leased the public lands in Utah at issue in this case. Acting Director Pendley is ultimately responsible for the decision challenged here.

21.     Defendant KENT HOFFMAN is sued in his official capacity as Deputy State Director, Division of Lands and Minerals, of BLM's Utah State Office. Deputy State Director Hoffman is responsible for overseeing Utah BLM's minerals program, including the oil and gas leasing decision at issue in this lawsuit. He signed the Decision Record ("DR") and Protest Decision denying the Alliance's protest of the leasing decision at issue. Deputy State Director Hoffman is ultimately responsible for the decision challenged here.

## LEGAL FRAMEWORK

### I.     Administrative Procedure Act

22.     The APA is a limited waiver of sovereign immunity and authorizes judicial review of agency action. It provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be[] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

### II.     National Environmental Policy Act

23.     NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two primary objectives: (1) to foster informed decisionmaking by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to

---

Pendley changed his job title, but not his duties. Nominally, Mr. Pendley is now BLM's "Deputy Director, Policy and Programs." However, Mr. Pendley in fact continues to serve—unlawfully— as BLM's Acting Director.

ensure that agencies inform the public that they have considered environmental concerns in their decisionmaking. *See id.* § 1500.1(c).

24.     NEPA achieves its purpose through action forcing procedures requiring agencies to take a hard look at environmental consequences of their actions and authorizations.

25.     The Council on Environmental Quality ("CEQ") regulations implementing NEPA[3] require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

26.     Federal agencies must comply with NEPA before there are "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C)(v); *see also* 40 C.F.R. §§ 1501.2, 1502.5(a). "In the fluid minerals program, this [irreversible] commitment occurs at the point of lease issuance." BLM, H-1624-1 Planning for Fluid Mineral Resources § I.B.2, at I-2 (Jan. 28, 2013).

27.     To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an environmental impact statement ("EIS") must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, and indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16.

---

[3] On September 14, 2020, the Council on Environmental Quality's revised NEPA regulations went into effect. *See generally* 85 Fed. Reg. 43304 (July 16, 2020). However, the Lease Sale DNA and accompanying DR were signed in February 2019 and are subject to the NEPA regulations in effect at that time.

28.     An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

29.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact. *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

30.     NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action to inform its decision about whether the agency must prepare an EIS because a proposed action significantly impacts the environment. *Id.* §§ 1502.16(a)-(b), 1508.7, 1508.8.

31.     Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8(a).

32.     Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

33.     Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

34.     NEPA allows an agency to "tier" a site-specific environmental analysis for a project to a broader EIS or EA for a program or plan under which the subsequent project is carried out. *Id.* § 1508.28. When an agency tiers a site-specific analysis to a broader EIS or EA,

11

"the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action." *Id.* § 1502.20.

35.      The Department of the Interior's NEPA regulations contemplate that BLM may consider whether existing EISs or EAs "adequately assess[] the environmental effects of the proposed action and reasonable alternatives." *Id.* § 46.120(c). If so, BLM may rely on a DNA to fulfill its NEPA obligations. *See id.* To rely on a DNA, an agency must evaluate "whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id.* BLM must explain why "any previously unanalyzed effects are not significant." *Id.* § 46.140(c). *See generally* 43 C.F.R. § 46.20 (explaining that Department of the Interior's NEPA regulations "supplement[], and is to be used in conjunction with, the CEQ regulations except where it is inconsistent with other statutory requirements.").

36.      DNAs are not NEPA documents, do not contain NEPA analysis, and are not expressly identified in CEQ's NEPA regulations. They are instead an administrative convenience created by the Department of the Interior. As such, BLM's decision to rely on a DNA must rise or fall solely on the analyses contained in the existing EISs and EAs, to which BLM is tiering in a particular instance.

### III.    Oil and Gas Development on Public Lands

37.      BLM manages onshore oil and gas development through a three-stage process: (1) land use planning, (2) leasing, and (3) approval of drilling proposals.

38.      First, pursuant to FLPMA, BLM develops a programmatic land use plan, known as a Resource Management Plan ("RMP"), specifying which lands will be open and which will

be closed to oil and gas leasing, and stipulations and conditions that may be placed on any such development. *See* 43 U.S.C. § 1712(a). An RMP does not mandate leasing any specific lands for oil and gas development.

39.     Second, BLM may offer leases for the development of specific tracts of public lands. *See* 43 C.F.R. § 1610.5-3; *id.* §§ 3120-3120.7-3. BLM has considerable discretion to determine which lands will be leased and is not obligated to offer any particular tract of public land that has been nominated by industry for leasing. The issuance of a surface occupancy lease gives the lessee a right to use some of the land for oil and gas development. *Id.* § 3101.1-2. Pursuant to a change made in the Dingell Act, an oil and gas lessee can drill for and develop helium and continue to hold an oil and gas lease without also producing paying quantities of oil and gas. Pub. L. 116-9, 133 Stat 580, Section 1109.

