**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Southern Utah Wilderness Alliance, *et al.*, | |
| Plaintiffs, | |
| v. | Civ. No. 1:20-cv-03654-RC |
| David Bernhardt, *et al.*, | **HEARING REQUESTED** |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

LIST OF ACRONYMS .................................................................................................... vii

INTRODUCTION ............................................................................................................... 1

LEGAL BACKGROUND ................................................................................................... 3

    I.    OIL AND GAS LEASING ON PUBLIC LANDS ............................................. 3

    II.    NATIONAL ENVIRONMENTAL POLICY ACT ........................................... 4

FACTUAL BACKGROUND ............................................................................................... 7

    I.    DEVELOPMENT OF THE SAN RAFAEL DESERT MASTER LEASING PLAN ....... 7

    II.    THE TRUMP ADMINISTRATION'S "ENERGY DOMINANCE" AGENDA ............ 10

    III.    DECEMBER 2018 LEASE SALE .................................................................... 12

    IV.    THE "ENERGY DOMINANCE" AGENDA STUMBLES AND BACKFIRES ........... 16

    V.    THE IMMINENT TWIN BRIDGES PROJECT ................................................. 18

ARGUMENT ..................................................................................................................... 19

    I.    SUWA IS LIKELY TO SUCCEED ON THE MERITS OF ITS NEPA AND APA CLAIMS. ........................................................................................................... 20

        A.    BLM's Leasing Decision Violates NEPA ....................................................... 20

        B.    BLM Violated the APA When It Arbitrarily Abandoned the San Rafael Desert MLP. 24

    II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION. 28

        A.    The Twin Bridges Project Will Cause Irreparable Environmental Harm. ..................... 28

        B.    The Twin Bridges Project Will Cause Irreparable Aesthetic Harm. .............................. 35

    III.    THE BALANCE OF EQUITIES WEIGHS DECIDEDLY IN PLAINTIFFS' FAVOR. 36

    IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST. ...................................... 37

    V.    THE COURT SHOULD NOT REQUIRE A BOND, OR ALTERNATIVELY IMPOSE ONLY A MINIMAL BOND. .......................................................................... 39

CONCLUSION .................................................................................................................. 39

## **TABLE OF AUTHORITIES**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..................................... 31

*Am. Wild Horse Preserv. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)................... 26, 27

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987)........................................... 2, 29, 36

*Baltimore Gas and Elec. Co. v. Natural Res. Defense Council, Inc.*, 462 U.S. 87 (1983)....... 5, 20

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ............................................................. 4

*Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009) ..... 28, 38

*California v. Bernhardt*, --- F. Supp. 3d ---, 2020 WL 4001480 (N.D. Cal. July 15, 2020) ........ 26

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)................ 30, 33

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702 (GK), 1995 WL
    748246 (D.D.C. 1995)........................................................................................................... 38

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988)......................................................................... 4

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) .................................................................. 37, 39

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ......................................... 19

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)................................................ 24, 27

*Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332 (D.D.C. 2017) ...................................... 34

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska I*"), 381 F. Supp. 3d
    1127 (D. Alaska 2019) .......................................................................................................... 26

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska II*"), 463 F. Supp. 3d.
    1011 (D. Alaska 2020) ..................................................................................................... 26, 27

*Friends of Animals v. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53 (D.D.C. 2017) ....................... 6

*Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) ....................................................... 38

*Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156 (D.D.C. 2002) ............................ 38

*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004)......................................... 37

*Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018) .......... 26

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ...................................................... 4, 39

*Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983) .................................................................. 39

*Monumental Task Comm. v. Foxx*, 157 F. Supp. 3d 573 (E.D. La. 2016).................................... 31

*Muvvala v. Wolf*, No. 1:20-CV-02423 (CJN), 2020 WL 5748104 (D.D.C. Sept. 25, 2020)........ 19

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009)...................... 5

*Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ............................................. 39

*Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245 (D.D.C. 1977) ............................................. 37

*Natural Res. Def. Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988)............................................ 20

*Natural Res. Defense Council, Inc. v. U.S. Envtl. Prot. Agency*, 438 F. Supp. 3d 220 (S.D.N.Y 2020)........................................................................................................................................ 26

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147 (10th Cir. 2004).......................... 3

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010)............................................................................................................................ 37

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)....................................... 5, 20

*Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177 (N.D. Cal. 2009)............... 39

*Sierra Club v. Block*, 614 F. Supp. 488 (D.D.C. 1985) ............................................................. 39

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) ....................................................... 4, 5

*Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189 (D.C. Cir. 2017) ........................................ 21

*Sierra Club v. Watkins*, 808 F. Supp. 852 (D.D.C. 1991)........................................................ 29

*State of Cal. v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019).................... 26

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 453 U.S. 519 (1978)........... 5

*W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042 (D. Idaho 2020) ................................... 11

*WildEarth Guardians v. Bernhardt* ("*WildEarth Guardians II*"), No. 16-CV-1724 (RC), 2020 WL 6701317 (D.D.C. Nov. 13, 2020)....................................................................................... 23

*WildEarth Guardians v. Zinke* ("*WildEarth Guardians I*"), 368 F. Supp. 3d 41 (D.D.C 2019) .............................................................................................................................................. passim

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ........................................................... 19

*Wis. Gas Co.  v. Fed. Energy Reg. Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ...................... 33, 36

## Statutes

16 U.S.C. § 1131.......................................................................................................................... 2

42 U.S.C. § 4332..................................................................................................................... 5, 21

43 U.S.C. § 1701.......................................................................................................................... 3

43 U.S.C. § 1712.......................................................................................................................... 3

43 U.S.C. § 1732.......................................................................................................................... 3

## Regulations

40 C.F.R. § 1500.1 (2019) ......................................................................................... 4, 5

40 C.F.R. § 1501.4 (2019) ............................................................................................. 5

40 C.F.R. § 1502.20 (2019) ........................................................................................... 6

40 C.F.R. § 1508.13 (2019) ........................................................................................... 6

40 C.F.R. § 1508.28 (2019) ........................................................................................... 6

40 C.F.R. § 1508.7 (2019) ........................................................................................... 20

40 C.F.R. § 1508.8 (2019) ........................................................................................... 20

40 C.F.R. § 1508.9 (2019) ............................................................................................. 5

43 C.F.R. § 1601.0-5 ...................................................................................................... 3

43 C.F.R. § 3101.1-2 ...................................................................................................... 4

43 C.F.R. § 3120.1-2 ...................................................................................................... 3

43 C.F.R. § 3120.5-1 ...................................................................................................... 3

43 C.F.R. § 3120.5-2 ...................................................................................................... 3

43 C.F.R. § 3120.5-3 ...................................................................................................... 3

43 C.F.R. § 3162.3-1 ...................................................................................................... 4

43 C.F.R. § 46.120 ..................................................................................................... 6, 13

## Other Authorities

Executive Order 13783, "Promoting Energy Independence and Economic Growth" (Mar. 28,
2017) .............................................................................................. 10, 11, 25, 26

Instruction Memorandum No. 2010-117, "Oil and Gas Leasing Reform – Land Use Planning and
Lease Parcel Reviews" ............................................................................................ 7

Instruction Memorandum No. 2018-34, "Updating Oil and Gas Leasing Reform – Land Use
Planning and Lease Parcel Reviews" .......................................................... 11, 25, 26

John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. 116-9, 133 Stat 580
.............................................................................................................. 4, 13

Notice of Intent to Prepare a Master Leasing Plan, Amend the Resource Management Plans for
the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment,
Utah, 81 Fed. Reg. 31,252-02 (May 18, 2016) ................................................. 7, 27

Notice of Termination of the San Rafael Swell Master Leasing Plan, Utah, 83 Fed. Reg. 32,681-
01 (July 13, 2018) ........................................................................................... 12, 25

Secretarial Order No. 3354, "Supporting and Improving the Federal Onshore Oil and Gas
Leasing Program and Federal Solid Mineral Leasing Program" (July 5, 2017) ........... 11, 25, 26

Update to the Regulations Implementing the Procedural Provisions of the National
    Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020) ............................................... 4

**LIST OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| APD | Application for Permit to Drill |
| BLM | Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| DNA | Determination of NEPA Adequacy |
| DOI | Department of the Interior |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| FOIA | Freedom of Information Act |
| GHG | Greenhouse gas |
| IM | Instruction Memorandum |
| MLP | Master Leasing Plan |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| NSO | No-Surface-Occupancy |
| PFO | Price Field Office |
| RMP | Resource Management Plan |
| SLFO | Salt Lake Field Office |

# INTRODUCTION

Plaintiffs Southern Utah Wilderness Alliance, Natural Resources Defense Council, Center for Biological Diversity, and Living Rivers (collectively, "SUWA") hereby seek a temporary restraining order and preliminary injunction enjoining implementation of the so-called Twin Bridges Helium Development Project (hereinafter, the "Twin Bridges Project" or "Project"), a proposed helium development project targeting an unlawfully issued federal oil and gas lease (and a state lease) within the congressionally designated Labyrinth Canyon Wilderness. The Defendants, officials at the U.S. Department of the Interior and Bureau of Land Management (collectively, "BLM"), have been working in concert with Twin Bridges Resources LLC, the lessee, to fast-track the Project in the waning days of the Trump administration. BLM will soon decide whether to authorize one of two alternative plans for the Project, either of which will irreversibly industrialize one of the most remote, spectacular, and undeveloped locations in the United States. SUWA faces imminent harm—BLM plans to authorize the Project on or around December 23, 2020 so that Twin Bridges Resources can immediately begin surface-disturbing construction, work through the Christmas weekend unimpeded, and evade judicial review by quickly commencing their environmentally destructive activities.

