```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2     _____

3     Southern Utah Wilderness        )  Civil Action
      Alliance, et al.,               )  No. 1:20-cv-03654-RC
4                                     )
                      Plaintiffs,     )
5                                     )
      vs.                             )
6                                     )  Motion Hearing for
      David Bernhardt, et al.,        )  Temporary Restraining
7                                     )  Order
                      Defendants,     )  (via videoconference)
8                                     )
      and                             )
9                                     )
      Pure Helium, LLC,               )  Washington, D.C.
10                                    )  December 22, 2020
                 Intervenor Defendant.)  Time:  3:00 p.m.
11    _____

12    Transcript of Motion Hearing for Temporary Restraining Order
                       (via videoconference)
13                          Held Before
           The Honorable Rudolph Contreras (via videoconference)
14                    United States District Judge
      _____

15
                       A P P E A R A N C E S
16
      For the Plaintiffs Southern Utah Wilderness Alliance, Center
17    for Biological Diversity, and Living Rivers:
      (via videoconference)    Stephen H.M. Bloch
18                             Joseph J. Bushyhead
                               Landon Newell
19                             SOUTHERN UTAH WILDERNESS ALLIANCE
                               425 East 100 South
20                             Salt Lake City, Utah 84111-1801

21                             William N. Lawton
                               EUBANKS & ASSOCIATES, LLC
22                             1331 H Street, Northwest, Suite 902
                               Washington, D.C. 20005
23
      For the Plaintiff Natural Resources Defense Council:
24    (via videoconference)    Sharon Buccino
                               NATURAL RESOURCES DEFENSE COUNCIL
25                             1152 15th Street, Northwest, Suite 300
                               Washington, D.C. 20005
```

```
 1    For the Defendants:      Michelle-Ann C. Williams
      (via videoconference)    U.S. DEPARTMENT OF JUSTICE
 2                             Environment & Natural Resources Division
                               P.O. Box 7611
 3                             Washington, DC 20044-7611

 4    For the Intervenor Defendant Pure Helium, LLC:
      (via videoconference)    Alison D. Garner
 5                             Benjamin Machlis
                               DORSEY & WHITNEY LLP
 6                             111 South Main Street, Suite 2100
                               Salt Lake City, Utah 84111

 7
      Also Present on behalf of the U.S. Department of the Interior
 8    Office of the Solicitor:
      (via videoconference)
 9                             Elizabeth Schulte

10    _____

11    Stenographic Official Court Reporter:
      (via videoconference)    Nancy J. Meyer
12                             Registered Diplomate Reporter
                               Certified Realtime Reporter
13                             United States Courthouse, Room 6509
                               333 Constitution Avenue, Northwest
14                             Washington, D.C. 20001
                               202-354-3118

15    _____

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the

3      limitations of technology associated with the use of
technology, including but not limited to telephone and video

4      signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court

5      reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7              THE COURTROOM DEPUTY:  This is Civil Action 20-3654,

8      Southern Utah Wilderness Alliance, et al. v. David Bernhardt,

9      et al., Intervenor Defendant Pure Helium, LLC.

10             For plaintiffs, I have Mr. William Lawton, Ms. Sharon

11     Buccino, Mr. Stephen Bloch, Mr. Landon Newell, and Mr. Joe

12     Bushyhead.

13             For defendants, I have Ms. Michelle Williams.

14             For intervenor defendant, I have Ms. Alison Garner.

15             I also have Ms. Elizabeth Schulte from the Solicitor's

16     Office present.

17             And our court reporter today is Ms. Nancy Meyer.

18             All parties are present.

19             THE COURT:  Good afternoon, everyone.

20             Who is going to be speaking for the plaintiffs?

21             MR. BLOCH:  This is Stephen Bloch, Your Honor.  I

22     will be speaking for the plaintiffs.

23             THE COURT:  Okay.  Great.  All right.  Let's start

24     with the intervenor's motion to intervene -- or the putative

25     intervenor's motion to intervene.  I haven't seen any

1    opposition to that.  I gather that the government takes no

2    position; is that correct?

3                MS. WILLIAMS:  That's correct, Your Honor.

4                THE COURT:  And the plaintiffs?

5                MR. BLOCH:  SUWA does not oppose this motion, Your

6    Honor.

7                THE COURT:  Mr. Bloch, you're coming in very quietly.

8                MR. BLOCH:  All right.  I will try and correct that,

9    Your Honor.  Thank you.  I'm not sure what I'm going to be able

10   to do.  Maybe I'll speak up.  How is that?

11               THE COURT:  That sounds better.

12               MR. BLOCH:  All right.  Thank you.

13               THE COURT:  So I'll go ahead and grant the

14   intervenor's motion as a matter of right, and they shall be

15   allowed to intervene as a defendant in the matter.

16         All right.  Mr. Bloch, it's your motion.  Why don't you

17   start.

18               MR. BLOCH:  Your Honor, would you like me to begin

19   with responding to the Court's minute order from yesterday

20   afternoon?

21               THE COURT:  What -- however order you wish to present

22   it.

23               MR. BLOCH:  All right.  Well, may it please the

24   Court, Stephen Bloch for plaintiffs, Southern Utah Wilderness

25   Alliance.

1        At the outset, I want to thank the Court's attention and

2   time this afternoon.  I am going to begin with the Court's

3   minute order from yesterday.

4        THE COURT:  I gather you agree with it given that you

5   added it to the reply brief.  So if you agree with it, you

6   don't have to add a whole lot to it.

7        MR. BLOCH:  That's fine, Your Honor.  If -- if

8   Your Honor is interested, at some point in this afternoon's

9   hearing, we'd be happy to discuss the schedule that we think

10  would fit with some other cases like *AstraZeneca* for resolution

11  here.

12       THE COURT:  All right.  We'll talk to that at the

13  appropriate time, if necessary.

14       MR. BLOCH:  With regard to SUWA's motion for

15  emergency injunctive relief, SUWA has to establish the four

16  factors that the D.C. Circuit requires for relief.

17       And I'm going to start off with the likelihood of

18  success on the merits.  The Twin Bridges federal lease was

19  issued in violation of the National Environmental Policy Act,

20  or NEPA.  Pure Helium essentially concedes this fact,

21  Your Honor, in their -- in their opposition brief, and the

22  United States, for all intents and purposes, takes the same

23  position.

24       That lease was issued without the greenhouse gas

25  emissions analysis required pursuant to this Court's order in

1     *WildEarth Guardians I*, the 2019 ruling from this Court.

2         The development of the federal and state leases are

3     inextricably linked in the BLM's NEPA analysis, and they cannot

4     be separated in the way that the United States and the

5     intervenor suggest.  So in the environmental assessment, what

6     the agency reviewed -- and when I say "environmental