40.     Third, lessees must submit, and BLM must approve, applications for permits to drill before a lease may be developed. *Id.* § 3162.3-1(c). If a lease is issued without non-waivable no-surface occupancy stipulations, then BLM cannot outright prohibit surface development on that lease. *Id.* § 3101.1-2. A lessee must obtain a right-of-way or other appropriate authorization from BLM to conduct off-lease activities related to development of its lease, such a road or drill pad construction, 43 C.F.R. Part 2800, or drill through unleased lands. *Id.* Subpart 2920.

41.     A lessee intending to drill for and produce helium submits the same application to BLM for a permit to drill as for conventional oil and gas.

## FACTUAL BACKGROUND

### I.     The Climate Crisis

42.     Helium extraction entails the same processes as natural gas extraction. Though helium gas is not used for energy production, the gas exists in natural gas deposits and must be

extracted with, and separated from, other hydrocarbons. Moreover, an oil and gas lease—even if intended to be used for helium development—also allows a developer to extract oil and gas from the same lands. For these reasons, helium development can contribute to climate change in the same manner as energy development.

43.     The climate crisis has been intensively studied at global, national, and regional scales. The scientific evidence is clear and compelling—climate change is being fueled by the human-caused release of GHG emissions, in particular carbon dioxide and methane.

44.     Carbon dioxide is the leading cause of climate change and the most emitted GHG in the United States. According to a 2019 United States Environmental Protection Agency ("EPA") report, *Inventory of U.S. Greenhouse Gas Emissions and Sinks, 1990-2018*, carbon dioxide comprised 81.3 percent of total U.S. GHG emissions, or 5.424 billion metric tons.[4] "The largest source of [carbon dioxide], and of overall [GHG] emissions, was fossil fuel combustion." *Id.* at ES-9. "Within the United States, fossil fuel combustion accounted for 92.8 percent of [carbon dioxide] emissions in 2018." *Id.* at ES-11. Carbon dioxide emissions "from fossil fuel combustion has accounted for approximately 76 percent of [global warming potential]-weighted total U.S. gross emissions" since 1990." *Id.*

45.     The Intergovernmental Panel on Climate Change ("IPCC") is a Nobel Prize-winning scientific body within the United Nations that reviews and assesses the most recent scientific, technical, and socio-economic information relevant to our understanding of climate change. The IPCC has identified the heat-trapping effect—or global warming potential—of

---

[4] Report available at https://www.epa.gov/sites/production/files/2020-04/documents/us-ghg-inventory-2020-main-text.pdf (last visited Dec. 11, 2020).

methane as 36 times more potent than carbon dioxide over a 100-year period and 87 times more potent over a 20-year period.

46.    In a 2014 summary to policymakers, the IPCC discussed our understanding of human-caused climate change. Among other things, the IPCC stated:

- Human influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history. Recent climate changes have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic GHG emissions have increased since the preindustrial era, driven largely by economic and population growth, and are now higher than ever. This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years. Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20th century.

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans. Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems. Limiting climate change would require substantial and sustained reductions in GHG emissions which, together with adaptation, can limit climate change risks.

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios. It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions. The ocean will continue to warm and acidify, and global mean sea level will continue to rise.[5]

---

[5] IPCC AR5, *Summary for Policymakers* (March 2014), https://www.ipcc.ch/site/assets/uploads/2018/02/AR5_SYR_FINAL_SPM.pdf (last visited Dec. 11, 2020).

47.     More recently, the IPCC reaffirmed the severe impacts from the climate crisis and that rapid action away from fossil fuels is needed if we are to limit the impacts of climate change:

- Human activities are estimated to have caused approximately 1.0°C of global warming above pre-industrial levels, with a likely range of 0.8°C to 1.2°C. Global warming is likely to reach 1.5°C between 2030 and 2052 if it continues to increase at the current rate.

- Warming from anthropogenic emissions from the pre-industrial period to the present will persist for centuries to millennia and will continue to cause further long-term changes in the climate system, such as sea level rise, with associated impacts but these emissions alone are unlikely to cause global warming of 1.5°C.

- Climate models project robust differences in regional climate characteristics between present-day and global warming of 1.5°C, and between 1.5°C and 2°C. These differences include increases in: mean temperature in most land and ocean regions, hot extremes in most inhabited regions, heavy precipitation in several regions, and the probability of drought and precipitation deficits in some regions.

- Climate-related risks to health, livelihoods, food security, water supply, human security, and economic growth are projected to increase with global warming of 1.5°C and increase further with 2°C.

- Pathways limiting global warming to 1.5°C with no or limited overshoot would require rapid and far-reaching transitions in energy, land, urban and infrastructure (including transport and buildings), and industrial systems (high confidence). These systems transitions are unprecedented in terms of scale, but not necessarily in terms of speed, and imply deep emissions reductions in all sectors, a wide portfolio of mitigation options and a significant upscaling of investments in those options (medium confidence).[6]

48.     The western United States is particularly susceptible to the effects of climate change. The West is already experiencing increasing temperatures, prolonged droughts and catastrophic wildfires, with widespread impacts across its forests, wildlife, and human communities. Local economies, which are reliant on consistent precipitation and snowfall for

---

[6] SR 15, *Global Warming of 1.5°: Summary for Policy Makers* (Oct. 2018), https://report.ipcc.ch/sr15/pdf/sr15_spm_final.pdf (last visited Dec. 11, 2020).

surface and groundwater recharge, agriculture, recreation, and other uses, have also seen

significant adverse impacts.