SUWA seeks an injunction to preserve the status quo. Any helium underlying the lease has existed for geologic ages, and still will during the pendency of this case. But without an injunction, the Labyrinth Canyon Wilderness and equally remarkable public lands will be irreparably harmed within just weeks in a manner that cannot be meaningfully restored during our lifetimes. Regardless of which development alternative BLM approves, Twin Bridges Resources will soon widen and clear primitive roads extending deep into the Wilderness area, bulldoze and clear acres of land for a well pad, drill wells, and install gas processing

infrastructure and pipelines. This industrialization will occur a stone's throw from an area Congress recently preserved "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

BLM itself recognizes the irreparable harm the Twin Bridges Project will cause. *See* Part II, Argument, *infra*. The Project will destroy acres of sensitive desert soils and plants, as well as the values that led Congress to protect the area—naturalness, solitude, and a landscape "untrammeled by man, where man himself is a visitor who does not remain." *Id.* § 1131(c). This is precisely the type of damage the United States Supreme Court has held "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

SUWA meets each of the elements necessary for a temporary restraining order and preliminary injunction. First, SUWA is likely to succeed on the merits because, as BLM itself has recognized, the Twin Bridges lease was issued in violation of the National Environmental Policy Act ("NEPA") as well as this Court's order in *WildEarth Guardians v. Zinke* ("*WildEarth Guardians I*"), 368 F. Supp. 3d 41 (D.D.C. 2019). Also, BLM's abrupt about-face—its decision to offer leases like the Twin Bridges lease in an area that had been closed to such activities for years for required pre-leasing studies and planning—was arbitrary. Second, SUWA and its members will suffer imminent and irreparable environmental, recreational, and aesthetic harm if the exploration and development is not enjoined. Third, the balance of harms and the public interest both weigh heavily in favor of maintaining the status quo until the Court can review and resolve this case on the merits.

## LEGAL BACKGROUND

### I.     OIL AND GAS LEASING ON PUBLIC LANDS

BLM manages public lands pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, and authorizes mineral development on those lands pursuant to both FLPMA and the Mineral Leasing Act, 30 U.S.C. §§ 181-287. FLPMA broadly authorizes BLM to manage the use, occupancy, and development of public lands under principles of "multiple use and sustained yield" that balance development with environmental protection. 43 U.S.C. § 1701(a)(7)-(8); *see also id.* § 1732(b).

Under FLPMA, BLM must "develop, maintain, and, when appropriate, revise land use plans" for public lands. 43 U.S.C. § 1712(a). These land use plans—termed resource management plans, or RMPs—allocate resource uses within certain agency-identified planning areas. *See id.* § 1732(a) (the Secretary "shall manage the public lands . . . in accordance with the land use plans"); 43 C.F.R. § 1601.0-5(n) (RMPs generally establish "designation[s]"and "allowable resource uses").

To authorize oil and gas development under FLPMA, BLM makes at least three separate decisions. *See generally Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). First, BLM develops an RMP that allocates federal public lands for various uses, including which lands across the planning area may be open to oil and gas development and under what terms and conditions. 43 U.S.C. § 1712(a).

Second, BLM issues leases on specific parcels of land. *See generally* 43 C.F.R. §§ 3120.1-2, 3120.5-1 to -3 (describing BLM's lease sale procedures). If BLM issues leases without no-surface-occupancy ("NSO") stipulations (referred to as "non-NSO leases" or "surface-

occupancy leases"),[1] it thereafter lacks the authority to preclude surface disturbance on the leasehold. 43 C.F.R. § 3101.1-2; *see Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983). Thus, the sale of a non-NSO oil and gas lease is the point BLM engages in an irreversible and irretrievable commitment of resources.

Third, after a parcel has been sold, the lessee may submit and the BLM may approve an application for permit to drill ("APD"), which authorizes drilling and development of the lease parcel. 43 C.F.R. § 3162.3-1(c).[2] APDs may include or be accompanied by surface use plans of operations, right-of-way applications, and requests for authorizations which together detail proposed pipelines, roads, well pads, and other related facilities and activities. *Id.* § 3162.3-1(d). BLM's approval of an APD authorizes on-the-ground development.

## II.   NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1.[3] The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (citation omitted). The Supreme Court has

---

[1] NSO stipulations "prohibit lessees from occupying or using the surface of the leased land without further specific approval from the BLM." *Conner v. Burford*, 848 F.2d 1441, 1444 (9th Cir. 1988).

[2] Congress recently amended the Mineral Leasing Act to allow an oil and gas lessee to drill for and develop helium and continue to hold an oil and gas lease without also producing in paying quantities of oil and gas. *See* Pub. L. 116-9, 133 Stat 580, Section 1109.

[3] In the summer of 2020, the Council on Environmental Quality announced updates to the NEPA regulations in effect when BLM made the lease decision challenged here. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). The new regulations took effect on September 14, 2020, but do not apply retroactively to BLM's decision here. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Accordingly, SUWA cites throughout this Memorandum to the regulations in effect when BLM conducted the relevant NEPA analyses here, not the newly-promulgated regulations.

explained that NEPA has "twin aims," the first of which "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas and Elec. Co. v. Natural Res. Defense Council, Inc.*, 462 U.S. 87, 97 (1983). "[A]ssessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009) (quoting 42 U.S.C. § 4332(2)(C)(v); *see also Peterson*, 717 F.2d at 1415 (the agency violated NEPA "because it has sanctioned activities which have the potential for disturbing the environment without fully assessing the possible environmental consequences").

   "At its core, NEPA simply requires that federal agencies consider the environmental consequences of their actions." *WildEarth Guardians I*, 368 F. Supp. 3d 41 at 52. "Under NEPA, agency decisionmakers must identify and understand the environmental effects of proposed actions, and they must inform the public of those effects so that it may 'play a role in both the decisionmaking process and the implementation of the agency's decision.'" *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)) (internal alteration omitted)). Stated differently, NEPA was designed "to insure a fully informed and well-considered decision." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 453 U.S. 519, 558 (1978); *see also WildEarth Guardians I*, 368 F. Supp. 3d at 53 (NEPA is intended to "'foster excellent action' through informed decisionmaking") (quoting 40 C.F.R. § 1500.1(c)).

   Under NEPA, an agency must prepare a detailed environmental impact statement ("EIS") before undertaking any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the agency is unsure whether it needs to prepare an EIS, it instead may prepare an environmental assessment ("EA"). 40 C.F.R. §§ 1501.4, 1508.9.

An EA is a less comprehensive document than an EIS, but it must nonetheless analyze the effects of a proposed action and reasonable alternatives to the proposal. *Id.* § 1508.9(b) (requiring both effects analysis and alternatives analysis). Should an agency determine in the EA that significant effects may occur, it must prepare an EIS. *Id.* § 1508.9(a)(1). Otherwise, the agency proceeds to issue a Finding of No Significant Impact (FONSI) and Decision Record that signals the end of NEPA analysis for that action. *Id.* § 1508.13.

NEPA regulations encourage agencies to "tier" narrower environmental analyses to broader environmental analyses. 40 C.F.R. §§ 1502.20, 1508.28. Tiering allows agencies to analyze the broad effects of a proposed program or plan in a programmatic EIS, then incorporate that analysis by reference when examining later, site-specific proposals in a site-specific EIS or EA. *Id.* § 1508.28(a). Agencies can thus "concentrate on the issues specific to the subsequent action." *Id.* § 1502.20.

Tiering does not alter any of NEPA's procedural requirements. It "helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe." 40 C.F.R. § 1508.28(b). But an agency must still analyze the site-specific effects of development once those effects become reasonably foreseeable.

If an agency believes that existing NEPA documentation fully considers a proposed action, it may prepare a determination of NEPA adequacy ("DNA") to confirm or deny this assertion. *See Friends of Animals v. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 57 (D.D.C. 2017); 43 C.F.R. § 46.120(c). DNAs are not NEPA documents; rather, they are worksheets completed by agency staff to document their conclusions that existing NEPA analyses are sufficient. *See Friends of Animals*, 232 F. Supp. 3d at 57. If existing NEPA documents do not

fully analyze the impacts of or alternatives to a project, an agency must prepare a new NEPA document to comply with its NEPA obligations before issuing any decision.