7     assessment," I'm referring now to the drilling environmental

8     assessment.  The approval of the federal and the state -- the

9     approval of drilling on the federal and the state leases, as

10     well as the series of federal rights of way and other

11     authorizations, the federal lease and state lease are going to

12     be developed from the same pad.  They're going to use the same

13     roads, the same rights of way, and same authorizations.

14         Without the unlawfully issued lease, the NEPA process

15     here would not have proceeded, and it certainly wouldn't have

16     happened in the same fashion.  As I said, I feel like the

17     United States and Pure Helium essentially concede this point.

18     The lease was issued in violation of NEPA, and SUWA is likely

19     to prevail on the merits of that claim.

20         THE COURT:  So what -- what are you saying happens if

21     whatever they issue tomorrow says, you know, we are approving

22     just drilling pursuant to the state lease, all we're approving

23     today is -- is the enhancements to the road and -- and the like

24     on the right of way that's outside of the wilderness; and we've

25     look at the $CO_2$ emissions that are going to result from that --

1    from that work, which is, you know, much less than -- than what

2    was at issue in *WildEarth*, which also -- had -- you know,

3    *WildEarth*, they also -- part of the problem was they didn't do

4    a good job of considering what the downstream $CO_2$ emissions

5    would be.  No one has told me helium is -- is a $CO_2$ problem

6    as -- as the natural gas at issue in *WildEarth* is for -- for

7    purposes of downstream releases.  And the $CO_2$ emissions here

8    are quite limited, and -- and we're fine with them.  What --

9            MR. BLOCH:  Your Honor -- so a few responses,

10   Your Honor.  First of all, as you discussed in *WildEarth*, there

11   are multiple stages that the BLM has to comply with in its NEPA

12   obligation to do this kind of greenhouse gas emissions

13   analysis.  There's both at the leasing stage as well as at

14   drilling stage.  And what we're arguing here is they haven't

15   done it at the leasing stage, and we haven't -- we don't

16   believe that they are going to meet essentially what would be a

17   *WildEarth II* scenario in the authorization that will come out

18   in the morning.

19            So I don't think that they -- I think the answer is that

20   the -- the federal lease and the construction activities

21   related to the development of the roads and the drilling have

22   not been sufficiently analyzed.

23            THE COURT:  But -- but if -- if the federal lease had

24   never occurred, couldn't they still authorize these

25   enhancements to the -- to what -- to enable the drilling on the

1    state lease?

2            MR. BLOCH:  Well, they could, but it would be a

3    different project, Your Honor.  I mean, the authorization that

4    they are -- that they've indicated they intend to approve

5    tomorrow, the NEPA analysis that they intend to take across the

6    finish line in the morning is going to be for the development

7    of the federal lease, these federal rights of way, federal

8    underground authorizations, and development of the state lease.

9    They really can't tease apart those inextricably linked facets

10   of the project.

11           Had they come forward and said this is a state lease and

12   we have a right of access under this ruling from the district

13   of Utah and that's how we want to proceed here, that would be a

14   different environmental assessment than what BLM has prepared.

15           THE COURT:  All right.  Your -- your assumption is

16   that whatever they approve tomorrow will allow drilling not

17   just on the state lease but also on the federal lease?

18           MR. BLOCH:  This would be the first and only time

19   they do a NEPA analysis, is going to be the FONSI, the finding

20   of no significant impact; and the decision record final

21   environmental assessment will be for all phases of the project.

22   So the drilling of seven wells, the construction of the road,

23   the construction -- the construction and clearing of the rights

24   of way, the underground authorizations, that's all going to be

25   a part of this single NEPA analysis.  It's a bit of a show game

1    to say that what they intend to approve in the first instance

2    is the state -- is the drilling of a state lease, the state

3    well, when that suggested to me, when I read it, that they were

4    thinking there would be a later-in-time NEPA document, and

5    that's just not the case.  The environmental assessment they're

6    going to finish in the morning is one for the full scope and

7    extent of the project.

8         THE COURT:  But -- okay.  Let's -- let's assume that

9    that's correct.  Then my -- wouldn't my TRO say you can't

10   develop the federal lease; everything else is okay?

11        MR. BLOCH:  Your Honor, we think that the

12   authorizations that come for the rights of way, for -- for the

13   road construction, is all as I said -- is all -- is all

14   inextricably linked up.  It's a single approval.  It's a single

15   NEPA analysis.  And so when --

16        So the development of that state well is going to

17   involve these other federal authorizations.  It just -- yeah, I

18   think it can't be teased apart the way the -- the United States

19   and the company want to see it.

20        THE COURT:  You know, I hear you say that a few times

21   now, but explain to me why that's the case.  I think any

22   injunctive relief I give has to be narrowly tailored to the

23   harm that you're alleging.  And if -- if the harm that you're

24   alleging is that there wasn't a proper NEPA analysis on the

25   federal lease, it seems to me that the -- that the remedy for

1    that would be -- prohibit the drilling on the federal lease

2    until that NEPA analysis is completed, which sounds like that

3    will be soon.

4         MR. BLOCH:  Well, I feel like -- respectfully, I feel

5    like this now has a -- where I started off, which is with the

6    Court's order from yesterday, the idea that is SUWA's challenge

7    to the drilling EA ripe and the opportunity for us to challenge

8    that EA and all the authorizations prior to that challenge

9    being moot.

10        And the awkward bind that we find ourselves in by BLM

11   saying they're going to approve it in the morning and by the

12   afternoon -- or by noontime Mountain, the company is going to

13   be on the ground and operating.  And in our complaint, we

14   challenge the federal lease.  We also sought other relief, such

15   as the Court deems proper and appropriate.  And I feel like

16   that is the way we can get to the All Writs Act and have the

17   Court issue the temporary relief of enjoining authorizations

18   pursuant to the drilling project.

19        THE COURT:  No.  I -- I understand that.  And if I --

20   even if I were inclined to do that, it would be on a very rapid

21   schedule.  So we'll be back in the same place, you know, in a

22   week or two.  So -- so I'm trying to tease out what -- what the

23   arguments would be at that point.

24        MR. BLOCH:  Well, I think what we -- you know, stop

25   me if this is not the right time for this, but what we would

1    feel is appropriate would be -- the BLM has indicated they

2    intend to issue the final environmental assessment and the

3    decision record in the morning; that the authorizations, all

4    the authorizations under that approval, would be enjoined for a

5    limited amount of time -- let's say seven days -- pursuant to

6    review and amend the complaint.