49.     Additionally, the United States Global Change Research Program, a collaboration

of thirteen federal agencies including BLM, has prepared a series of National Climate

Assessments. With particular regard to the Southwest Region—which includes Utah—the Third

National Climate Assessment[7] provided the following overview:

- Snowpack and streamflow amounts are projected to decline in parts of the Southwest, decreasing surface water supply reliability for cities, agriculture, and ecosystems.

- The Southwest produces more than half of the nation's high-value specialty crops, which are irrigation-dependent and particularly vulnerable to extremes of moisture, cold, and heat. Reduced yields from increasing temperatures and increasing competition for scarce water supplies will displace jobs in some rural communities.

- Increased warming, drought, and insect outbreaks, all caused by or linked to climate change, have increased wildfires and impacts to people and ecosystems in the Southwest. Fire models project more wildfire and increased risks to communities across extensive areas.

- Projected regional temperature increases, combined with the way cities amplify heat, will pose increased threats and costs to public health in southwestern cities, which are home to more than 90% of the region's population. Disruptions to urban electricity and water supplies will exacerbate these health problems.

50.     The Fourth National Climate Assessment,[8] released in 2018, notes that

temperatures have already "increased across almost all of the Southwest region from 1901 to

2016," magnifying the impacts of drought and wildfire. For example, hotter temperatures have

already contributed to reductions in snowpack, amplifying drought conditions in the Colorado

River Basin. The Assessment also estimated that the area burned by wildfire across the western

---

[7] Available at https://nca2014.globalchange.gov/report/regions/southwest (last visited Dec. 11, 2020).
[8] Available at https://nca2018.globalchange.gov/ (last visited Dec. 11, 2020).

United States between 1984 and 2015 was twice what would have burned had climate change not occurred.

51.     Future projections for the region from the Fourth National Climate Assessment are even more alarming. Climate change threatens to lead to "to aridification (a potentially permanent change to a drier environment) in much of the Southwest, through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff." Climate change-related drought has already had massive impacts on food production and the agricultural economy of rural areas in the Southwest, and poses a long-term threat to regional food security.

*A.   BLM's Oil and Gas Leasing Program's Contribution to the Climate Crisis*

52.     BLM's oil and gas leasing program contributes vast amounts of GHG pollution to the atmosphere. BLM manages nearly 700 million acres of subsurface minerals, and estimates that about half of this federal mineral estate contains oil and/or natural gas. Currently, over 25 million acres of federally managed lands are leased for oil and gas development.

53.     According to the most recent data available from the United States Geological Survey ("USGS"), "[n]ationwide emissions from fossil fuels produced on Federal lands in 2014 were 1,279.0 million metric tons of carbon dioxide equivalent (MMT $CO_2$ Eq.) for [$CO_2$], 47.6 MMT CO2 Eq. for methane . . . and 5.5 MMT CO2 Eq. for nitrous oxide."[9] These emissions totals represent "23.7 percent of national emissions for $CO_2$, 7.3 percent for [methane], and 1.5 percent for [nitrous oxide] over" a ten year period.[10]

---

[9] USGS, Federal Lands Greenhouse Gas Emissions and Sequestration in the United States: Estimates for 2005-14 at 1 (2018), https://pubs.usgs.gov/sir/2018/5131/sir20185131.pdf (last visited Dec. 11, 2020).
[10] *Id.*

## B.  The Trump Administration's Attacks on Climate Change Science

54.     The Trump administration has repeatedly attacked, and continues to attack, the well-established science and data regarding the climate crisis and restricted federal agencies' abilities to research, disseminate, or rely on scientific data and information related to the climate crisis. The Union of Concerned Scientists ("Concerned Scientists") maintains a running list of these growing attacks on science.[11] This list includes, but is not limited to:

- Suppressing EPA scientist from commenting on stream and wetlands protections.[12]

- Delaying a USGS press release on climate change for months and then releasing a highly edited version that removed references to the study's main findings.[13]

- Restricting the public's access to climate change research.[14]

- Suppressing climate science from Congressional testimony.[15]

- Ordering federal agency scientists to conduct less accurate climate change science.[16]

---

[11] Available at https://www.ucsusa.org/center-science-and-democracy/attacks-on-science (last visited Dec. 11, 2020).

[12] *See* Concerned Scientists, *EPA Scientists Were Suppressed from Commenting on Stream and Wetland Protections*, https://www.ucsusa.org/resources/attacks-on-science/scientists-were-suppressed-commenting-stream-and-wetland-protections (March 6, 2020).

[13] *See* Concerned Scientists, *Climate Change Research Downplayed at the U.S. Geological Survey*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/climate-change-research-downplayed-us-geological (July 17, 2019).

[14] *See* Concerned Scientists, *USDA Restricts the Public's Access to Climate Change Research*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/usda-restricts-public-s-access-climate-change (July 12, 2019).

[15] *See* Concerned Scientists, *The White House Suppressed Science from Congressional Testimony*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/white-house-suppressed-science-congressional (June 19, 2019).