## FACTUAL BACKGROUND

### I.    DEVELOPMENT OF THE SAN RAFAEL DESERT MASTER LEASING PLAN

In 2010, BLM issued Instruction Memorandum ("IM") No. 2010-117, "Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (hereinafter, "IM 2010-117") (attached as Ex. 1). IM 2010-117 introduced a host of measures designed to better balance oil and gas leasing and development and environmental protection. Among its provisions, IM 2010-117 introduced the Master Leasing Plan ("MLP") concept. *See id.* § II. MLPs, a type of land use plan amendment, were "a mechanism for completing the additional planning, analysis, and decision-making that may be necessary for areas meeting" established criteria. *Id.* If an area of public lands satisfied the criteria, then BLM was "required" to prepare an MLP. *Id.*

BLM determined that several MLPs were required across the West, including for 525,000 acres of public lands in the San Rafael Desert region—that is, the San Rafael Desert MLP area. *See generally* Notice of Intent to Prepare a Master Leasing Plan, Amend the Resource Management Plans for the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment, Utah, 81 Fed. Reg. 31,252-02, 31,252–54 (May 18, 2016). At that time, BLM explained "[t]he [San Rafael Desert] MLP process will provide additional planning and analysis for areas *prior to new leasing of oil and gas resources*." *Id.* at 31,253 (emphasis added). This planning process, when completed, would "provide a framework for determining which areas are appropriate for responsible oil and gas exploration and development." BLM,

News Release, *BLM initiates Master Leasing Plan Process for the San Rafael Desert* at *1 (May 18, 2016) (attached as Ex. 2).[4]

In its "fact sheet" prepared to explain the MLP process to the public, BLM explained that "MLPS are required in areas with sensitive resources, such as the San Rafael Desert." BLM, San Rafael Desert Master Leasing Plan, Fact Sheet at 1 (undated) ("MLP Fact Sheet") (attached as Ex. 3). BLM identified a host of issues that required additional analysis in this area including "air quality, climate change, cultural resources, night skies, paleontological resources, recreation, riparian resources, socioeconomics, soil and water resources, special status species, vegetation, visual resources, wildlife and fisheries, and wilderness characteristics." *Id.* According to BLM, this analysis had to be prepared "before new mineral leasing and development are allowed" in the San Rafael Desert. BLM, San Rafael Desert Master Leasing Plan, Purpose and Need, at *2 (undated) (attached as Ex. 4).

In 2015, BLM began preparing NEPA analysis for the San Rafael Desert MLP, which included the following:

- A comprehensive review of potential alternatives. BLM, San Rafael Desert Master Leasing Plan, Chapter 2—Alternatives (undated) (attached as Ex. 5);

- New and updated, lease stipulations and lease notices the agency determined should be applied to all new leases. BLM, San Rafael Desert Master Leasing Plan, Appendix B—Oil and Gas Stipulations and Lease Notices (undated) (attached as Ex. 6);

- New and updated "best management practices" for development activities in the MLP area. BLM, San Rafael Desert Master Leasing Plan, Appendix C—Best Management Practices (undated) (attached as Ex. 7); and

- The San Rafael Desert MLP reasonably foreseeable development scenario. BLM, Reasonably Foreseeable Development Scenario for Oil and Gas in the San Rafael

---

[4] Pin cites to the attached exhibits are either made to the page numbers originally labeled on the documents or, when an exhibit lacks native page numbers, to the sequential page number of the PDF exhibit. Pin cites in the latter instance (such as this citation) are denoted by an asterisk.

Desert Master Leasing Plan Area (Sept. 2016) ("San Rafael Desert MLP RFDS")
(attached as Ex. 8).

Based on this information, BLM prepared a draft EA totaling 400 pages. BLM, San

Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments / Draft

Environmental Assessment (May 2017) ("San Rafael Desert MLP EA") (attached as Ex. 9).[5]

BLM also explained that it had to prepare the MLP to address new information and

changed circumstances including "[a] cultural resources inventory, viewshed analysis, and

historic setting analysis for the Old Spanish National Historic Trail," "[v]isual resource

inventories for the Price and Richfield Field Offices," and the San Rafael Desert MLP

reasonably foreseeable development scenario, among other issues. San Rafael Desert MLP EA at

1-3 (Ex. 9). This new information had to be analyzed and disclosed in the EA "prior to new

leasing of oil and gas within the planning area." *Id.*

BLM invited public comments on the San Rafael Desert MLP and held public open house

meetings to help inform the public regarding the need for the MLP. It received hundreds of

public comments, including from the United States Environmental Protection Agency ("EPA")

and the National Park Service ("NPS"). EPA explained that BLM should analyze and disclose

impacts to air resources, groundwater resources, surface water resources, public drinking water

supply sources, wetlands, riparian areas and floodplains, and environmental justice, among other

issues—since such issues had not been adequately analyzed in BLM's prior NEPA documents

for this area. *See generally* EPA Letter to Jake Palma, BLM, *Re: San Rafael Desert Master*

---

[5] In each of these documents, BLM reconfirmed its long-standing position that the MLP was
"required" by law and that additional NEPA analysis was necessary *before* the agency could
offer new leases for development in the San Rafael Desert. *See, e.g.*, San Rafael Desert MLP EA
at 1-3 (Ex. 9) (describing "Need" for San Rafael Desert MLP: "In response to [the MLP] policy,
the State Director has determined that additional planning and analysis are warranted prior to
allowing new mineral leasing and development.").

*Leasing Plan, Resource Management Plan Amendment and National Environmental Policy Act Analysis Scoping Comments* (June 29, 2016) (attached as Ex.10).

NPS likewise expressed its support for the MLP and encouraged BLM to analyze air quality and air quality related values, dark night skies, viewsheds, soundscapes, and watersheds, among other resources. *See* NPS Letter to Jake Palma, BLM, *Scoping Comments on the Master Leasing Plan for the San Rafael Desert* (undated) (attached as Ex. 11). To ensure full consideration of these concerns in the MLP, BLM and NPS entered into a "memorandum of understanding" "for the purposes of preparing a[n RMP] amendment and its accompanying [EA] for the development of the San Rafael Desert Master Leasing Plan (MLP)." Memorandum of Understanding Between The Department of the Interior, Bureau of Land Management, Price and Richfield Field Offices and the National Park Service: Canyonlands National Park, Glen Canyon National Recreation Area, and Capitol Reef National Park at 1 (May 25, 2016) (attached as Ex. 12).

Importantly, from 2010 through mid-2017, while the MLP concept was in place, BLM did not offer a single oil and gas lease in the San Rafael Desert MLP. As explained by the BLM's Utah State Director in 2015: "BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans." BLM, Memorandum, *Updated Utah Master Leasing Plan (MLP) Strategy* at 2 (Aug. 14, 2015) (MLP Strategy Letter) (attached as Ex. 13).

## II.     THE TRUMP ADMINISTRATION'S "ENERGY DOMINANCE" AGENDA

Shortly after President Trump took office in January 2017, he issued Executive Order 13783, titled "Promoting Energy Independence and Economic Growth," in which he declared a new "energy dominance" agenda. 82 Fed. Reg. 16,093, 16,093 (Mar. 28, 2017). Executive Order

13783 required administrative agencies to "review all existing . . . orders, guidance documents, policies, and any other similar agency actions . . . that potentially burden the development or use of domestically produced energy resources, with particular attention to oil [and] natural gas." *Id.*

Soon after, then-Secretary of the Interior Ryan Zinke issued Secretarial Order No. 3354, "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program," to further the President's new energy agenda. Sec. of the Interior, Order No. 3354 (July 5, 2017) (attached as Ex. 14). Secretary Zinke's order required BLM to "identify any provisions in [its] existing policy and guidance documents that would impede BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

In response to Executive Order 13783 and Secretarial Order 3354, BLM's headquarters office in Washington, D.C. issued new nationwide policies to "streamline" oil and gas leasing and development. Specifically, BLM issued IM No. 2018-34 (hereinafter, "IM 2018-34"), entitled "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (Jan. 31, 2018) (attached as Ex. 15). IM 2018-34 replaced BLM's longstanding oil and gas leasing policy and established a framework for how BLM would achieve "energy dominance." Most of the changes involved eliminating or curtailing environmental review, oversight, and public involvement.

Among other things, IM 2018-34 directed BLM to forgo its obligation to fully analyze site-specific impacts of leasing and development under NEPA, and instead encouraged agency staff to look for opportunities to rely on pre-existing NEPA analyses. *See id.* § III.D (Ex. 15).[6]

---

[6] Significant portions of IM 2018-34 have been held to be unlawful. *See, e.g.*, *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1089 (D. Idaho 2020) (enjoining the BLM from relying on four sections of IM 2018-34).

The IM also scrapped BLM's development of the MLP process, which included finalization of the San Rafael Desert MLP. Although these actions marked an abrupt reverse course in agency policy and practice, BLM did not provide any reasoned explanation for why the MLP concept (including the San Rafael Desert MLP) was no longer required. Instead, citing to the aforementioned Trump Executive Order and Zinke Secretarial Order, BLM stated in the IM only that "Master Leasing Plans . . . have created duplicative layers of NEPA review. This policy, therefore, eliminates the use of MLPs." *Id.* § II. When BLM specifically ended the San Rafael Desert MLP process, it gave only the following perfunctory explanation: "The preparation of an Environmental Assessment associated with the San Rafael [Desert] Master Leasing Plan Amendment is no longer required, and the process is hereby terminated." Notice of Termination of the San Rafael Swell Master Leasing Plan, Utah, 83 Fed. Reg. 32,681-01, 32,681 (July 13, 2018).