7         What we would ask -- I'm going to hit the pause button

8    here for a moment, and what we would ask is that if you look at

9    the United States' brief at 19 through 21 -- and this is also

10   in SUWA's brief -- there's a preview of the supplemental

11   greenhouse gas environmental assessment.  And the United States

12   argues that makes our claims potentially moot.  We obviously

13   don't agree with it.  But the point of it is is that decision

14   is soon to issue as well.

15        And what we would -- and it may be in a matter of days

16   or maybe in a week or so.  Maybe Ms. Williams can shed light on

17   that.  But what we would propose is that the Court would enjoin

18   the authorization -- enjoin the authorizations for a limited

19   amount of time so we can review that, then file an amended

20   complaint.  We also think it's appropriate that the Court would

21   extend for a short window the stand-down until the BLM can get

22   the final supplemental greenhouse gas environmental assessment

23   across the finish line, until we have a chance to review that

24   and decide if there are claims there as well.  And then bring a

25   challenge surely against the Twin Bridges drilling

1    environmental assessment and possibly against the supplemental

2    environmental assessment as well.

3         That feels a little complicated, I think, but it's

4    really -- as -- as I thought about it, it feels like the

5    neatest way to address some of these loose threads that the

6    government has lurking out there, that the supplemental EA will

7    soon be issued and may affect the ability of the Court to issue

8    relief to SUWA.

9              THE COURT:  All right.  Go ahead.

10              MR. BLOCH:  There's also this issue that we raised

11   about how the government has -- has violated the Administrative

12   Procedure Act.  This is our second argument under the

13   likelihood of success on the merits.  And it's the BLM and the

14   interior department, essentially did an about-face, a 180, on

15   this idea of a San Rafael Desert Master Leasing Plan; that from

16   2010 through 2017, there was no leasing in this area that

17   included the Twin Bridges lease.  And there was no leasing

18   because the United States said they had to finish that master

19   lease plan.  They had to look at new stipulations.  They had to

20   do additional environmental analysis prior to selling new

21   leases, and they went very far down the road from 2010 through

22   '16 to completing that work.

23         So far they were looking at alternatives, each of which

24   would have changed the resource allocation with this area with

25   the Twin Bridges lease such that it either would have been

1   closed entirely for new leasing or subject to no surface

2   occupancy stipulations.

3          And then in 2018, in -- in a -- essentially a three-word

4   sentence fragment, the United States 180s on that, and they

5   say:  We're done with master leasing plans.  It's a duplicative

6   NEPA process.  And they issue a one-sentence order in the

7   *Federal Register* that says that they're going to be finished

8   with the San Rafael Desert Master Leasing Plan; and this is

9   very reminiscent of a number of decisions made by this

10  administration that federal courts have reviewed.  They're

11  found to be not-a-sufficient-reasoned explanation.  And we feel

12  that SUWA has established a likelihood of success on the merits

13  on this claim as well.

14          THE COURT:  Why -- why isn't that duplicative of the

15  NEPA analysis?

16          MR. BLOCH:  Well, what the BLM said was they

17  needed -- that they did a high-level resource management

18  plan -- and I know Your Honor is familiar with those -- and

19  that they needed -- that that was at a 40,000-foot and they

20  needed to do a 10,000-foot view of this area.  That the -- the

21  field office here -- several million acres -- and they were

22  looking at a several-hundred-thousand-acre master lease plan so

23  they can have specific lease notices, stipulations that would

24  address the on-the-ground resources.

25          And that's what BLM said from 2010 through '16 for why

1    they had set forth that process and why they were going down

2    that path and identified, in fact, that additional analysis was

3    necessary.  Additional, not simply the same analysis.  And the

4    response from the United States is that the three -- is that

5    the three-word sentence fragment is a sufficient-reasoned

6    explanation for why they did the 180.

7         And as I said, and as we have cited in our brief, courts

8    from -- from this Court to around the nation have held that

9    that is not a sufficient-reasoned explanation.  That type of a

10   very short shift -- short shrift, back of the hand for why

11   they're doing a 180.

12        Pardon me.

13        Moving to the irreparable harm.  SUWA has established

14   that -- and I think we've heard from the United States and from

15   the company -- that they intend to start operations as soon as

16   tomorrow afternoon.  SUWA has a declarant who states that he's

17   been to the area, he enjoys it, and, in turn, his -- his

18   aesthetic appreciation, and SUWA's interests will be

19   irreparably damaged from the construction of the road, the

20   pipeline rights of way, and the clearing of the drill pad; but

21   he also states the Labyrinth Canyon Wilderness area and, as the

22   BLM acknowledges, the implementation of the project is going to

23   result in irreparable harm to that area's unique wilderness

24   values.  So I really don't feel like they joined -- battled

25   with us all that much on this -- on this score, Your Honor.

1      The environmental assessment is clear that the

2   surface-disturbing operations are going to result in long-term,

3   if not irreparable, change to the environment since it is a

4   high desert, arid environment, and they, I think, are clear

5   that the -- the impacts of the project are going to be

6   long-lasting and significant.

7      And then, finally, there's the balance of harms and the

8   public interest.  As the Court's well aware, when faced with

9   irreparable environmental injury, the balance of harms shifts

10  heavily in favor of the movant.  The arguments raised about the

11  Helium Act or the President's designation of helium as a

12  mineral of -- as an essential mineral, well, this is -- the

13  order we're asking the Court for here is a -- seeks to preserve

14  the status quo.  The helium isn't going anyplace, and the

15  intent of Congress and the administration can still be

16  furthered should this Court decide to allow the project to move

17  ahead.  It's a stand-down so the Court has an opportunity to

18  review the merits and, as we talked about under the

19  All Writs Act, the merits of both the lease and of the drilling

20  environmental assessment.

21      I'd be happy to answer any questions, if Your Honor has

22  any.

23          THE COURT:  No.  I think I got it.

24      All right.  Ms. Williams, you're up.

25          MS. WILLIAMS:  Good afternoon, Your Honor.

1       THE COURT:  Good afternoon.

2       MS. WILLIAMS:  There -- there are three main reasons

3  this Court should deny plaintiffs' motion for a TRO/PI.

4  Your Honor, none of the harms alleged in their TRO are related

5  to the federal lease.

6       Now, as an initial matter, plaintiffs' assertion of harm

7  in their TRO, they're outside the scope of their complaint.

8  Plaintiffs allege a NEPA deficiency regarding the federal lease

9  parcel.  However, the harms asserted in their -- their briefing

10  are unrelated to this procedural harm for a NEPA violation.

11       So, particularly, considering each phase -- so the --