[16] *See* Concerned Scientists, *Trump Administration Orders Scientists to Conduct Less Accurate Climate Change Science*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/trump-administration-orders-scientists-conduct-less (June 3, 2019).

- Restricting the use of scientific information by federal agencies to inform policies.[17]

- Hiding (or burying) information and data that shows the harms of oil and gas exploration and development to climate change, ecosystems, and threatened and endangered species.[18]

- Rescinding policies that promote science-based decisionmaking.[19]

- Restricting scientists, including those at the Department of the Interior, from attending or presenting at scientific conferences.[20]

55.     President Trump himself has repeatedly questioned the clearly-established scientific link between GHG emissions and climate change. Mr. Trump has referred to the climate crisis as "mythical," "non-existent," an "expensive hoax," and "based on faulty science and manipulated data."[21]

---

[17] *See* Concerned Scientists, *The White House Restricts Science, Potentially Causing the Best Available Science to Disappear from Policymaking*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/white-house-restricts-science-potentially-causing (May 20, 2019).

[18] *See* Concerned Scientists, *Scientists' concerns on oil and gas operations in Alaska are buried by the Trump administration*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/scientists-concerns-oil-and-gas-operations-alaska (April 12, 2019); Concerned Scientists, *Trump Administration Hides Oil Exploration Harms to Polar Bears*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/trump-administration-hides-oil-exploration-harms (Feb. 13, 2019).

[19] *See* Concerned Scientists, *Trump Administration Rescinds Policy that Promoted Science-Based Decision-making for National Parks*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/trump-administration-rescinds-policy-promoted (July 27, 2018).

[20] *See* Concerned Scientists, *DOI Restricts Scientists From Attending Scientific Conferences*, https://www.ucsusa.org/center-science-and-democracy/attacks-on-science/doi-restricts-scientists-attending-conferences (July 10, 2018).

[21] Dylan Matthews, *Donald Trump has tweeted climate change skepticism 115 times. Here's all of it*, Vox, June 1, 2017, https://www.vox.com/policy-and-politics/2017/6/1/15726472/trump-tweets-global-warming-paris-climate-agreement. *See also* Peter Baker *et al.*, *As Trump Again Rejects Science, Biden Calls Him a "Climate Arsonist'*, NYTimes (Sept. 14, 2020), https://www.nytimes.com/2020/09/14/us/politics/trump-biden-climate-change-fires.html (explaining that President Trump, referring to climate science, stated that "I don't think science knows" what is actually happening).

56.     The Trump administration's de facto policy of climate change denial does not change reality or science.

57.     In keeping with President Trump's skepticism regarding the public health and environmental impacts of the climate crisis, his administration has explicitly pursued a policy of American "energy dominance," based on a dramatic expansion of fossil fuel leasing and development across the nation, at the expense of environmental protections and public participation in agency decisionmaking.

58.     Shortly after President Trump took office in January 2017, BLM's Washington, D.C. headquarters office implemented new policies to "streamline" oil and gas leasing to align with what the President termed his "energy dominance" agenda. Among other things, BLM took steps to: (1) eliminate opportunities for public engagement in the agency's leasing decisions, (2) eliminate the agency's obligation to fully analyze site-specific impacts of leasing and development, and (3) eliminate any additional identified "burdens" on oil and gas leasing and development.

59.     Since the start of 2017, BLM has dutifully implemented the Trump administration's energy dominance agenda. For example, the number of leases BLM has offered for sale in Utah increased more than seven-fold compared to a similar timeframe during the Obama administration.

II.     **BLM's Issuance of the Twin Bridges Lease**

    *A.   The Development of the San Rafael Desert Master Leasing Plan*

60.     Under Obama administration policies, the Twin Bridges Lease would never have been issued in its current form. In May 2010, BLM released Instruction Memorandum No. 2010-117, entitled "Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews"

(hereinafter, "IM 2010-117").[22] To better balance oil and gas leasing and development and environmental protection, IM 2010-117 introduced the Master Leasing Plan ("MLP") concept. *See id.* §§ II. The MLP concept recognized that in certain instances BLM's land use plans (*i.e.*, RMPs) were outdated and that "additional planning and analysis may be necessary prior to new oil and gas leasing because of changing circumstances, updated policies, and new information." *Id.* § II. In such instances, "the MLP process will be conducted *before* lease issuance and will reconsider RMP decisions pertaining to leasing." *Id.* (emphasis added). The preparation of an MLP was "required" when, among other factors, "[a]dditional analysis or information is needed to address likely resource or cumulative impacts" including to "air quality." *Id.* BLM could also use MLPs as a tool to impose "[r]equirements to reduce or capture emissions." *Id.*

61.     Shortly after the release of IM 2010-117, BLM determined that an MLP was "required" for the public lands in the San Rafael Desert, including the lands encompassing the now-designated Labyrinth Canyon Wilderness and the Twin Bridges Lease. *See* BLM, San Rafael Desert Master Leasing Plan Fact Sheet, Price and Richfield Field Offices, Utah at 1 (undated).[23] BLM stated that completion of the San Rafael Desert MLP was "warranted before new mineral leasing and development are allowed." BLM, San Rafael Desert Master Leasing Plan, Purpose and Need, at *2 (undated).[24]

62.     BLM did not offer any oil and gas leases for development in the San Rafael Desert MLP area from 2010-2016, "in order to preserve potential alternatives for" the eventual

---

[22] Available at https://www.blm.gov/policy/im-2010-117 (last visited Dec. 11, 2020).
[23] Available at https://eplanning.blm.gov/public_projects/nepa/61781/75437/83351/SRD_MLP_Fact_Sheet.docx (last visited Dec. 12, 2020).
[24] Available at https://eplanning.blm.gov/public_projects/nepa/61781/75437/83361/SRD_MLP_Purpose_and_Need.pdf (last visited Dec. 12, 2020).