With these perceived "burdens" on oil and gas leasing and development eliminated, BLM proceeded to offer hundreds of oil and gas leases across the West for development, including the Twin Bridges lease in what is now the Labyrinth Canyon Wilderness.

### III.    DECEMBER 2018 LEASE SALE

As explained above, the Trump administration's energy dominance agenda requires BLM to offer oil and gas leases with as little analysis as possible, as quickly as possible, and with as little public participation as possible. BLM-Utah's December 2018 lease sale typified this approach in two ways.

First, BLM did not prepare site-specific NEPA analysis prior to selling the Twin Bridges lease at the December 2018 lease sale. Instead, BLM completed a DNA. *See generally* BLM, Determination of NEPA Adequacy, DOI-BLM-UT-G020-2018-0057-DNA, Price Field Office

December 2018 Competitive Oil and Gas Lease Sale (Oct. 2018) ("Lease Sale DNA") (attached as Ex. 16).

As noted *supra*, a DNA is not a NEPA document and does not contain NEPA analysis. *See* 43 C.F.R. § 46.120(c). Instead, a decision issued using a DNA must rely entirely on preexisting NEPA documents to analyze *all* direct, indirect, and cumulative impacts, and to evaluate reasonable alternatives to the proposed action. *See id.* Here, the Lease Sale DNA relied on a high-level programmatic land use plan and NEPA analyses prepared by BLM for *other* lease sales that encompassed *different* public lands in Utah and different resource conflicts. Specifically, the DNA relies on:

- The 2008 resource management plan prepared for the BLM's Price field office ("Price RMP") (excerpts attached as Ex. 17);

- An EA prepared for BLM's November 2015 lease sale ("November 2015 Lease Sale EA") (excerpts attached as Ex. 18);

- An EA prepared for BLM's September 2018 lease sale (Price field office) ("PFO September 2018 Lease Sale EA") (excerpts attached as Ex. 19); and

- An EA prepared for BLM's September 2018 lease sale (Salt Lake field office) ("SLFO September 2018 Lease Sale EA") (excerpts attached as Ex. 20).

*See* Lease Sale DNA § C (Ex. 16) (citing these documents as the analyses that "cover the proposed action").

Second, BLM sold the Twin Bridges lease at the December 2018 lease sale but, because new oil and gas leasing is prohibited in designated Wilderness areas, 43 C.F.R. § 3100.0-3(a)(2)(xi), it had to race ahead and issue the lease before the President signed the John D. Dingell, Jr. Conservation, Management, and Recreation Act, which created the Labyrinth Canyon Wilderness, into law. Pub. L. 116-9, 133 Stat 580, §1231(a)(7). BLM issued the lease to the company with a March 1, 2019 effective date, *after* the Dingell Act was passed by both

13

chambers of Congress and just days before the President signed the Act into law on March 12, 2019.



Labyrinth Canyon Wilderness. The lease and development area are located in the area highlighted by the red box.

Labyrinth Canyon is one of the most remote, wild, and rugged landscapes in the nation. When BLM inventoried the area's wilderness characteristics in 1999, it wrote that the now-designated lands are "wild, remote, expansive, and rugged." BLM, Utah Wilderness Inventory at 79 (1999) (attached as Ex. 21). "There are interesting geologic features, rugged and varied terrain, extensive vistas, hidden and remote grottos, incised canyons, river floating opportunities, numerous cultural sites, a number of trails, and opportunities to climb exposed rock faces." *Id.*



This map depicts the location of the Twin Bridges lease in the Labyrinth Canyon wilderness, as well as the company's state leases. Twin Bridges intends to develop its leases from the same drilling pad.



The Labyrinth Canyon Wilderness.

## IV.    THE "ENERGY DOMINANCE" AGENDA STUMBLES AND BACKFIRES

On March 19, 2019, this Court issued its decision in *WildEarth Guardians I*, in which it held that BLM violated NEPA when it failed to fully analyze all reasonably foreseeable greenhouse gas ("GHG") emissions and climate change impacts from certain oil and gas leases in Wyoming. 368 F. Supp. 3d at 67–78. Among other things, BLM failed to: (1) quantify downstream GHG emissions from oil and gas leasing and development, and (2) analyze the GHG emissions of all past, present, and reasonably foreseeable oil and gas leasing decisions for public lands across the United States. *See id.*

The Court's *WildEarth Guardians I* decision has important ramifications for oil and gas leasing across the West. Following that decision, BLM conceded that the NEPA analyses it prepared for hundreds of recently issued, similarly situated oil and gas leases sold in Utah were insufficient with regard to GHG emissions and climate change. *See infra.* The agency has voluntarily suspended more than 240 leases while it attempts to cure these deficiencies, including

other leases sold and issued at the December 2018 lease sale that relied on the same Lease Sale

DNA, *but not the Twin Bridges lease*.

BLM is in the process of preparing—but has not finalized—a new NEPA analysis for the

hundreds of leases in Utah that suffer from these flaws. BLM hopes the new NEPA analyses will

cure the deficiencies recognized by this Court, and has explained the situation as follows:

> Following the issuance of the court's [*WildEarth Guardians I*]
> decision, Utah BLM reassessed the adequacy of the EAs, FONSIs,
> and a determination of NEPA adequacy (DNA) supporting the
> [lease sales at issue in that litigation], in light of the court's decision.
> Based on that assessment, the BLM concluded that voluntary
> remand for further analysis of GHG emissions and climate under
> [NEPA] was appropriate.
>
> . . .
>
> Since the [*WildEarth Guardians I*] decision was issued, various
> BLM oil and gas lease sales have been challenged (seven
> administrative appeals to the Interior Board of Land Appeals
> (IBLA) and three judicial challenges in federal district court). Each
> of these proceedings, involve challenges to the BLM's analysis of
> GHG emissions, similar to what was at issue in the [*WildEarth
> Guardians*] litigation. As a result, BLM Utah suspended 242 leases
> associated with the ensuing litigation.
>
> Following the [*WildEarth Guardians I*] litigation, the BLM
> determined that the GHG emissions and climate change analysis
> presented in the EAs associated with lease sales that occurred
> between 2014 through 2018 [in Utah], was similar to the NEPA
> analysis at issue in [*WildEarth Guardians I*]. As such, the BLM
> decided it was appropriate to suspend certain leases that were issued
> between 2014 and 2018 and which were also subject to one of the
> challenges listed above, while it prepared additional NEPA analysis
> for these resources.

BLM, Draft Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas

Leasing in Utah, Environmental Assessment, DOI-BLM-UT-0000-2021-0001-EA at 6 (Oct.

2020) (Supplemental Leasing Analysis EA) (attached as Ex. 22).

In sum, BLM has conceded that the NEPA analysis it relied on to issue the Twin Bridges lease is deficient. *See id.* App. D, at 73, tbl. 20 (Ex. 22) (listing the Price Field Office December 2018 lease sale—the sale at issue—among the sales being reanalyzed by the agency). However, BLM is poised to approve the Twin Bridges project *before* completing the curative NEPA analysis it began in direct response to this Court's *WildEarth Guardians I* decision.

## V.   THE IMMINENT TWIN BRIDGES PROJECT

BLM is racing at a breakneck pace to approve surface development targeting the Twin Bridges lease and a separate state lease on the eve of the holiday season and during a renewed nationwide surge of the COVID-19 health pandemic. At this moment, BLM is deciding whether to approve one of two development plans, which vary by location of the well pad. Regardless of which alternative is selected, the Twin Bridges Drilling Project involves the drilling of up to seven wells, construction of a drill pad, road construction and widening, and installation of several new pipelines. In addition to considering granting approval to drill the Twin Bridges lease, BLM is also evaluating granting several rights of way and authorizations to the company to construct these and other additional improvements.

Under one plan, analyzed as Alternative A in BLM's Twin Bridges Bowknot Helium Project Draft EA, the well pad would sit at the end of a cherry-stemmed road over two miles within the Wilderness boundary, and cause over 43 acres of surface disturbance. *See* BLM, Twin Bridges Bowknot Helium Project, Emery County, Utah, DOI-BLM-UT-G020-2020-0033-EA, at 9-10, tbl. 2-1 (October 2020) ("Twin Bridges EA") (attached as Ex. 23). Under Alternative B,

the well pad would actually be constructed within the Wilderness boundary, and cause over fifty acres of surface disturbance. *Id.* at 10, tbl. 2-1.[7]

SUWA has learned that BLM intends to sign the authorization for one of the two alternatives on or around December 23, 2020—which government counsel has confirmed—and that Twin Bridges Resources will begin construction immediately thereafter or the next day, causing immediate and irreversible harm to the environment and Plaintiffs' interests.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). As demonstrated below, all four factors weigh in favor of granting a temporary restraining order and preliminary injunction to maintain the status quo while the Court resolves the merits of the case.[8]

---

[7] Under either alternative, regardless of whether Twin Bridges first drills wells to target the state or federal lease, the road construction, clearing of the drill pad, and other operational activities are virtually identical; the only difference is the precise location of the drill rig on the recently cleared pad and the subsurface resources the drill bore ultimately targets.