12  the -- Phase 1 of the proposed action would not have an

13  imminent impact or -- imminent impact of federal parcel.  So

14  plaintiffs are challenging a leasing decision that would not

15  affect any exploratory work that BLM could approve, and that's

16  what Phase 1 is -- that's Phase 1 under the proposed action.

17  So even if the Court vacates the leasing decision, there still

18  remains exploratory work to be done to access plaintiffs' [sic]

19  preexisting right on the SITLA parcel.

20       So I just want to give the Court an idea of what's to

21  occur in Phase 1.  And, of course, the counsel for the company

22  can articulate in greater detail for the Court what will

23  happen, but this will help to illustrate that plaintiffs'

24  assertion of imminent irreparable harm is unfounded.  So under

25  Phase 1 of the proposed action, road improvements, installation

1   of a well pad, and an underground wellbore to ultimately access

2   the SITLA parcel are what's at issue within any rights-of-way

3   authorization for this first phase.  And these activities would

4   be taking place within what they call a cherry stem road, and

5   this cherry stem road is not located within wilderness lands at

6   all.

7         So contrary to what plaintiffs have asserted in their

8   briefing, this cherry stem road is a preexisting road.  It's

9   not untraveled and untouched as plaintiffs have asserted.  So

10   with respect to the roadwork in particular, the company would

11   be doing grading, leveling, and reducing curving out there.

12   And so this road -- this cherry stem road is measured at about

13   a hundred feet on each -- from the centerline of the road on

14   each side.  And the -- the -- the boundary -- boundary of the

15   cherry stem road would be the -- the boundary of the wilderness

16   area.

17         But here, BLM, if it were to issue an authorization for

18   the rights of way for this first phase, would only authorize up

19   to 30 feet from the centerline on each side.  Now, the road is

20   just under 30 feet.  I'm not exactly sure of the exact

21   calculations here.  So any one -- any work to be done would not

22   be really traversing new -- new ground.  So this --

23         THE COURT:  But it would double -- it would double

24   the width of it, essentially.

25         MS. WILLIAMS:  No, Your Honor, because currently

1   the -- the -- the -- this cherry stem road or the -- the --

2   the -- it's supposed to be from the centerline of the road out

3   to a hundred feet.  So by only authorizing up to 30 feet on

4   each side -- right? -- they're not getting close to --

5          THE COURT:  Yeah.  Now, 30 feet on each side is 60.

6          MS. WILLIAMS:  Yes.

7          THE COURT:  And you said the road is approximately

8   30.  So it would be doubling it.

9          MS. WILLIAMS:  On each side, yes, from the --

10   however --

11          THE COURT:  And it's -- according to BLM's own

12   paperwork, it's sensitive to rain and -- and any

13   ground-disturbing activity, the restoration, or -- or

14   remediation might -- is -- might or is likely to -- to be

15   ineffective; is that right?

16          MS. WILLIAMS:  So, Your Honor, I -- I should make a

17   correction.  First, that the -- the rights of way itself over

18   which the -- that the company -- that BLM would authorize is

19   actually 30 feet.  And with respect to any work that would be

20   done out -- within the rights of way, the -- the road is

21   actually open to vehicular access for recreational use.  So

22   it's not as plaintiffs have suggested that this area is unused,

23   that it's pristine.  That's not the case.  And --

24          THE COURT:  That's besides the point.  I -- 30 feet

25   in addition to a 30-foot road doubles it.  Do I have your

1    agreement on that?

2         MS. WILLIAMS:  I'd like to hear what Your Honor --

3    I'm sorry?

4         THE COURT:  Thirty feet -- approval for a 30-feet

5    right of way is in addition to a 30-foot road; is that right?

6         MS. WILLIAMS:  The road -- Your Honor, the road is --

7    the road is -- the cherry stem road is the -- is 100 feet on

8    each side.

9         THE COURT:  No, no.  That's -- that's what's excluded

10   from the wilderness.  I understand that, but the -- you said

11   that the road is currently 30 feet wide, where you're adding a

12   right of way of an additional 30 feet.  So that doubles the --

13   the area of ground disturbance; is that right?

14        MS. WILLIAMS:  So I'm not quite sure, Your Honor,

15   that I agree with your assessment.  My understanding is that

16   the right of way -- the road is the right of way and that the

17   right of way -- the road, as it currently stands, is the right

18   of way.

19        THE COURT:  So all of these pipes and the like are

20   going under the road or next to it?

21        MS. WILLIAMS:  They -- all of the activities in

22   Phase 1, my understanding is that they will take place within

23   the right of way, within the authorized right of way.

24        THE COURT:  I -- I think we're just talking in

25   circles now.  When this is all done, will the disturbed area of

1   soil be 30 feet or 60 feet?

2            MS. WILLIAMS:  The disturbed area will be up to --

3   I'm sorry, Your Honor.  I -- may I confer with my client to

4   make sure I'm giving you the exact --

5            THE COURT:  I -- I would appreciate that, yes.

6            MS. WILLIAMS:  Just one moment, Your Honor.  I'll

7   confer with the client.

8            (Off the record.)

9            MS. WILLIAMS:  Thank you, Your Honor.  I have some

10   clarification now.

11        So according to the agency, the road right of way is

12   30 feet.  That is it in terms of Phase 1 work.  Now -- and

13   that's the total.  So the company will have to operate within

14   this 30-foot area for the work.

15            THE COURT:  So if they're going to put in a pipe, it

16   has to go under the road, underneath the existing road?

17            MS. WILLIAMS:  So the second phase would involve the

18   pipeline work, and then that would involve an additional

19   30 feet on each side, but still within that

20   100-feet-on-each-side restriction.  So if we're talking about

21   imminent harm from the exploratory work, the Phase 1 work,

22   plaintiffs' claims are unfounded because the work would be

23   confined within this existing footprint of the cherry stem road

24   right now.

25            THE COURT:  Well, when they -- when they talk about

1   leveling out or softening curves, I assume that that means that

2   there will be areas disturbed that were not previously

3   disturbed; is that right?

4           MS. WILLIAMS:  So, Your Honor, the company can speak

5   further to that part, but my understanding is any leveling, any

6   improvement, any grading of a curve will be within the set

7   footprint of this road.  So not any area extraneous within the

8   phase -- the first phase.

9           Now, if you're talking about the second phase, again,

10  the company can speak further as to what the -- their

11  underground work would entail, but my understanding is that

12  there will be -- because of the pipelines, it will require an

13  additional 30 feet on each side, still within the 100 feet on

14  each side, for the pipeline work.  And my understanding is --

15  I -- and as I said, the company can speak further to that, but

16  in terms of Phase 1, imminent work that's to begin, no, the

17  work would be within the footprint of the existing right of

18  way.

19          THE COURT:  All right.  Go ahead.

20          MS. WILLIAMS:  So this -- this -- this right of way,

21  Your Honor, it currently gets traffic from recreational