MLP. Letter from Utah-BLM Acting State Director, to BLM Assistant Director, Energy, Minerals and Realty Management Directorate at 2 (Aug. 14, 2015).[25]

63.     In the fall of 2015, BLM began preparing the San Rafael Desert MLP. Among other things, the agency prepared a draft EA for the MLP, a preliminary alternatives document, a Reasonably Foreseeable Development Scenario, held public meetings, and invited public comments on the MLP proposal.[26] Importantly, under the MLP, BLM would not have allowed any surface development of the lands encompassing the Twin Bridges Lease. In every action alternative in the draft EA, the lands were either limited to "no surface occupancy" leasing, or closed to leasing altogether.

64.     After BLM abandoned the MLP process in 2017 to comply with the Trump administration's "energy dominance" agenda, the Alliance submitted a Freedom of Information Act ("FOIA") request regarding the San Rafael Desert MLP. That FOIA request resulted in the production of 2,016 documents, totaling 20,107 pages. These documents contain hundreds of statements regarding the need for the MLP, the lack of existing information and data, and demonstrate that for more than eighteen months BLM diligently worked toward completing the San Rafael Desert MLP.

       *B.  The Trump Administration Reverses Course on the San Rafael Desert MLP.*

65.     Two months after taking office President Trump issued Executive Order No. 13,783, entitled "Promoting Energy Independence and Economic Growth." *See generally* 82

---

[25] Available at https://suwa.org/wp-content/uploads/Updated-Utah-Master-Leasing-Plan-MLP-Strategy-8.14.15.pdf (last visited Dec. 14, 2020).

[26] The majority of this information is available at https://eplanning.blm.gov/eplanning-ui/project/61781/570 (last visited Dec. 11, 2020). The draft EA is available at https://suwa.org/wp-content/uploads/SanRafael_MLP_EA_Draft.pdf (last visited Dec. 14, 2020).

Fed. Reg. 16093 (March 28, 2017). This Executive Order required administrative agencies, including BLM, to "review all existing . . . orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas." *Id.*

66.     Soon thereafter, the Secretary of the Interior issued Secretarial Order No. 3354, entitled "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program." *See generally* Sec. of the Interior, Order No. 3354 (July 5, 2017).[27] This order directed BLM to "identify additional steps to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 3(b). It further required that BLM "identify any provisions in [its] existing policy and guidance documents that would impede BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

67.     In response to Executive Order 13,783 and Secretarial Order 3354, BLM's Washington, D.C. office issued Instruction Memorandum No. 2018-034, entitled "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (Jan. 31, 2018) [hereinafter, "IM 2018-34"].[28] IM 2018-34 replaced BLM's longstanding oil and gas leasing policy, IM 2010-117, and established the framework for how BLM would implement the Trump administration's energy dominance agenda. Among other things, IM 2018-34: (1) eliminated the MLP concept; (2) eliminated or significantly restricted opportunities for public involvement in oil and gas leasing decisions; and (3) encouraged BLM to rely on existing NEPA analyses rather

---

[27] Available at https://www.doi.gov/sites/doi.gov/files/uploads/doi-so-3354.pdf (last visited Dec. 11, 2020).
[28] Available at https://www.blm.gov/policy/im-2018-034 (last visited Dec. 11, 2020).

than prepare site-specific NEPA analysis in order to "streamline" oil and gas leasing and development. *See id.* §§ II, III.B.5, III.D.

68.     BLM did not prepare NEPA analysis or provide a reasoned explanation for why the MLP concept (including the San Rafael Desert MLP) was no longer required. Instead, citing to the aforementioned Executive Order and Secretarial Order, BLM stated only that "Master leasing Plans . . . have created duplicative layers of NEPA review. This policy, therefore, eliminates the use of MLPs." *Id.* § II.

69.     When rescinding its plan to complete the San Rafael Desert MLP, BLM stated only:

> The preparation of an Environmental Assessment associated with the San Rafael [Desert] Master Leasing Plan Amendment is no longer required, and the process is hereby terminated.

83 Fed. Reg. 32681, 32681 (July 13, 2018).

70.     With these perceived "burdens" on oil and gas leasing and development eliminated, BLM proceeded to offer hundreds of oil and gas leases in former-MLP areas, including the San Rafael Desert. BLM offered the Twin Bridges Lease at its December 2018 lease sale.