[8] The viability of the D.C. Circuit's "sliding-scale test" to evaluate the injunction factors, whereby a strong showing of likelihood of success on the merits can make up for a weaker showing of irreparable harm, is uncertain following the Supreme Court's decision in *Winter*. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring). Nevertheless, the D.C. Circuit has not overruled the sliding-scale test, and it remains the appropriate standard. *See, e.g.*, *Muvvala v. Wolf*, No. 1:20-CV-02423 (CJN), 2020 WL 5748104, at *2 n.3 (D.D.C. Sept. 25, 2020) ("[B]ecause the Court of Appeals has yet to explicitly overrule the sliding-scale framework, the Court must continue to utilize it."). As explained *infra*, the Court need not address the sliding scale test because SUWA has established that each of the four factors weighs in favor of emergency injunctive relief.

## I.   SUWA IS LIKELY TO SUCCEED ON THE MERITS OF ITS NEPA AND APA CLAIMS.

SUWA is likely to prevail on the merits. First, BLM has already recognized that the Lease Sale DNA—the document prepared to sell the Twin Bridges lease and which is challenged here—does not comply with NEPA. BLM issued the lease without quantifying foreseeable GHG emissions, or analyzing the cumulative effects of issuing the lease together with other reasonably foreseeable oil and gas development. BLM has suspended other leases that relied on that document for these very reasons, but inexplicably not the Twin Bridges lease.

Second, BLM unlawfully and without adequate explanation reversed course and terminated both its established MLP policy and the San Rafael Desert MLP and accompanying NEPA analysis, which included detailed climate change analysis. It did so despite determining completion of the analysis to be legally necessary before offering new leases in this exact area.

### A.  BLM's Leasing Decision Violates NEPA.

NEPA imposes "action-forcing procedures ... requir[ing] that agencies take a hard look at environmental consequences." *Robertson*, 490 U.S.at 350 (internal citations omitted).The "hard look" requirement ensures that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec*, 462 U.S. at 98; *see also Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988) (the agency's "hard look" at environmental impacts must be "fully informed" and "well-considered"). To comply with the requirement, agencies must analyze the direct, indirect, and cumulative effects of its actions and authorizations. 40 C.F.R. §§ 1508.7, 1508.8.

"A hard look requires that BLM assess the 'reasonably foreseeable' impacts of a proposed action before an 'irretrievable commitment of resources' is made that would trigger those impacts." *WildEarth Guardians I*, 368 F. Supp. 3d at 64 (quoting 42 U.S.C. §

4332(2)(C)(v)) (alteration marks omitted). "In determining what effects are 'reasonably foreseeable,' an agency must engage in 'reasonable forecasting and speculation,' with *reasonable* being the operative word." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198 (D.C. Cir. 2017) (quoting *Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1310 (D.C. Cir. 2014)). While an "agency 'need not foresee the unforeseeable, [] by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting.'" *Id.* (quotation marks and citation omitted).

With regard to oil and gas leasing decisions, BLM must analyze the direct, indirect, and cumulative effects of GHG emissions from development.[9] This Court has explained that "because BLM cannot fully prevent GHG emissions from oil and gas drilling once leases have been issued, BLM [is] required to assess the reasonably foreseeable impacts of drilling, at the leasing stage." *WildEarth Guardians I*, 368 F. Supp. 3d at 64. BLM must quantify drilling-related GHG emissions in the aggregate. *Id.* at 67–71. BLM must also analyze and disclose downstream (*i.e.*, "indirect") GHG emissions, *id.* at 72–75, and the cumulative GHG emissions and climate change impacts of the agency's oil and gas leasing program across the region and nation. *Id.* at 75–77. NEPA requires

> that BLM quantify the emissions from each leasing decision—past, present, or reasonably foreseeable—and compare those emissions to regional and national emissions, setting forth with reasonable specificity the cumulative effect of the leasing decisions at issue. To the extent other BLM actions in the region—such as other lease sales—are reasonably foreseeable when an EA is issued, BLM must discuss them as well. . . . Although BLM may determine that each

---

[9] The development of helium from the Twin Bridges lease will result in quantifiable GHG emissions at the drilling and production stages. Twin Bridges EA at 11-20 (Ex. 23). Moreover, Twin Bridges is not precluded from producing oil or natural gas from its lease now or at some later stage.

> lease sale individually has a de minimis impact on climate change, the agency must also consider the cumulative impact of GHG emissions generated by past, present, or reasonably foreseeable BLM lease sales in the region and nation.

*Id.* at 77.

Here, before issuing the Twin Bridges lease, BLM did not quantify foreseeable GHG emissions from the lease (or explain why it was impossible to do so), nor did it analyze and disclose past, present, and reasonably foreseeable oil and gas leasing in Utah, the region, or nation. Instead, as explained above, BLM used the Lease Sale DNA to issue the Twin Bridges lease, which in turn relied on three previous leasing EAs: the November 2015 Lease Sale EA (Ex. 18), PFO September 2018 Lease Sale EA (Ex. 19), and SLFO September 2018 Lease Sale EA (Ex. 20).[10] All three EAs contained similar analysis of GHG emissions and climate change, which is wholly insufficient under *WildEarth Guardians I*.

For instance, in the PFO September 2018 Lease Sale EA,[11] BLM's indirect effects "analysis" for GHG emissions and climate change is nothing more than a few statements that

---

[10] The Lease Sale DNA (Ex. 16) also relied on the Price RMP, BLM's governing land use plan for the area. The Price RMP is a programmatic document that does not contain climate change analysis, nor any *site-specific* analysis pertaining to any particular lease. Instead, in that document, BLM concluded that such analysis is not possible due to "[t]he lack of scientific tools designed to predict climate change on regional or local scales" and thus "BLM does not have an established mechanism to accurately predict the effect of resource management-level decisions from this planning effort on global climate change." Price RMP at 4-5 to 4-6 (Ex. 17). In *WildEarth Guardians I*, this Court confronted and rejected BLM's reliance on similar RMPs. 368 F. Supp. 3d at 77.

[11] The GHG emissions and climate change analysis in the other two leasing EAs relied on by BLM in the Lease Sale DNA contain nearly identical language to that described in the PFO September 2018 Lease Sale EA. *See* SLFO September 2018 Lease Sale EA at 37-41, 55-56 (Ex. 19) (providing nearly identical statements); November 2015 Lease Sale EA at 39-42, 51-52 (Ex. 20) (briefly referring to GHG emissions and climate change when discussing the potential air quality impacts from leasing and development—there is no standalone GHG emissions and climate change section in the EA). To avoid repetition, SUWA provides detailed references to only the one EA.

such analysis cannot be performed at the lease sale stage. *See* PFO September 2018 Lease Sale

EA at 48-50 (Ex. 18). According to BLM, "[a]ccurate statements of GHG emissions are *not*

*possible* at the leasing stage since emissions are dependent on factors. . . . [that] are not known at

the leasing stage." *Id.* at 49 (emphasis added). This Court has rejected the same argument,

indicating that SUWA is at least *likely* to succeed on the merits here. *See WildEarth Guardians I*,

368 F. Supp. 3d at 68 (rejecting the argument that "quantifying GHG emissions at the leasing

stage would be overly speculative").

      For cumulative impacts analysis, BLM did not list a single other past, present, or

reasonably foreseeable leasing decision, let alone analyze and disclose the cumulative impacts of

the agency's leasing program. Instead, BLM alleged that "given the lack of adequate analysis

methods it is *not possible* to identify specific local, regional, or global climate change impacts

based on potential GHG emissions from any specific project's incremental contributions to the

global GHG burden." PFO September 2018 Lease Sale EA at 61 (Ex. 18) (emphasis added).

Again, this Court has twice rejected this same argument. *See WildEarth Guardians I*, 368 F.

Supp. 3d at 77 ("Without access to a data-driven comparison of GHG emissions from the leased

parcels to regional and national GHG emissions, the public and agency decisionmakers had no

context for the EAs' conclusions that GHG emissions from the leased parcels would represent

only an 'incremental' contribution to climate change."); *WildEarth Guardians v. Bernhardt*

("*WildEarth Guardians II*"), No. 16-CV-1724 (RC), 2020 WL 6701317, at *9 (D.D.C. Nov. 13,

2020) ("Failing to analyze the lease sales in the region, and other reasonably foreseeable lease

sales in the country, renders BLM's cumulative impact analysis deficient").[12] The Lease Sale

---

[12] BLM has not yet finalized its Supplemental Leasing Analysis EA and thus this case is not yet
at the point in which this Court addressed BLM's supplemental analysis in *WildEarth Guardians
II*.