22  visitors who -- their vehicles then drive along on -- along

23  this -- this road.  There's -- there's equipment out there that

24  pertains to grazing that's currently there.  So as I previously

25  stated, the plaintiffs' contention that this is some

1    undisturbed spot, it simply is not true.

2          With respect to wilderness values that plaintiffs

3    assert, there would be irreparable harm to those values, well,

4    as we stated in our briefing, there's no surface disturbance to

5    the wilderness area.

6          Now, as it pertains to activities within the right of

7    way in the vicinity of the wilderness area, well, the -- the

8    Dingell Act, as we stated in our briefing, anticipated this

9    type of development.  Congress was aware of the road prior to

10    the passage of the -- the act.  And it stated that it did not

11    intend for the wilderness designation to create any protective

12    perimeter or a buffer zone for the wilderness area.  And,

13    furthermore, that nonwilderness activities or uses that can be

14    seen or heard from within the wilderness area must not preclude

15    the conduct of those activities.

16          So plaintiffs' assertion of harm to their aesthetic

17    interests and so on were contemplated by Congress, and Congress

18    said those activities are not -- are not precluded.  The fact

19    that those may happen, it just acknowledged that that's a fact.

20    And -- and so plaintiffs are not suffering any special harm

21    that was not contemplated by Congress when it -- when it passed

22    the Dingell Act.

23          Now -- so plaintiffs are unable to establish that right

24    now based on the Phase 1 work that is to take place that they

25    would suffer any irreparable harm from work that would be

1    conducted within the right of way in particular.

2         Now, plaintiffs, they -- plaintiffs have sought to muddy

3    the waters as to the -- their contention regarding the federal

4    lease.  So their contention that because the -- the -- the --

5    there's an application for permit to drill that the federal

6    lease is implicated, and the -- our point here is that, one, as

7    we stated yesterday, BLM has indicated that it does not intend

8    to authorize an application for permit to drill.  So with

9    respect to the proposed action or even Alternative B -- however

10   BLM turns out tomorrow -- there will be no approval for an

11   application for permit to drill on the federal parcel.

12         THE COURT:  Is that being denied, or is it just being

13   deferred?

14         MS. WILLIAMS:  I believe it is being deferred at this

15   point.  For whatever reasons the agency has, I -- they have not

16   articulated specifically to me what those are, but the agency

17   has said that at this point, it does not plan to authorize the

18   APD.

19         Moreover, I'd like make a few clarifications.  So BLM

20   does not authorize leasing on state land, and I think that's

21   one of the things where plaintiffs are kind of muddying the

22   waters.  BLM doesn't do authorization for that.

23         THE COURT:  That has already been authorized by the

24   state; is that right?

25         MS. WILLIAMS:  That's correct, Your Honor.

1        So without -- without -- so if -- if -- if the

2    plaintiffs -- if -- if the company wanted -- and the company

3    can speak more to this -- they can -- they could access the

4    state parcel and do whatever work that they -- they want to do

5    on that state parcel.  And, I mean, if it has an -- an impact

6    on plaintiffs' aesthetic interest, then -- I mean, it's private

7    land.  So there's nothing BLM can do about that.

8            THE COURT:  But they need BLM's authority to make

9    changes to the road, don't they?

10            MS. WILLIAMS:  So the right of way and -- and that

11    would be within whatever authorization that -- within the

12    parameters of the authorization that BLM would give.

13            THE COURT:  Okay.

14            MS. WILLIAMS:  Now, turning to the matter of the --

15    the All Writs Act.  Now, the cases that the Court mentioned in

16    its order are factually and really procedurally distinguishable

17    from this case.  So in the *AstraZeneca* case, there was no issue

18    in -- in that case and also in the *Trump v. Committee on Ways*

19    *and Means*.  There was no issue there as to whether the

20    allegations asserted in the motions for relief were

21    specifically alleged in -- in the -- in their complaints.  As

22    opposed to here where plaintiffs are making an allegation that

23    has no foundation in the causes of action that they have

24    pled -- pled in their complaint.

25            And the Court does have jurisdiction or would have

1    jurisdiction to resolve the complaint as it currently stands.

2    If plaintiffs have jumped the gun in some way, this still

3    doesn't deprive the Court from ruling on the complaint as they

4    have filed.  And so this issue of -- of wanting the Court to

5    make a decision right now is really of plaintiffs' own making,

6    and they can wait and amend their complaint and make the proper

7    assertions.

8         THE COURT:  But the coordination between the agency

9    and the company have -- have essentially assured that the case

10   will be at least -- become at least partially moot before

11   plaintiffs would be able to supplement their complaint and I

12   would be able to review it.  And that seems by design.  So it

13   would seem like under the All Writs Act, in order for me to

14   preserve my jurisdiction, I would need to prevent that from

15   happening.

16        MS. WILLIAMS:  Your Honor, our contention is that the

17   Court has jurisdiction right now on plaintiffs' present

18   complaint.  Plaintiffs jumped the gun, and plaintiffs will have

19   an opportunity to amend their complaint to -- and go through

20   the process that they're going through right now.

21        THE COURT:  I -- I agree that they will have that

22   opportunity, but it will be by -- by my order, not -- not

23   because you've allowed time to accomplish that.

24        MS. WILLIAMS:  Your Honor, we -- we assert that

25   the -- the -- this issue and in terms of the cases that

1    Your Honor included in the order yesterday, that the

2    circumstances are certainly very different.  So in *AstraZeneca*,

3    there -- the issue there was that this generic product would

4    immediately flood the market and thereby dramatically reducing

5    the company's market share.  That was an issue there.

6         And in -- in the Trump's *Ways and Means* case, private

7    tax return or -- or a private return would not be able to

8    become private once it became public.

9         Here the harm that plaintiffs are alleging that they

10   would suffer would presumably continue based on their -- based

11   on their articulation in their brief.  So they would not be

12   precluded from coming back to the Court and say, Your Honor,

13   please rule on this specifically pled complaint.

14             THE COURT:  Okay.  I hear you.

15             MS. WILLIAMS:  Now, a -- a few other points.  So with

16   respect to the -- the point that the underlying lease in terms

17   of -- of vacatur, I think the Court correctly distinguished the

18   White [sic] case here as it pertains to emissions -- emissions

19   from helium, and plaintiffs also mention that.  I'm just trying

20   to get through some of the points that -- that plaintiffs

21   mention.

22        So -- so plaintiffs articulated as a proposal that BLM

23   should be ordered to stand down until it can get the final GHG

24   analysis done and then give them an opportunity to challenge,

25   but I don't -- but we disagree that this is the forum and the