### C.  The December 2018 Lease Sale

71.     BLM prepared a DNA to offer the Twin Bridges Lease for sale and development at the agency's December 2018 Utah-BLM lease sale. *See generally* BLM, Determination of NEPA Adequacy, DOI-BLM-UT-G020-2018-0057-DNA, Price Field Office December 2018 Competitive Oil and Gas Lease Sale (Oct. 2018) (referred to herein as the "Lease Sale DNA").[29]

---

[29] Available at https://eplanning.blm.gov/public_projects/nepa/116617/166175/202487/2019-02-08_-_PFO_DNA_Final.pdf (last visited Dec. 14, 2020).

72.     The DNA relied on other, previously prepared NEPA documents—lease sale EAs prepared *for other public lands* in the state—for *all* direct, indirect, and cumulative impacts analysis. These prior NEPA documents did not analyze and disclose the impacts of offering the Twin Bridges Lease for development.

73.     Further, the leases at issue in the NEPA documents relied upon in the Lease Sale DNA were not the only leases offered by BLM for development. Rather, in line with the Trump administration's "energy dominance" agenda, over the past four years BLM has offered, sold, and issued numerous oil and gas leases across the West, including many in Utah. This includes hundreds of leases, covering hundreds of thousands of acres of public lands, including in the San Rafael Desert.

74.     During this same period of time, a Utah state agency—the Utah School and Institutional Trust Lands Administration ("SITLA")—offered and sold numerous oil and gas leases for development on state-owned lands in Utah, including near the Twin Bridges Lease. BLM is aware of SITLA's oil and gas leasing activity.

75.     The following map shows the leasing activity in the San Rafael Desert from 2016-2018:[30]

---

[30] The Twin Bridges Lease is shown in pink and indicated in the legend as "BLM – December 2018." The "BLM – September 2018" leases, shown in blue, were offered at the September 2018 lease sale and are all suspended, for the reasons discussed herein. The "BLM – Suspended Leases," shown in orange, were previously suspended as a result of other litigation.



76.     BLM did not analyze and disclose the cumulative impacts of offering the Twin Bridges Lease for development when viewed together with these other federal and state leasing decisions. This includes, but is not limited to, their cumulative impacts on GHG emissions and climate change, lands with wilderness characteristics, wildlife (including pollinators), water quality and quantity, viewsheds, soils, and soundscapes.

77.     BLM did not allow the public an opportunity to review and comment on the Lease Sale DNA. Instead, the agency posted the signed, final, DNA to its ePlanning project website and required the public to protest that leasing decision in a shortened ten-day period rather than

the usual thirty-day protest period, without providing a reasoned explanation for the highly truncated protest period.

78.     The Alliance and others protested the Lease Sale DNA. BLM denied that protest.

   D.  *BLM Is Forced to Suspend Certain Oil and Gas Leasing Decisions on Account
       of Its Failure to Fully Analyze GHG Emissions and Climate Change Impacts*

79.     On March 19, 2019, this Court issued a decision in *WildEarth Guardians v. Zinke* ("*WildEarth Guardians*"), 368 F. Supp. 3d 41 (March 19, 2019) (Contreras, J.). This Court held that BLM violated NEPA when it failed to fully analyze all reasonably foreseeable GHG emissions and climate change impacts of certain oil and gas leasing decisions for BLM-managed lands in Wyoming. Among other things, BLM failed to: (1) quantify GHG emissions of oil and gas leasing and development (including downstream GHG emissions), and (2) analyze the GHG emissions of all past, present, and reasonably foreseeable oil and gas leasing decisions for public lands across the United States. *See id.* at 67-78.

80.     The Court's decision in *WildEarth Guardians* has had broad ramifications across the country, with regard to oil and gas leasing and development. In response to *WildEarth Guardians*, BLM's Utah Office has recognized that it violated the law in numerous NEPA analyses regarding GHG emissions and climate change prepared to justify the sale hundreds of oil and gas leases. This includes the NEPA documents and analyses prepared for BLM's 2014, 2015, 2016, 2017, and 2018 lease sales in Utah including—importantly—the December 2018 lease sale at which the Twin Bridges Lease was sold.

81.     BLM has explained the facts surrounding its legally inadequate GHG emissions and climate change analysis for these leasing decisions (including the Lease Sale DNA) in the following manner:

Following the issuance of the court's [*WildEarth Guardians*] decision, Utah BLM reassessed the adequacy of the EAs, FONSIs, and a determination of NEPA adequacy (DNA) supporting the [lease sales at issue in that litigation], in light of the court's decision. Based on that assessment, the BLM concluded that voluntary remand for further analysis of GHG emissions and climate under [NEPA] was appropriate.[31]

. . .

Since the [*WildEarth Guardians*] decision was issued, various BLM oil and gas lease sales have been challenged (seven administrative appeals to the Interior Board of Land Appeals (IBLA) and three judicial challenges in federal district court). Each of these proceedings, involve challenges to the BLM's analysis of GHG emissions, similar to what was at issue in the [*WildEarth Guardians*] litigation. As a result, BLM Utah suspended 242 leases associated with the ensuing litigation.