DNA relies entirely on this and the other similarly deficient GHG emissions and climate change analysis for the December 2018 Lease Sale. *See* Lease Sale DNA § C (Ex. 16) (listing the three earlier EAs and Price RMP as the only documents that allegedly "cover the proposed action").

Importantly, BLM itself recognizes that the analysis underlying the Lease Sale DNA is deficient. As described above, BLM has suspended hundreds of oil and gas leases in Utah while it attempts to come into compliance with this Court's decision. This includes other leases sold and issued at the December 2018 lease sale. *See* Supplemental Leasing Analysis EA at 6 (Ex. 22). The Twin Bridges Lease is the *only* challenged lease from that sale BLM has not suspended, despite the agency itself acknowledging that the NEPA analysis underlying its issuance was deficient with regards to GHG emissions and climate change.

For these reasons, SUWA is likely—if not certain—to prevail on the merits of its claim that BLM's decision to sell the Twin Bridges lease for oil and gas development violated NEPA.

## B.  BLM Violated the APA When It Arbitrarily Abandoned the San Rafael Desert MLP.

BLM's leasing decision is arbitrary and capricious for an additional reason. The agency abandoned the San Rafael Desert MLP without justification, and without completing the environmental analysis the agency itself stated was necessary before it offered and sold any new oil and gas leases on the public lands in the MLP area, including the Twin Bridges lease.

"Congress passed the Administrative Procedure Act (APA) to ensure that agencies follow constraints even as they exercise their powers. One of these constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009). Here, BLM failed to provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. As discussed *supra*, BLM

determined that an MLP was "required" for the San Rafael Desert, including the public lands

encompassing the Labyrinth Canyon Wilderness and the Twin Bridges lease, *before* any new

leases could be sold. MLP Fact Sheet at 1 (Ex. 3). Consequently, BLM did not offer any oil and

gas leases in the San Rafael Desert during the approximately six-year MLP planning process for

the area, "in order to preserve potential alternatives for" the eventual MLP. *See* MLP Strategy

Letter at 2 (Ex. 13). And every leasing alternative BLM formulated for the San Rafael Desert

MLP would have either designated the lands encompassing the Twin Bridges Lease as closed or

subject to NSO restrictions. *See* BLM, San Rafael Desert Master Leasing Plan, Preliminary

Alternatives at *9–10 (undated) (attached as Ex. 24).

Despite this years-long effort, countless statements that the San Rafael Desert MLP was

"required" and "warranted" before new leasing could be approved, and thousands of pages of

analysis and information to support this position, BLM abruptly abandoned the MLP concept

shortly after the 2016 Presidential election. *See* Part II, Factual Background, *supra*. BLM

provided only a few sentences of "explanation" for this sharp reversal of policy:

> The BLM conducted the review required by Executive Order 13783 and
> Secretarial Order 3354 and determined that Master Leasing Plans (MLPs) have
> created duplicative layers of NEPA review. This policy, therefore, eliminates the
> use of MLPs.

IM 2018-34 § II (Ex. 15). And:

> The preparation of an Environmental Assessment associated with the San Rafael
> Swell Master Leasing Plan Amendment is no longer required, and the process is
> hereby terminated.

83 Fed. Reg. at 32,681.

These two conclusory statements, both of which entirely lack supporting evidence (let

alone any analysis of governing law), are not "reasoned explanations" but were instead about-

faces to orient BLM with the Trump administration's "energy dominance" agenda.[13] Courts have recently, repeatedly held that similar unexplained reversals are arbitrary. *See, e.g.*, *Am. Wild Horse Preserv. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska I*"), 381 F. Supp. 3d 1127, 1143 (D. Alaska 2019); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska II*"), 463 F. Supp. 3d. 1011, 1022 (D. Alaska 2020); *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 584 (D. Mont. 2018); *California v. Bernhardt*, --- F. Supp. 3d ---, 2020 WL 4001480, at *19–*20 (N.D. Cal. July 15, 2020); *State of Cal. v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1165–68 (N.D. Cal. 2019); *Natural Res. Defense Council, Inc. v. U.S. Envtl. Prot. Agency*, 438 F. Supp. 3d 220, 231–233 (S.D.N.Y 2020).

For example, in *Friends of Alaska I*, the court held that the Interior Department ("DOI") failed to provide a reasoned explanation for reversing its position on whether to allow construction of a road through the Izembek National Wildlife Refuge. 381 F. Supp. 3d at 1136-43. DOI had, on several occasions and over many years, previously declined to authorize the road construction, citing the potential for irreversible damage. This long-standing position was based on years of studies, data, and information. *Id.* at 1136. However, soon after a change in Presidential administration, DOI reversed its position by entering into a two-page Exchange Agreement with local officials in Alaska to facilitate construction of the road. *Id.* at 1140.

The Exchange Agreement failed to acknowledge DOI's prior position, or the agency's prior contrary findings. *Id.* The court explained that "[w]hile an agency is certainly permitted to rebalance relevant factors to arrive at a new policy, [the Supreme Court and appellate courts]

---

[13] As discussed *supra*, Executive Order 13783 and Secretarial Order 3354—the energy dominance orders—led to BLM's issuance of IM 2018-34, which eliminated the MLP concept, including the San Rafael Desert MLP.

make clear . . . that even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Id.* at 1141 (quotation and citation omitted). Thus, DOI's unexplained change in position violated the APA. *Id.* at 1143 (DOI's decision violated the APA because "[t]he Exchange Agreement does not contain any acknowledgment that [DOI's] decision to enter into that agreement constitutes a fundamental change in agency policy"). Another district court judge subsequently rejected DOI's revised Exchange Agreement, stating that DOI had to provide "more substantial justification" for the change—that is, "'further justification' is needed when the agency 'disregards facts and circumstances that underlay or were engendered by the prior policy.'" *Friends of Alaska II*, 463 F. Supp. 3d at 1018–19 (quoting *Fox Television Stations*, 556 U.S. at 516) (alteration marks omitted). The revised Exchange Agreement, unlike its predecessor, had made an effort to provide some justification for DOI's changed position. *Id*. However, DOI's posited justifications contradicted—without explanation—its prior findings and determinations. *Id.* at 1019–20.

Here, BLM provided no explanation whatsoever for its blatantly political decision to abandon the San Rafael Desert MLP process. BLM's two conclusory statements failed to explain or recognize, among other things, that: (1) for nearly seven years the agency did not offer a single oil and gas lease for development in MLP areas, and (2) BLM repeatedly concluded that "additional planning and analysis are warranted prior to allowing new mineral leasing and development." *See* 81 Fed. Reg. at 31,253.

BLM's brief statements provide no explanation or evidence for how MLPs—including the San Rafael Desert MLP—constitute "duplicative layers" of NEPA analysis or are "no longer warranted." The agency has a "duty to reasonably explain its about-face." *Am. Wild Horse Preserv. Campaign*, 873 F.3d at 924. And it fails to satisfy this duty when, as is the case here, it

merely "whistle[s] past [the] factual graveyard" and reverses without explanation its "established pattern of agency conduct and formalized positions." *Id.* at 927. This duty "cannot be evaded." *Id.*

Thus, SUWA is likely to succeed on its claim that BLM's failure to provide any explanation, let alone a reasoned explanation, for abandoning the San Rafael Desert MLP violates the fundamental tenets of the APA.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

In a case such as this, "[w]hen a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009). SUWA has also demonstrated above that BLM violated NEPA and the APA, and that SUWA will suffer irreparable procedural harm from these violations. [14] As discussed below, SUWA will also suffer both irreversible environmental and aesthetic injuries during the pendency of this case which warrant emergency injunctive relief. [15]

### A.  The Twin Bridges Project Will Cause Irreparable Environmental Harm.

---

[14] Although the D.C. Circuit has held that procedural harm *alone* is not enough to warrant a preliminary injunction, it still weighs in favor of injunctive relief. "The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur. If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury." *Brady Campaign*, 612 F. Supp. 2d at 24 (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985)) (alteration omitted).

[15] SUWA anticipates that Defendants will point out that SUWA could have—but did not— pursue its challenge to the Twin Bridges Lease as early as March 2019. But it was reasonable to wait under these circumstances until SUWA could discern whether BLM would take any action that would threaten imminent, irreparable harm to SUWA's interests, especially when BLM has voluntarily suspended hundreds of leases in Utah to conduct NEPA analysis in response to this Court's decision in *WildEarth Guardians I*.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco*, 480 U.S. at 545; *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 875 (D.D.C. 1991) ("Environmental harms are rarely . . . remediable by relief other than an injunction.").

The environmental harm here is not in dispute. BLM will imminently authorize one of two development scenarios, both of which it analyzed in the Twin Bridges EA, and both of which involve development of the Twin Bridges lease. In the EA, BLM recognized the immediate and long-lasting damage construction of either proposal—termed in the EA and here as "Alternative A" and "Alternative B"—will cause to soil, vegetation, and wilderness values. The soil in the project area, classified as Rock outcrop-Moffat-Moenkopie and Sheppard-Nakai-Moffat, "is sensitive and is considered saline and highly erodible." Twin Bridges EA at 20 (Ex. 23). The project area also has a "high potential" for biological soil crusts. These soil types can "be especially vulnerable to impacts and *harder to reclaim or restore after disturbance*." *Id.* (emphasis added). Disturbance of these soil types leads to "soil compaction, increased susceptibility to soil erosion, mixing of soil horizons, changes in soil function due to soil exposure from vegetation removal, and loss of soil productivity (ability to support vegetation)." *Id.* at 21.