```
1     vehicle and the way to go about doing it.  First of all, those
2     analyses, whether any additional NEPA or the -- the NEPA for
3     the project, they're entitled to a presumption of regularity.
4     And the plaintiffs have not cited to any authority that the
5     Court should hold everything in abeyance -- right? -- until
6     they get to see this analysis and then decide if they want --
7     and then decide that they want to -- to make this challenge.
8          I mean, they should -- they should go through the --
9     the -- the -- the process of the agency making its decision.
10    And then if it's -- and if there is a -- a -- a violation under
11    NEPA, then they can go through the process of filing a
12    complaint to address it.  But to hold this whole proceeding in
13    abeyance until they do that, we assert, is -- is highly
14    irregular.
15         So with respect to plaintiffs' intentions on the balance
16    of the harms, as we asserted in our -- as we asserted in our
17    brief, you know, helium is a critical resource, and by
18    delaying -- by imposing an -- by granting injunctive relief,
19    there would be a delay in this process in meeting the nation's
20    need for helium.  So we disagree that the balance of the harms
21    tips in -- in plaintiffs' -- in plaintiffs' favor.
22         So if Your Honor has any --
23              THE COURT:  Isn't -- isn't the record mixed on that?
24    Doesn't Pure Helium say that the reason we've got to act
25    quickly is because there's -- there's all this new helium
```

1   that's going to be dumped on the market and that's going to

2   bring the price way down?

3            MS. WILLIAMS:  Well, Your Honor, I will leave that to

4   the company to articulate that point, but as it currently

5   stands, helium has been designated a critical mineral resource.

6   And there is a shortage of helium currently, and, therefore,

7   the ability to give the company the opportunity to be able to

8   continue this work is in the public's interest.

9            THE COURT:  All right.

10           MS. WILLIAMS:  If Your Honor has no additional

11  questions for me, federal defendants respectfully request that

12  the Court denies plaintiffs' request for a temporary

13  restraining order because plaintiffs have failed to establish

14  that they would suffer any imminent irreparable harm.

15           THE COURT:  Thank you.

16        All right.  Mr. Garner; is that right?

17           MS. GARNER:  Yes, Your Honor.  Alison Garner for

18  the --

19           THE COURT:  Ms. Garner, I'm sorry.

20           MS. GARNER:  That's all right.  Alison Garner for the

21  intervenor defendant, Pure Helium.

22        Your Honor, I'd like to address your All Writs Act

23  question first, if I may.

24           THE COURT:  Of course.

25           MS. GARNER:  We -- we think that it is

1    distinguishable for several reasons, the cases that the Court

2    raised.  First, in both of the cases, *AstraZeneca* and the *Trump*

3    case, the plaintiffs in those cases, as we read, actually

4    brought claims challenging those yet-to-be issued decisions.

5    The plaintiffs in this case have not done that.  They've

6    indicated they may amend their complaint, but they have not

7    brought claims.  The Court, you know, hasn't had the benefit of

8    that briefing as the courts did in the *AstraZeneca* and *Trump*

9    cases.

10    They are also factually distinguishable.  In both of

11    those cases, at the time the claims became ripe and the

12    decisions were issued, almost simultaneously the claims could

13    have become moot.  Because in the *Trump* case, if his

14    accountants had given his tax returns, those could have become

15    public immediately and you can't make them unpublic.

16    Likewise, in the *AstraZeneca* case, the market would be

17    flooded with these generic drugs, and the company could

18    probably not gain back that market share.  You know, the horse

19    has left the barn, so to speak, in both of those cases.

20    That's not the situation here.  There is a short amount

21    of time between the decision and ground-disturbing activity,

22    but the -- the Court -- we -- we -- we don't believe the Court

23    should conflate potential that harms may begin, and we don't

24    concede that the plaintiffs have shown irreparable harm.  But,

25    in any event, we don't concede that -- we don't think the Court

1    should conflate the fact that harms may begin to occur with

2    mootness.  The project, you know, will be ongoing for some

3    time.  We don't believe it will become moot, you know,

4    immediately following the -- the -- the agency's decisions, as

5    was the situation in both the cases the Court mentioned.

6         And -- and importantly, I mean, I want --

7         THE COURT:  Let me ask you this question.  What we're

8    talking about primarily immediately is -- is the roadwork;

9    right?

10        MS. GARNER:  Correct.

11        THE COURT:  And that's estimated to last, from what I

12   read, about two weeks; is that right?

13        MS. GARNER:  So the roadwork and the well pad

14   construction will be conducted simultaneously over

15   approximately seven days.

16        THE COURT:  Okay.  So how does that not become moot

17   almost immediately?

18        MS. GARNER:  Well, perhaps the harms plaintiffs

19   allege may be occurring within the next seven days, but I don't

20   believe the -- the case is -- becomes constitutionally moot, I

21   suppose.

22        But I would like to answer a couple of questions that

23   came up about the roadwork and the well pad construction,

24   because I think we can clarify a few points.

25        THE COURT:  Of course.

1       MS. GARNER:  So we talked about Phase 1, which is

2   what is planned to occur over the next, approximately, 60 days

3   or so, 70 days, because there is a restriction -- a seasonal

4   restriction beginning March 1st where the company can no longer

5   work on-site because of the potential for the Mexican spotted

6   owl habitat.  So we're talking about, you know, approximately

7   70 days.  There will be no pipelines installed in the first

8   phase.  If -- if they are installed it would happen in the

9   second phase, in the fall of 2021 at the, probably, earliest.

10  So not, you know, imminent.

11      Secondly, the roadwork contemplated is -- in the

12  Phase 1, in the next seven days, would be a cut and fill;

13  leveling, bringing in gravel to level, stabilize; also putting

14  in erosion controls using best management practices to prevent

15  erosion; and reducing curves, if necessary; and a turnout or

16  two would be put in place to allow for the safe passage of