Following the [*WildEarth Guardians*] litigation, the BLM determined that the GHG emissions and climate change analysis presented in the EAs associated with lease sales that occurred between 2014 through 2018 [in Utah], was similar to the NEPA analysis at issue in [that court decision]. As such, the BLM decided it was appropriate to suspend certain leases that were issued between 2014 and 2018 and which were also subject to one of the challenges listed above, while it prepared additional NEPA analysis for these resources. As a result, BLM Utah suspended 242 leases, while it prepared and completed this supplemental NEPA analysis for GHG emissions and climate change.

BLM, Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, Environmental Assessment, DOI-BLM-UT-0000-2021-0001-EA at 6 (Oct. 2020).[32]

82.     BLM has not finalized its "curative" NEPA analysis regarding GHG emissions and climate change for the leasing decisions discussed *supra*, including the December 2018 Lease Sale DNA. Nevertheless, BLM is poised to approve the Twin Bridges Drilling Project for

---

[31] This Court recently held that BLM's supplemental GHG analysis for the leases at issue in *WildEarth Guardians* decision was unlawful because BLM—once again—failed to analyze and disclose the cumulative GHG emissions and climate change impacts from its nationwide oil and gas leasing program. *See generally* WildEarth Guardians v. Bernhardt, --- F. Supp. 3d ---, 2020 WL 6701317 (D.D.C. Nov. 13, 2020) (Contreras, J.).

[32] Available at https://eplanning.blm.gov/public_projects/2002778/200390662/20027883/250034085/2020-10-08-DOI-BLM-UT-0000-2021-0001-EA%20GHG-15daypubliccomment.pdf (last visited Dec. 14, 2020).

that lease—based on the same faulty NEPA analysis that caused the agency to suspend hundreds

of other functionally indistinguishable leases.

### E.  The Twin Bridges Drilling Project

83.     BLM has prepared a draft environmental assessment in advance of approving

development on the Twin Bridges Lease. *See generally* BLM, Twin Bridges Bowknot Helium

Project Environmental Assessment, DOI-BLM-UT-G020-2020-0033-EA (hereinafter, "Twin

Bridges EA").[33]

84.     The Twin Bridges Drilling Project involves the drilling of up to seven wells,

construction of a drill pad, road construction and widening, and installation of several new

pipelines. In total, these activities will disturb approximately 43 acres of public lands

immediately adjacent to the Labyrinth Canyon Wilderness. Based on information and belief,

BLM has not completed the required "official survey" of "the portion of the boundary of the

Wilderness adjacent to the lease." BLM Manual 6340.1.6(C)(11)(d) (Management of Designated

Wilderness Areas). BLM acknowledges in the Twin Bridges EA that the company's activities

will result in long-term if not permanent damage to these public lands, including the destruction

of native vegetation and soils. Without conducting the required "official survey" BLM does not

know whether the project will unlawfully enter the Wilderness Area and cause unauthorized

damage.

85.     Based on information and belief, the Office of the Secretary of the Department of

the Interior is orchestrating BLM's approval of the project on or around December 23. At that

---

[33] Available at
https://eplanning.blm.gov/public_projects/2001542/200383490/20028429/250034631/DOI-
BLM-UT-G020-2020-0033-EA%20-%20Public%20Comment%20Period.pdf (last visited Dec.
14, 2020).

point, Twin Bridges or its contractor will already be on-site ready to immediately proceed with destructive surface disturbing operations. These operations are planned to continue throughout the Christmas holiday and weekend.

### FIRST CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze and Disclose Indirect Effects*
*of Oil and Gas Leasing and Development*

86.　　SUWA incorporates by reference all proceeding paragraphs.

87.　　NEPA requires BLM to take a "hard look" at the indirect effects of oil and gas leasing and development. *See* 40 C.F.R. 1508.8(b).

88.　　NEPA further requires that BLM in its analysis consider "[b]oth short- and long-term effects." *Id.* § 1508.27(a).

89.　　BLM failed to analyze reasonably foreseeable indirect GHG emissions and climate change impacts from offering the Twin Bridges Lease for development.

90.　　The Lease Sale DNA and DR violated NEPA's hard look mandate and were arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION
*Violation of NEPA: Failure to Analyze and Disclose Cumulative Impacts*
*of Oil and Gas Leasing and Development*

91.　　SUWA incorporates by reference all proceeding paragraphs.

92.　　NEPA requires BLM to take a "hard look" at all cumulative impacts of oil and gas leasing and development. *See* 40 C.F.R. § 1508.7.

93.　　To determine whether a proposed action will have a significant impact, BLM must consider, among other factors: "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts." *Id.* § 1508.27(b)(7). NEPA's

implementing regulations caution that "[s]ignificance cannot be avoided . . . by breaking it down into small component parts." *Id.*

94.     The Lease Sale DNA and DR did not analyze and disclose the cumulative impacts of BLM's leasing decision when viewed with past, present, and reasonably foreseeable oil and gas leasing decisions in Utah, the region, and nationwide. Instead, BLM unlawfully segmented its decision into a small component part, without considering the cumulative impact to GHG emissions and climate change.

95.     BLM's and SITLA's lease sales in Utah addressed herein constitute "past, present, [or] reasonably foreseeable future actions."