The soils support a variety of native plant species, including Mormon tea, blackbrush, spiny hopsage, sand sagebrush and, at the site of Alternative A, the rare wildflower Entrada Rushpink. *Id.* at 22, 27 (Ex. 23). As with soils, these plant species are especially vulnerable to surface disturbances from project construction:

> Effects to vegetation from the Project would consist of damage to or loss of individual plants and could, as a result, include changes to community composition (species composition and plant density) on a localized basis. Clearing would remove protective vegetative

> cover in a sparsely vegetated landscape and could increase soil erosion and the transport of sediment. Grading, excavation, and backfilling could result in the mixing of topsoil with subsoil and in loss and alteration of seed banks, which could result in long-term reduction of productivity and introduction of noxious and invasive weeds.

*Id.* at 23.

The damage to soils and vegetation will be widespread. Construction of the well pads will entail clearing vegetation and topsoil to a depth of six inches. *Id.* at G-2 (Ex. 23). Under Alternative A, construction of the well pad alone will disturb 5.4 acres of soils and destroy all vegetation. With the addition of road improvements, the pipeline right-of-way, and gas plant, the project will disturb a total of 43.1 acres of land. *Id.* at 9–10, tbl. 2-1.

Alternative B will vary only in "the location and magnitude of the impacts." *Id.* at 21 (Ex. 23). Well pad construction will cause 7.3 acres of surface disturbance, while road upgrades will cause 14.5 acres of permanent disturbance. *Id.* Together with the proposed pipeline and gas plant, Alternative B will disturb a total of 52.3 acres of soils and vegetation. *Id.* at 10, tbl. 2-1.

This damage will be irreparable, by definition, since much of it is "beyond remediation," even in BLM's estimation. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). According to BLM, Alternative A will permanently damage or destroy soils and vegetation on 22.3 of the 41.3 disturbed acres even *after* restoration work. Twin Bridges EA at 20 (Ex. 23). Alternative B will permanently damage or destroy 27.9 of the 52.3 total acres. *Id.* at 21. And these calculations may well underestimate the severity of the damage caused by the project under either scenario. While BLM deems some disturbance "temporary" due to anticipated restoration efforts, it acknowledges those efforts may not work: "[r]estoration treatments for soil and vegetation in the drylands of the southwestern United States can be time-consuming and expensive *with low success*." *Id.* at 23 (emphasis added); *see also id.* ("Because

30

of the highly saline and erodible nature of the soil, combined with the arid climate, successful reclamation would be difficult, and the acres of vegetation loss *may essentially be permanent, even with the proposed reclamation*." (emphasis added)).

While BLM quantifies the amount of soil and vegetation loss as miniscule percentage figures—for example, "0.00004% of the analysis area," *id.* at 20—that only speaks to the massive scope of the four-watershed, 529,837.05 acre analysis area (for comparison, the entire Labyrinth Canyon Wilderness is approximately a tenth this size). *Id.* Moreover, courts have rejected arguments that conservation groups did not suffer irreparable harm because challenged project represented a de minimis fraction of larger forest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "This argument proves too much. Its logical extension is that a plaintiff can never suffer irreparable injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed." *Id.*; *see also Monumental Task Comm. v. Foxx*, 157 F. Supp. 3d 573, 583 (E.D. La. 2016) ("The focus of this inquiry is not so much the magnitude but the irreparability of the threatened harm.").

In addition to soils and vegetation, construction of the Twin Bridges Project will also cause irreparable damage to the Labyrinth Canyon Wilderness and Plaintiffs' interests in the Wilderness. *See infra* § II.B. The Wilderness starts in the west as a high desert plateau, then breaks into steep canyons dropping to the east, to the Labyrinth Canyon section of the Green River. The area is remote, rugged, and retains a wild and natural character. While "[h]uman impacts are present in the form of reclaiming seismic lines and range improvements," those impacts are largely unnoticeable. Twin Bridges EA at H-21 (Ex. 23). "Naturalness is enhanced by topographic screening from deep canyons, rugged terrain, and the natural revegetation of disturbed areas, which obscures most intrusions in the predominantly blackbrush communities."

31

*Id.* All told, "[s]teep and rugged topography, as well as the extensive side canyons, cliffs, and other topographical features maintain the area's natural character and also provide outstanding opportunities for solitude." *Id.*

Surface disturbing activities conducted pursuant to either development alternative will industrialize the surrounding Wilderness. Under Alternative A, Twin Bridges will upgrade an access road to the well pad that follows a cherry-stemmed path approximately two and a half miles through the Wilderness. *Id.* at 53-54; G-1 (Ex. 23). The road will be transformed from a primitive desert two-track to a graded, levelled, and straightened gravel road with a new, non-native road base measuring double the current width—which will be visible from miles away. *Id.* at 54; G-1. The well pad itself will be built atop a canyon rim deep within the Wilderness boundary, and will also be visible from many vantage points in the Wilderness. *See id.* at F-2 (Map). To build the well pad, Twin Bridges will remove topsoil and vegetation using a front-end loader, bulldozer, and dump truck. *Id.* at G-2. The pad will be graded and filled to support a 400-ton and 150-foot-tall drilling rig, as well as up to five single-wide mobile homes for temporary worker housing. *Id.* Should Twin Bridges find sufficient helium, the company will build permanent infrastructure on the well pad, including "holding tanks, transfer pumps, separators, vessels, flowlines, and safety equipment." *Id.* at G-3.

The harm from this development to the surrounding Wilderness is not in dispute. With regard to naturalness, BLM is clear:

> [v]isual impacts and surface disturbance from the introduction of the road improvements, well pad, stockpile areas, and side cut and fill slopes to the landscape would have direct impacts on areas visible from the Labyrinth Canyon Wilderness Area within the analysis area. Specifically, the proposed action would increase the levels of trammeling and human development adjacent to and visible from within the wilderness.

*Id.* at 54 (Ex. 23). The project will also irreparably harm the area's solitude. "Outstanding opportunities for solitude would be indirectly impacted by the presence of trucks and heavy equipment during construction and drilling of the well pad." *Id.* The access road will "be maintained and improved by road upgrades, possible [sic] increasing visitation and affecting solitude to this portion of the wilderness area." *Id. See* Part II.B, Argument, *infra* (describing Plaintiffs' aesthetic interests in Labyrinth Canyon Wilderness).

The harm from Alternative B will be even greater. Twin Bridges will engage in more extensive construction activities involving upgrading four miles of road cherry-stemmed through Labyrinth Canyon Wilderness. *Id.* at G-9 (Ex. 23). Over a half mile of the access road crosses a slick rock outcrop, and Twin Bridges will blast the outcrop apart with explosives to permit access by drilling equipment. *Id.* Moreover, Twin Bridges will construct the well pad *within* designated Wilderness. *Id.* at F-6. "The proposed well pad would create 7.3 acres of long-term disturbance and would reduce the size of the wilderness characteristics within the Labyrinth Canyon Wilderness Area by 7.3 acres." *Id.* at 56. Hence, under either alternative, BLM's action will jeopardize the qualities and characteristics of this unique area that led Congress to recently confer special protections by designating it as Wilderness for this and future generations, as well as Plaintiffs' interests in this Wilderness. *See* Part II.B, Argument, *infra* (describing Plaintiffs' aesthetic interest in the Labyrinth Canyon Wilderness and surrounding region).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297. The harm "must be both certain and great" and "actual and not theoretical." *Wis. Gas Co.  v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). It must also be "of such *imminence* that there is a clear and present need for

equitable relief to prevent irreparable harm." *Id.* (internal quotations omitted; emphasis in original).

The environmental harm, and harm to Plaintiffs aesthetic interests described *infra*, caused by either alternative meets and exceeds the D.C. Circuit's standard. The effects of development will be actual, certain, and irreparable. Under either alternative, road and well pad construction will destroy soil and vegetation on well over forty acres of federal public lands within and surrounded by the Labyrinth Canyon Wilderness; BLM acknowledges that much of the destruction will be permanent. More broadly, the project will change the undeveloped character of the Labyrinth Canyon Wilderness. Harm to the area's naturalness and solitude will extend past the project's boundaries and last for generations.

These harms are also acutely imminent. This is not a case where construction will take place "years in the future and subject to further government approval." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 337 (D.D.C. 2017). BLM, through its counsel in this case, represented to counsel for SUWA that the agency *will* make a decision on the Twin Bridges Project on December 23, 2020. Based on information and belief, SUWA understands that BLM *will* approve at least some of the surface disturbing activity considered under Alternative A or Alternative B, and that Twin Bridges *will* begin construction the following day. Absent an injunction, SUWA (and the environment) will suffer irreparable harm almost immediately.