17  vehicles going opposite directions.

18      THE COURT:  So the government's assertion that it

19  would stay within the boundaries of the existing road, that's

20  incorrect?

21      MS. GARNER:  I think, for the most part, the work

22  would stay within the existing road, but there would be perhaps

23  some work in a few spots outside of the existing road for those

24  turnabouts.  If there is curve reduction, it will be minimal.

25      And now for the well pad construction, which is -- which

1    is at the end of the road -- it's sort of a turnabout,

2    roundabout at the end -- the same type of work would be

3    occurring with the leveling, bringing in gravel, and using

4    those best management practices to -- to prevent erosion, to

5    store the topsoil.  And I think we can't emphasize enough all

6    of this occurs in an existing area of disturbance outside the

7    boundaries of the Labyrinth Canyon Wilderness area.

8         And as Ms. Williams mentioned, the road boundary is

9    approximately 100 feet from the centerline in each direction,

10   the wilderness boundary.  So, you know, we're talking

11   further -- much further within -- outside of the wilderness

12   area.  And at the -- at the cherry -- at the end of the cherry

13   stem road where the well pad will be located, that is an

14   existing area of disturbance.  There is currently, as we

15   understand it, evidence of man -- man there.  There are --

16   there's an abandoned stock tank, some other abandoned

17   structures that are there and that, you know, the company would

18   clean up as part of the work.  So I wanted to clarify those

19   points for -- for the Court.

20        I also wanted to talk a little bit about the federal

21   lease.  And, you know, as Ms. Williams mentioned, it sounds

22   like the BLM is not planning to approve the application for

23   permit to drill, the federal lease, and, you know, the

24   company -- that's fine.  With the company, they -- we believe

25   that BLM can bifurcate the decision and defer the issue -- a

1    decision on the APD and yet grant the rights of way that the

2    company has requested to develop -- or, you know, to use the

3    road and the cherry stem and for the underground wellbore that

4    would lead to the school trust land parcels.

5            And the -- the -- the current analysis -- and, now, of

6    course, we haven't seen the final environmental assessment

7    either.  So we're all kind of speculating about what it might

8    say, which is, you know, why the claim is unripe at this point,

9    but as we understand it, you know -- as -- as we -- the

10   drafting of that environmental analysis does analyze the

11   impacts of the rights of way, and we believe that decision can

12   be bifurcated and -- and the company can proceed to develop its

13   SITLA leases using those rights of way and without the federal

14   lease for some time, 30 -- at least for Phase 1.

15           And -- and so I also wanted to mention the Court is

16   absolutely correct that no one has alleged any downstream

17   greenhouse gas impacts from a helium lease.  Those -- we

18   believe those are entirely separate.  Any arguments are --

19   are -- to try to conflate this helium lease with impacts from

20   an oil or gas -- natural gas lease are -- are erroneous.

21           And I also wanted to emphasize that the harms the

22   plaintiffs have alleged from the rights of way are inconsistent

23   with the Dingell Act, and Ms. Williams read the language there.

24   There are not to be any buffer zones around the wilderness to

25   prevent nonwilderness work from occurring.  Congress

1    contemplated that work may happen outside the wilderness

2    boundaries but that should not preclude that work from

3    happening.

4         Lastly, the plaintiffs have failed on the balancing of

5    harms and the public interest arguments.  And the company will

6    suffer imminent and concrete harms from even a short delay.  We

7    submitted a declaration from a company employee, Kirby Carroll,

8    that outlines the timing for Phase 1.  If you add up the -- the

9    different pieces of work in Phase 1, that comes to 66 days.

10   It's 68 days from March 1st when that seasonal restriction

11   begins.  So we have a very tight timeline here.  And if the

12   company is unable to complete that well testing at the end of

13   Phase 1, they -- their ability to obtain critical information

14   about the well could be delayed as -- as long -- as far as next

15   fall.  This could result in a substantial financial harm to the

16   company, millions of dollars, tens of millions of dollars, if

17   the company is unable to secure these long-term helium

18   contracts at favorable prices.

19        And, you know, as the Court mentioned, these prices are

20   expected to decline substantially at the end of next year when

21   Russia and Qatar are expected to flood the market, impacting

22   domestic supply.  Potentially, you know, depending on how much

23   is released, really eviscerating the domestic market for

24   helium.  And it's a critical resource; it's been designated as

25   such.  We -- in Mr. Carroll's declaration, he outlines just a

1    few of the uses for helium.  There's some national security

2    uses.  There are medical uses for MRIs, for some of the

3    respiratory treatments for COVID-19.  A company has sought a

4    patent to use helium to get the super cold conditions needed to

5    ship a COVID-19 vaccine.  There are quite a few uses for helium

6    that I learned about in this case.

7            THE COURT:  Let me ask you a question.  When did the

8    company submit its application to the BLM?

9            MS. GARNER:  Your Honor, I'm not sure.  I believe it

10   was at some point this summer that it submitted the materials

11   to the BLM.

12           THE COURT:  The time pressure of being bumped up

13   against the Mexican spotted owl is a result of BLM's delay, not

14   any delay I might impose; is that right?

15           MS. GARNER:  Well, perhaps, Your Honor, but it could

16   just be a circumstance of time and processing its permits; but

17   being as it were, we are up against that spotted owl seasonal

18   restriction on March 1st.

19           THE COURT:  Okay.

20           MS. GARNER:  And, you know, as I was just mentioning,

21   all these uses of helium, those are also in the public

22   interest.  The state, the county, Emery County, Utah, and the

23   school trust lands administration could lose millions of

24   dollars in royalties and tax revenues if the project is

25   delayed.  All the employees that the company will be hiring for