96.     BLM's failure to analyze the cumulative impacts of offering the Twin Bridges Lease for development violates NEPA's hard look mandate and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION
*Violation of the APA: Failure to Provide a Reasoned Explanation*
*Prior to Reversing Course on the San Rafael Desert MLP*

97.     SUWA incorporates by reference all proceeding paragraphs.

98.     Federal agencies are allowed to change their prior positions. However, when an agency reverses its prior position the APA requires the agency, at a minimum, "display awareness that it *is* changing positions" and provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009).

99.     BLM did not provide a "reasoned explanation" prior to reversing course on the San Rafael Desert MLP. From 2010 through 2016, BLM did not offer any oil and gas leases in that planning area while the agency collected and analyzed significant new information related to

"[a]ir quality, climate change, cultural resources, paleontological resources, recreation, visual resources, [dark] night skies, riparian resources, soil and water resources, vegetation, wildlife resources, special status species, special designations, and wilderness characteristics." 81 Fed. Reg. 31252, 31253 (May 18, 2016).

100.    During that time, BLM repeatedly stated that the MLP, and the need to collect and analyze this the new information, was "necessary" and "required" "prior to new leasing of oil and gas resources." *Id.*

101.    BLM made it at least to the half-way point in the San Rafael Desert MLP process, including, but not limited to, the preparation of a draft EA, preliminary alternatives document, public hearings, and thousands of pages of supporting documents. However, BLM abandoned the MLP concept, including the San Rafael Desert MLP, following the 2016 presidential election. The abrupt reversal, memorialized in IM 2018-034 and a related Federal Register notice, was not accompanied with a reasoned explanation.

102.    BLM's decision to reverse course is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

### FOURTH CAUSE OF ACTION
*Violation of NEPA: Failure to Prepare NEPA Analysis*
*Prior to Reversing Course on the San Rafael Desert MLP*

103.    SUWA incorporates by reference all proceeding paragraphs.

104.    NEPA is triggered when a federal agency engages in "any major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1508.18(a) (major federal actions "include new and continuing activities" and "new or revised agency rules, regulations, plans, policies, or procedures").

105.    Once triggered, an agency must comply with its NEPA obligations by preparing

one of the following NEPA documents: (1) an EIS, (2) an EA and accompanying FONSI-DR, or

(3) a "categorical exclusion" ("CX"). 40 C.F.R. §§ 1508.4, 1508.9, 1508.11.

106.    BLM did not prepare an EIS, EA, or CX prior to abandoning the MLP concept,

including the San Rafael Desert MLP. The decision to abandon the MLP concept opened

millions of acres of public lands across the West to new oil and gas leasing, including more than

half a million acres in the San Rafael Desert.

107.    The opening of the San Rafael Desert to new leasing has had, and will continue to

have, significant and irreversible impacts to human health and the environment. For example,

immediately following the decision to abandon the San Rafael Desert MLP process, BLM

offered more than 200,000 acres of land previously encompassed by the MLP for leasing and

development at its September 2018 lease sale, and BLM offered and issued the Twin Bridges

Lease at the agency's December 2018 sale. Moreover, BLM has received and is in the process of

approving proposals to develop leases offered at these sales, including on the Twin Bridges

Lease.

108.    BLM's failure to prepare NEPA any analysis prior to abandoning the San Rafael

Desert MLP was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law and made without observance of procedure required by law, in violation of the APA, 5

U.S.C. §§ 706(2)(A), (D), and also in violation of NEPA, 42 U.S.C. § 4332(2)(C), and its

implementing regulations, *see* 40 C.F.R. §§ 1508.4, 1508.9, 1508.11.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and

against Defendants and provide the following relief:

1.      Declare that Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law by issuing the Twin Bridges Lease;

2.      Declare that Defendants violated NEPA and acted arbitrarily, capriciously, and contrary to law when Defendants abandoned the San Rafael Desert MLP planning process without a reasoned explanation and without NEPA analysis;

3.      Declare unlawful and vacate IM 2018-034;

4.      Declare unlawful and vacate the leasing decision, Lease Sale DNA, and accompanying Decision Record at issue in this litigation;

5.      Set aside and vacate the Twin Bridges Lease;

6.      Enjoin Defendants from approving or otherwise taking action on any applications for permit to drill on the Twin Bridges Lease until Defendants have fully remedied these legal violations;

7.      Enjoin Defendants from offering, selling, or issuing new leases for oil and gas development on BLM managed public lands encompassed by the San Rafael Desert MLP until Defendants provide a reasoned explanation for their changed position regarding that MLP, and prepare the necessary NEPA analysis to support that new position;

8.      Award Plaintiffs the costs they have incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable provisions; and,

9.      Provide such other relief as the Court deems just and proper.

Respectfully submitted this 14th day of December, 2020.

_/s/ William S. Eubanks II_
William S. Eubanks II
DC Bar No. 987036

William N. Lawton
DC Bar No. 1046604

Eubanks  & Associates, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
(970) 703-6060
bill@eubankslegal.com
nick@eubankslegal.com

_Counsel for Plaintiffs Southern Utah_
_Wilderness Alliance, Center for_
_Biological Diversity and Living_
_Rivers_

Sharon Buccino
D.C. Bar No. 432073

Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-6868
sbuccino@nrdc.org

_Counsel for Plaintiff_
_Natural Resources Defense Council_