In addition, even if BLM were to attempt to bifurcate its approval process to authorize Twin Bridges to drill its state lease first (which on information and belief is a possibility), SUWA will suffer the same harm to its interests through the environmental damage described above. That is because Twin Bridges will be constructing—*on the same BLM-managed lands*— the very same road, pipeline rights-of-way, and well pad to drill its state lease as its federal lease.

34

**B.  The Twin Bridges Project Will Cause Irreparable Aesthetic Harm.**

In tandem with environmental harm, SUWA and its members face imminent, irreparable

injury to their aesthetic interests. Attached to this Motion is the declaration of Mr. Ray Bloxham,

an employee and member of the Southern Utah Wilderness Alliance and a member of Natural

Resources Defense Council, Center for Biological Diversity, and Living Rivers. *See* Decl. of Ray

Bloxham (attached as Ex. 25).[16] Mr. Bloxham has made dozens of trips to the project area since

first visiting "more than two decades ago," for purposes of "camping, hiking, landscape

photography, sightseeing, and viewing the area's wildlife." *Id.* ¶¶ 11, 22. He has visited and has

definite plans to return to both the precise sites of planned development under Alternative A and

Alternative B, as well as many other surrounding areas from which development will be visible.

*Id.* ¶¶ 23–25, 30–36. Mr. Bloxham values the area because it "is entirely devoid of signs of

industrial development, including light pollution, visual obstructions, and noise." *Id.* ¶ 15; *see

also id.* ¶¶ 30–36 (explaining his appreciation of the untrammeled soils and vegetation).

Mr. Bloxham explains that either development proposal "will transform a wild,

untrammeled landscape, degrade the area's scenery, and destroy the area's solitude." *Id.* ¶ 28

(Ex. 25). He further explains that "[c]onstruction and drilling at either location will forever

degrade my experience when visiting these areas. The introduction of industrial development

will mar the area's world class scenery and destroy the peace, tranquility, and aesthetic

appreciation I experience when I visit." *Id.* at ¶ 29; *see also id.* ¶¶ 30–36. These injuries to Mr.

Bloxham's aesthetic interests, like harm to the environment, are certain, concrete, imminent, and

irreversible in the absence of an injunction.

---

[16] Mr. Bloxham's declaration includes four attachments, each of which is a viewshed map. The maps, and how they were created, are discussed in detail in the attached declaration of Mr. Creed Murdock (attached as Ex. 26).

### III.    THE BALANCE OF EQUITIES WEIGHS DECIDEDLY IN PLAINTIFFS' FAVOR.

In this case, where some of the most wild, scenic, and remote federal public lands in the lower 48 states face unavoidable, irreparable harm from industrial activity, the balance of harm weighs heavily in favor of maintaining the status quo until the Court can address this case at summary judgment. Without an injunction, BLM will authorize, and Twin Bridges will immediately commence, earthmoving activities on roads and well pads, destroying sensitive soils and vegetation and permanently altering the natural character of the surrounding lands (including designated Wilderness). If BLM selects Alternative B, some of this surface disturbance will be within the Labyrinth Canyon Wilderness itself. *See* Twin Bridges EA at G-9 (Ex. 23). Otherwise, under both Alternatives A and B the disturbance will lie immediately adjacent to the Wilderness area, be plainly visible and audible from the area, and occur on lands that while not designated Wilderness, are equally spectacular and important to SUWA's members. Bloxham Decl. ¶¶ 17–20, 27–36 (Ex. 25). In a situation such as this, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545.

In contrast, BLM will suffer no cognizable harm from granting SUWA this temporary relief. And while an injunction may cause Twin Bridges some financial harm from project delays, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. Moreover, any financial harm from an injunction will be short-lived, lasting only until the Court can resolve the case on the merits. The helium, if it exists, underneath Twin Bridges' lease is at no risk of disappearing.

Additionally, any harm to Twin Bridges Resources is self-inflicted. Twin Bridges bid on and acquired the lease with full knowledge of the then-pending Wilderness legislation, with the Dingell Act signed into law only eleven days after the lease's effective date. As such, Twin

36

Bridges was well aware of the controversial nature of developing an oil and gas lease in Wilderness, as well as the legal flaws of its lease, and thus accepted the risks that accompany such a lease sale. *See* Parts III & IV, Factual Background, *supra*. Likewise, its rushed effort to secure BLM approval and immediately begin surface disturbing activities over the Christmas weekend—which it coordinated at the highest levels of the Interior Department—is a transparent effort to force through all construction activities before a court can issue any meaningful relief to avoid irreversible harm to the environment. The fact that the company might "now [be] pressed for time" or have "invested a great deal of effort and money is a problem of their own making and does not weigh in their favor." *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1121 (S.D. Cal. 2010); *see also Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016) (state entities "'jumped the gun' on the environmental issues by entering into contractual obligations that anticipated a pro forma result," and were "largely responsible for their own harm").

In sum, the balance of harms tips decidedly in SUWA's favor and supports the issuance of emergency injunctive relief to preserve the status quo in this remarkable public landscape.

## IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST.

Emergency injunctive relief will serve the public interest. The public has a strong interest in "preservation of the natural environment" and in protecting its public lands. *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977). This interest is particularly strong in this case where the impacts of development will be felt in some of the nation's most prized public lands recognized for their wilderness quality and remote and sublime nature. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 643 (9th Cir. 2004) ("Because Congress has

recognized the public interest in maintaining these wilderness areas largely unimpaired by human activity, the public interest weighs in favor of equitable relief."). An injunction would also be in the public interest because it would vindicate Congress's intent in designating this Wilderness, which BLM has subverted by issuing the Twin Bridges lease in the few days between Congress passing the legislation authorizing this Wilderness and the President signing that legislation into law.

Likewise, there is a "strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993); *see also Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("Courts have not hesitated to enjoin an agency action that was taken in violation of NEPA."). An order issuing emergency injunctive relief in this case would ensure that BLM complies with NEPA as Congress intended by taking into account the serious environmental impacts of development before surface operations commence. *See Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702 (GK), 1995 WL 748246, at *12 (D.D.C. 1995) ("Issuance of a preliminary injunction here would thus directly serve the public interest by ensuring that federal agencies thoroughly consider the environmental consequences of their actions as mandated by NEPA."); *Fund for Animals*, 814 F. Supp. at 152 ("[A] public interest expressed by Congress was frustrated by approval of this proposal . . . without NEPA compliance."). In sum, "[t]here is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely." *Brady Campaign*, 612 F. Supp. 2d at 26.

On the other side of the scale, a temporary restraining order and preliminary injunction will not harm the public. At most, such an injunction may briefly delay initial development on these lands. The handful of wells that might be drilled during the relatively short time that this

case is being litigated would at most only supply a de minimis amount of helium and therefore

will have little or no impact on commodity prices or supply. *See Massachusetts v. Watt*, 716 F.2d

946, 953 (1st Cir. 1983), *abrogated on other grounds by Marsh*, 490 U.S. at 377 n.23 (finding

the integrity of the NEPA process outweighed any short delay in oil production).

## V.     THE COURT SHOULD NOT REQUIRE A BOND, OR ALTERNATIVELY IMPOSE ONLY A MINIMAL BOND.

Should the Court issue an injunction, Plaintiffs—all nonprofit organizations—

respectfully request that the Court not require a bond or, at most, impose only a nominal bond.

Because of their chilling effect on litigation to protect the environment and the public interest,

federal courts often dispense with the security requirement for public interest environmental

plaintiffs, or require only a nominal bond. *Davis*, 302 F.3d at 1126 ("Ordinarily, where a party is

seeking to vindicate the public interest served by NEPA, a minimal bond amount should be

considered."); *see, e.g.*, *Sierra Club v. Block*, 614 F. Supp. 488, 494 (D.D.C. 1985) (ordering a

$20 bond); *Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) (ordering

$100 bond); *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1191 (N.D. Cal.

2009) (ordering no bond). Should the Court require a bond, SUWA requests that the bond be no

more than $500.

## CONCLUSION

Because SUWA meets all four factors to obtain a preliminary injunction, SUWA

respectfully requests that this Court temporarily restrain and preliminary enjoin BLM from

authorizing all or part the Twin Bridges Project until further order of the Court.

Respectfully submitted this 18th day of December, 2020.

/s/ William N. Lawton
William N. Lawton
DC Bar No. 1046604

William S. Eubanks II
DC Bar No. 987036

Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
(970) 703-6060
bill@eubankslegal.com
nick@eubankslegal.com

Stephen H.M. Bloch (*pro hac vice*)
Landon Newell (*pro hac vice*)
Joseph J. Bushyhead (*pro hac vice*)

Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
landon@suwa.org
joe@suwa.org

*Counsel for Plaintiffs Southern Utah*
*Wilderness Alliance, Center for*
*Biological Diversity and Living*
*Rivers*

Sharon Buccino
D.C. Bar No. 432073

Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-6868
sbuccino@nrdc.org

*Counsel for Plaintiff*
*Natural Resources Defense Council*