```
1     the project, up to 200 contractors, will be released if the

2     project is delayed.

3          And so -- so we believe that the plaintiffs have failed

4     to demonstrate any of the four factors needed for a temporary

5     restraining order or preliminary injunction, and we request the

6     Court deny that motion.  Thank you.

7               THE COURT:  All right.  Thank you.

8               MS. WILLIAMS:  Your Honor.

9               THE COURT:  Yes.

10              MS. WILLIAMS:  If I may offer points of

11    clarification?

12              THE COURT:  Sure.

13              MS. WILLIAMS:  So -- so Ms. Garner had just stated

14    that the road would be -- the right of way would be widened

15    somewhat, and I would just direct the Court's attention to the

16    EA, the -- on page 9, Table 2 where it states the road

17    dimension and does not have any discussion of expanding that

18    30-foot right -- the 30-foot road, the right of way.  So as the

19    EA stands, there's not supposed to be any expansion of that

20    road, of the right of way.

21              THE COURT:  Okay.  But the EA does discuss the

22    turnabouts and -- and the leveling, softening of the curves.

23    So that has to be foreseeable.

24              MS. WILLIAMS:  Right.

25              MS. GARNER:  Your Honor, may I clarify.  I think we
```

1       might be -- there might be some confusion between the term

2       "right of way" and "road."  I mean, if we think about a regular

3       road we all drive along, there is a shoulder on most roads.

4       It's within the right of way.  So to be clear, the company will

5       not exceed the right of way at any point at all.

6                    THE COURT:  Okay.  But it will disturb ground that's

7       not currently disturbed; is that right?

8                    MS. GARNER:  Within Phase 1, there may be a few

9       spots, depending on the curvature of the road -- and I have not

10      been out there.  I don't know for certain -- where they may

11      smooth out those curves, which would perhaps exceed the

12      existing roadbed, but the right of way will not be exceeded at

13      any -- at any point --

14                   THE COURT:  Okay.

15                   MS. GARNER:  -- at any phase of the project.

16                   THE COURT:  All right.  All right.

17           Mr. Bloch, briefly.

18                   MR. BLOCH:  Thank you, Your Honor.

19           I'm just going to start where Ms. Garner left off.

20      The -- and we hit this point in our reply brief.  The

21      environmental assessment describes current status of the road

22      as a simple, primitive two-track.  That is shorthand for it's a

23      very narrow road that's probably the width of a vehicle.  I

24      think what we've heard from Ms. Garner, from Ms. Williams is

25      consistent with the harms that SUWA has alleged, which is that

1    the road is going to be widened within the right of way, but

2    there is undisturbed soil and vegetation within that scope, and

3    that's what's going to be impacted, as well as from the

4    clearing of the drill pad where there is existing vegetation.

5    So -- and the environmental assessment is clear that the

6    impacts from those activities will result in irreparable,

7    long-term environmental damage.

8          I -- as I was listening to the discussion about the

9    timing, at the end, from Ms. Garner and from Ms. Williams,

10   it -- it feels like a lot of gamesmanship for how the

11   authorization may unroll and in an effort -- because we heard

12   from counsel yesterday -- to make the case immediately ripe and

13   very immediately moot.  I mean, it feels very intentional that

14   they're trying to weave around and decide what's going to be

15   authorized, what's not.

16         The environmental assessment -- and this is the only

17   environmental assessment we're going to see for the drilling

18   project; even if there's a later-in-time authorization for the

19   federal APD, this is the NEPA analysis.  It relies on the

20   federal lease and contemplates the development of federal land,

21   the road construction, and the clearing, and the pipelines

22   related to the development of the federal lease and the state

23   lease.  These are, as I know I've said a few times,

24   inextricably intertwined.

25         I think last, with regard to the supplemental greenhouse

1    gas and environmental assessment, SUWA is not arguing that the

2    effectiveness of that decision should be stayed.  Instead what

3    we're saying is BLM would notify the Court and the parties that

4    that environmental assessment has been finalized.  And the

5    timing for SUWA then to file its -- and Ms. Williams indicated

6    in her pleading that is on the cusp, be a matter of days or few

7    weeks until it's -- it's finished.  And that would give us an

8    opportunity then to challenge both the drilling environmental

9    assessment and, if we elect to, to challenge the supplemental

10   environmental assessment for greenhouse gas emissions.  That's

11   really, feels like, the neatest way to tie together the strands

12   that Ms. Williams in particularly pled in her briefing are

13   lurking out there.

14       With that, Your Honor, we submit -- we believe the Court

15   should grant this motion.  Thank you.

16           THE COURT:  Okay.  So I -- I agree with defendants

17   that at least in part the plaintiffs' arguments do not have a

18   final agency decision.  That won't come until tomorrow.  But

19   under the All Writs Act, I believe I can -- I have the

20   authority to delay things from taking place in order to protect

21   my jurisdiction before those claims become moot given the --

22   the expedited schedule it's on and -- and the ground-disturbing

23   activity that will occur before the plaintiffs would be able to

24   supplement their complaint and for me to review it in time

25   to -- to have any effect.

1    So we're going to move under the following schedule.  I

2  presume that the government still intends to issue its decision

3  tomorrow.  One week thereafter, by December 30th, the plaintiff

4  will supplement its complaint.  They're granted leave to

5  supplement the complaint and renew any motion for a TRO or PI.

6    The government and the intervenor defendant will be able

7  to respond by January 4th.

8    And we'll have another hearing January 6th at 2:00 p.m.

9    And obviously the -- the -- the intervenor defendant

10 cannot do any ground-disturbing activity pursuant to that

11 authorization issued tomorrow pending the hearing on

12 January 6th.

13    Any questions?

14    MR. BLOCH:  No.  Thank you, Your Honor.

15    MS. GARNER:  Yes, Your Honor.  This is Alison Garner

16 for the intervenor defendant.

17    In our opposition to the plaintiffs' motion for a

18 temporary restraining order, we asked the Court to enter a

19 security bond pursuant to Rule 65(c).  And we would ask Your

20 Court -- Your Honor to weigh in on that.  I believe we asked

21 for a hundred thousand dollars because of the contract

22 penalties the company will incur by -- with a delay of, I

23 guess, approximately two weeks.

24    THE COURT:  Okay.  I don't -- that's not usual in

25 these types of cases that we see here in D.C.

1           All right.  If nothing -- if no other questions, you're

2     excused.

3           If I could have the government file on the docket the

4     authorization papers that are issued tomorrow at some point

5     tomorrow so that everyone can see them.

6                MS. WILLIAMS:  Yes, Your Honor.  Yes.

7                THE COURT:  All right.  Thank you.  You're excused.

8                (The proceedings were concluded at 4:03 p.m.)

1          <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 28th day of December, 2020.

10

11                        /s/ Nancy J. Meyer
                          Nancy J. Meyer
12                        Official Court Reporter
                          Registered Diplomate Reporter
13                        Certified Realtime Reporter
                          333 Constitution Avenue Northwest, Room 6509
14                        Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25