**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Southern Utah Wilderness Alliance, *et al.*, <br><br>    Plaintiffs, <br><br>       v. <br><br> David Bernhardt, *et al.,* <br><br>    Defendants. | Civ. No. 1:20-cv-03654-RC <br><br> **HEARING REQUESTED** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................iv

LIST OF ACRONYMS ..................................................................................................viii

INTRODUCTION ............................................................................................................ 1

LEGAL BACKGROUND ................................................................................................ 3

   I.    OIL AND GAS LEASING AND DEVELOPMENT ON PUBLIC LANDS ................... 3

   II.   NATIONAL ENVIRONMENTAL POLICY ACT........................................................ 5

FACTUAL BACKGROUND............................................................................................ 7

   I.    OIL AND GAS DEVELOPMENT IN THE DESERT SOUTHWEST ........................... 7

   II.   DEVELOPMENT OF THE SAN RAFAEL DESERT MASTER LEASING PLAN........ 8

   III.  THE TRUMP ADMINISTRATION'S "ENERGY DOMINANCE" AGENDA............. 11

   IV.  DECEMBER 2018 LEASE SALE ............................................................................. 13

   V.   THE "ENERGY DOMINANCE" AGENDA STUMBLES AND BACKFIRES ........... 17

   VI.  THE TWIN BRIDGES PROJECT ............................................................................. 18

ARGUMENT .................................................................................................................. 20

   I.    SUWA IS LIKELY TO SUCCEED ON THE MERITS OF ITS NEPA AND APA
       CLAIMS. ................................................................................................................. 20

       A.   BLM's Leasing and Development Approval Decisions Violate NEPA................. 21

           1.    BLM failed to consider and disclose the cumulative impacts of GHG
                emissions from the Twin Bridges lease......................................................... 22

           2.    BLM failed to calculate water quantity and to analyze and disclose the
                impacts of oil and gas leasing and development to that critical resource prior
                to leasing...................................................................................................... 25

           3.    BLM failed to analyze the cumulative effects of water consumption in the
                Twin Bridges Final EA................................................................................. 28

       B.   BLM Violated the APA When It Arbitrarily Abandoned the San Rafael Desert
          MLP. .................................................................................................................. 30

   II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION. 34

       A.   The Twin Bridges Project Will Cause Immediate Irreparable Environmental Harm.
          .......................................................................................................................... 34

       B.   The Twin Bridges Project Will Cause Immediate Irreparable Environmental Harm
          to the Naturalness and Solitude of the Labyrinth Canyon Wilderness. ................... 37

       C.   The Twin Bridges Project Will Cause Irreparable Aesthetic Harm. ....................... 41

III.   THE BALANCE OF EQUITIES WEIGHS DECIDEDLY IN PLAINTIFFS' FAVOR. 42

IV.   AN INJUNCTION IS IN THE PUBLIC INTEREST. ..................................................... 44

CONCLUSION............................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................... 37

*Am. Wild Horse Preserv. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017).................... 32, 33

\* *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987)........................................... 2, 34, 42

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 870 (1983) ......................... 21

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ............................................................. 5

\* *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009) ..... 34, 45

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)................ 36, 39

*Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702 (GK), 1995 WL 748246 (D.D.C. 1995)............................................................................................................ 44

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) ........................................................................ 4

\* *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832 (S.D. Ohio 2020).... 25, 26

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) ........................................................................ 43

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ........................................ 20

\* *Diné Citizens Against Ruining Our Environment v. Bernhardt* ("*Diné CARE*"), 923 F.3d 831 (10th Cir. 2019) .................................................................................................................. 6, 28

\* *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................................ 30

*Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332 (D.D.C. 2017) ...................................... 40

\* *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska I*"), 381 F. Supp. 3d 1127 (D. Alaska 2019) ......................................................................................................... 32

\* *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska II*"), 463 F. Supp. 3d 1011 (D. Alaska 2020) ..................................................................................................... 32, 33

*Friends of Animals v. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53 (D.D.C. 2017) ...................... 7

*Fund for Animals v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) ....................................................... 44

*Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156 (D.D.C. 2002) ............................ 44

*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004).......................................... 44

*Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561 (D. Mont. 2018) .......... 32

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ....................................................... 5, 45

*Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983) ................................................................. 45

*Mayo v. Reynolds*, 875 F.3d 11 (D.C. Cir. 2017) ....................................................................... 40

*Monumental Task Comm. v. Foxx*, 157 F. Supp. 3d 573 (E.D. La. 2016).................................... 37

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) ..................... 5

*Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ............................................ 45

*Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245 (D.D.C. 1977) ............................................ 44

*Natural Res. Def. Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) ........................................... 21

*Natural Res. Defense Council, Inc. v. U.S. Envtl. Prot. Agency*, 438 F. Supp. 3d 220 (S.D.N.Y 2020) ............................................................................................................................. 32

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) .................................................................................................................. 43

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ..................................... 5, 21

\* *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227 (D.N.M. 2018) .............................................................................................................. 25, 26, 29

*Sierra Club v. Block*, 614 F. Supp. 488 (D.D.C. 1985) ............................................................ 45

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) .......................................................... 4

*Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189 (D.C. Cir. 2017) ........................................ 22

*Sierra Club v. Watkins*, 808 F. Supp. 852 (D.D.C. 1991) ........................................................ 34

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519 (1978) ........... 5

*W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042 (D. Idaho 2020) ................................... 13

\* *WildEarth Guardians v. Bernhardt* ("*WildEarth Guardians II*"), No. 16-CV-1724 (RC), 2020 WL 6701317 (D.D.C. Nov. 13, 2020) ................................................................... 6, 24, 29

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880 (D. Mont. 2020) ..... 25

\* *WildEarth Guardians v. Zinke* ("*WildEarth Guardians I*"), 368 F. Supp. 3d 41 (D.D.C 2019) ............................................................................................................................. passim

\* *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ........................................................ 20

*Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ....................... 39, 42

**Statutes**

16 U.S.C. § 1131 ............................................................................................................................ 2

30 U.S.C. § 226 ...................................................................................................................... 20, 40

42 U.S.C. § 4332 .................................................................................................................. 5, 6, 22

43 U.S.C. § 1701 ............................................................................................................................ 3

43 U.S.C. § 1712 ........................................................................................................................ 3, 4

43 U.S.C. § 1732 ............................................................................................................................ 3

## Regulations

40 C.F.R. § 1500.1 (2019) ........................................................................................ 5

40 C.F.R. § 1501.4 (2019) ........................................................................................ 6

40 C.F.R. § 1502.20 (2019) ...................................................................................... 6

40 C.F.R. § 1508.13 (2019) ...................................................................................... 6

40 C.F.R. § 1508.28 (2019) ................................................................................... 6, 7

* 40 C.F.R. § 1508.7 (2019) .......................................................................... 6, 21, 29

40 C.F.R. § 1508.8 (2019) ..................................................................................... 5, 21

40 C.F.R. § 1508.9 (2019) ........................................................................................ 6

43 C.F.R. § 1601.0-5 ............................................................................................... 3

43 C.F.R. § 3100.0-3 .............................................................................................. 14

43 C.F.R. § 3101.1-2 ................................................................................................ 4

43 C.F.R. § 3120.1-2 ................................................................................................ 4

43 C.F.R. § 3120.5-1 ................................................................................................ 4

43 C.F.R. § 3120.5-2 ................................................................................................ 4

43 C.F.R. § 3120.5-3 ................................................................................................ 4

43 C.F.R. § 3162.3-1 ................................................................................................ 4

43 C.F.R. § 46.120 ............................................................................................... 7, 14

## Other Authorities

Executive Order 13783, "Promoting Energy Independence and Economic Growth" (Mar. 28, 2017).......................................................................................................... 11, 12, 31

Instruction Memorandum No. 2010-117, "Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" ................................................................................. 8

Instruction Memorandum No. 2018-34, "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" ..................................................... 12, 13, 31

John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. 116-9, 133 Stat 580 ............................................................................................................... 4, 15

Notice of Intent to Prepare a Master Leasing Plan, Amend the Resource Management Plans for the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment, Utah, 81 Fed. Reg. 31,252-02 (May 18, 2016) ................................................. 8, 33

Notice of Termination of the San Rafael Swell Master Leasing Plan, Utah, 83 Fed. Reg. 32,681-01 (July 13, 2018).................................................................................... 13, 31

Onshore Oil and Gas Order No. 1, 72 Fed. Reg. 10,308 (March 7, 2007) ................... 20

Secretarial Order No. 3354, "Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid Mineral Leasing Program" (July 5, 2017) ................ 12, 31

Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020) ............................................. 5

## LIST OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APD | Application for Permit to Drill |
| BLM | Bureau of Land Management |
| DNA | Determination of NEPA Adequacy |
| DOI | Department of the Interior |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| GAO | Government Accountability Office |
| GHG | Greenhouse gas |
| IM | Instruction Memorandum |
| MLP | Master Leasing Plan |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| NSO | No-Surface Occupancy |
| PFO | Price Field Office |
| RFDS | Reasonably Foreseeable Development Scenario |
| RMP | Resource Management Plan |
| SLFO | Salt Lake Field Office |

**INTRODUCTION**

Plaintiffs Southern Utah Wilderness Alliance, Natural Resources Defense Council, Center for Biological Diversity, and Living Rivers (collectively, "SUWA") move for a temporary restraining order and preliminary injunction enjoining implementation of the Twin Bridges Helium Development Project (hereinafter, the "Twin Bridges Project" or "Project"), a proposed helium development project targeting an unlawfully issued federal oil and gas lease (and state leases) within the congressionally designated Labyrinth Canyon Wilderness. The Defendants, officials at the U.S. Bureau of Land Management ("BLM") and Department of the Interior (collectively, "Federal Defendants"), have been working in concert with Twin Bridges Resources, LLC and Intervenor-Defendant Pure Helium, LLC (collectively, "Twin Bridges"), the lessees, to fast-track the Project in the final days of the Trump administration. BLM has now authorized a plan for development that will irreversibly industrialize one of the most remote, spectacular, and undeveloped locations in the United States. SUWA faces imminent harm— BLM approved the Project on December 23, 2020, and Twin Bridges can begin surface-disturbing construction absent a further injunction from the Court.

SUWA seeks an injunction to preserve the status quo. Any helium underlying the lease has existed for geologic ages, and still will during the pendency of this case. But without an injunction, the Labyrinth Canyon Wilderness and remarkable public lands surrounding it will be irreparably harmed with just a few days' work, and in a manner that cannot be meaningfully restored during our lifetimes. Pure Helium will soon widen and clear a primitive access road cherry-stemmed deep into the Wilderness area and bulldoze and clear acres of land for a well pad, drill wells, and install gas processing infrastructure. This industrialization will occur a stone's throw from an area Congress recently preserved "for the use and enjoyment of the

American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness." 16 U.S.C. § 1131(a).

BLM itself recognizes the irreparable harm the Twin Bridges Project will cause. *See* Part II, Argument, *infra*. The Project will destroy acres of sensitive desert soils and plants. This is precisely the type of damage the United States Supreme Court has held "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). It will also destroy the values that led Congress to protect the area—naturalness, solitude, and a landscape "untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c).

SUWA meets each of the elements necessary for a temporary restraining order and preliminary injunction. First, SUWA is likely to succeed on the merits because, as BLM itself has recognized, the Twin Bridges lease was issued in violation of the National Environmental Policy Act ("NEPA") as well as this Court's order in *WildEarth Guardians v. Zinke* ("*WildEarth Guardians I*"), 368 F. Supp. 3d 41 (D.D.C. 2019). The NEPA analyses prepared for the lease and Twin Bridges Project also fail to analyze the cumulative impacts of water use—that is, the impacts from this water-intensive development in combination with other reasonably foreseeable oil and gas development. And BLM's abrupt about-face—its decision to offer leases including the Twin Bridges lease in an area that had been closed to such activities for years for required pre-leasing studies and planning—was arbitrary.

Second, SUWA and its members will suffer imminent and irreparable environmental, recreational, and aesthetic harm if the initial exploration and development is not enjoined. And

lastly, both the balance of harms and the public interest both weigh heavily in favor of maintaining the status quo until the Court can review and resolve this case on the merits.

**LEGAL BACKGROUND**

**I.      OIL AND GAS LEASING AND DEVELOPMENT ON PUBLIC LANDS**

BLM manages public lands pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, and authorizes mineral development on those lands pursuant to both FLPMA and the Mineral Leasing Act, 30 U.S.C. §§ 181-287. FLPMA broadly directs BLM to manage the use, occupancy, and development of public lands under principles of "multiple use and sustained yield" that balance development with environmental protection. 43 U.S.C. § 1701(a)(7)–(8); *see also id.* § 1732(b).

Under FLPMA, BLM must "develop, maintain, and, when appropriate, revise land use plans" for public lands. 43 U.S.C. § 1712(a). These land use plans—termed resource management plans, or RMPs—allocate resource uses within certain agency-identified planning areas. *See id.* § 1732(a) (the Secretary "shall manage the public lands . . . in accordance with the land use plans"); 43 C.F.R. § 1601.0-5(n) (RMPs generally establish "designation[s]"and "allowable resource uses"). To gauge reasonably foreseeable oil and gas development, BLM typically prepares "reasonably foreseeable development scenarios" ("RFDS"), which serve as "long-term projection[s] of oil and gas activity" for a particular area of public lands. BLM, Reasonably Foreseeable Development Scenario for Oil and Gas in the San Rafael Desert Master Leasing Plan Area, at 1 (Sept. 2016) ("San Rafael Desert MLP RFDS") (attached as Ex. A). They are prepared to "project[] the level of oil and gas activity that can reasonably be expected to occur" over a particular timeframe (*e.g.*, fifteen years). *Id.* An RFDS does not analyze and

disclose environmental impacts but instead predicts future development based "largely on local geology, current and historical trends . . . and forecasts" of energy markets. *Id.*

To authorize oil and gas development under FLPMA, BLM makes at least three separate decisions. *See generally WildEarth Guardians I*, 368 F. Supp. 3d at 54. First, BLM develops an RMP that allocates federal public lands for various uses, including which lands across the planning area may be open to oil and gas leasing development, and under what terms and conditions. 43 U.S.C. § 1712(a).

Second, BLM issues leases on specific parcels of land. *See generally* 43 C.F.R. §§ 3120.1-2, 3120.5-1 to -3 (describing BLM's lease sale procedures). If BLM issues leases without no-surface-occupancy ("NSO") stipulations (referred to as "non-NSO leases" or "surface-occupancy leases"),[1] it thereafter lacks the authority to preclude surface disturbance on the leasehold. 43 C.F.R. § 3101.1-2; *see Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C. Cir. 1983). Thus, the sale of a non-NSO oil and gas lease is the point BLM engages in an irreversible and irretrievable commitment of resources.

Third, after a parcel has been sold, the lessee may submit and the BLM may approve an application for permit to drill ("APD"), which authorizes drilling and development of the lease parcel. 43 C.F.R. § 3162.3-1(c).[2] APDs may include or be accompanied by surface use plans of operations, right-of-way applications, and requests for authorizations which together detail proposed pipelines, roads, well pads, and other related facilities and activities. *Id.* § 3162.3-1(d).

---

[1] NSO stipulations "prohibit lessees from occupying or using the surface of the leased land without further specific approval from the BLM." *Conner v. Burford*, 848 F.2d 1441, 1444 (9th Cir. 1988).

[2] Congress recently amended the Mineral Leasing Act to allow an oil and gas lessee to drill for and develop helium and continue to hold an oil and gas lease without also producing in paying quantities of oil and gas. *See* Pub. L. 116-9, 133 Stat 580, Section 1109.

## II.       NATIONAL ENVIRONMENTAL POLICY ACT

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. §

1500.1.[3] The fundamental objective of NEPA is to ensure that an "agency will not act on

incomplete information only to regret its decision after it is too late to correct." *Marsh v. Or.*

*Natural Res. Council*, 490 U.S. 360, 371 (1989) (citation omitted). "Under NEPA, agency

decisionmakers must identify and understand the environmental effects of proposed actions, and

they must inform the public of those effects so that it may 'play a role in both the

decisionmaking process and the implementation of the agency's decision.'" *WildEarth*

*Guardians I*, 368 F. Supp. 3d at 52 (quoting *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 349 (1989)) (alteration marks omitted)). Stated differently, NEPA was designed "to

insure a fully informed and well-considered decision." *Vt. Yankee Nuclear Power Corp. v.*

*Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).

"[B]y regulation and by statute, assessment of all 'reasonably foreseeable' impacts must

occur at the earliest practicable point, and must take place before an 'irretrievable commitment

of resources' is made." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718

(10th Cir. 2009) (quoting 42 U.S.C. § 4332(2)(C)(v)). These include the direct impacts of a

decision on the environment, 40 C.F.R. § 1508.8(a), indirect impacts (those "caused by the

action and are later in time or farther removed in distance," *id.* § 1508.8(b)), and cumulative

impacts ("the impact on the environment which results from the incremental impact of the action

---

[3] In the summer of 2020, the Council on Environmental Quality finalized updates to the NEPA regulations. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). The new regulations took effect on September 14, 2020, but do not apply retroactively to BLM's leasing decision or its approval of the Twin Bridges Project. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Accordingly, throughout this Memorandum SUWA cites to the regulations in effect when BLM conducted the relevant NEPA analyses here, not the newly-promulgated regulations.

when added to other past, present and reasonably foreseeable future actions," *id.* § 1508.7).

Federal courts have held that the wells anticipated in a RFDS are "reasonably foreseeable future

actions" for purposes of NEPA analysis. *Diné Citizens Against Ruining Our Env't v. Bernhardt*

("*Diné CARE*"), 923 F.3d 831, 853 (10th Cir. 2019) (citing 40 C.F.R. § 1508.7); *WildEarth*

*Guardians v. Bernhardt* ("*WildEarth Guardians II*"), No. 16-CV-1724 (RC), 2020 WL 6701317,

at *8 n.9 (D.D.C. Nov. 13, 2020).

NEPA requires an agency to prepare a detailed environmental impact statement ("EIS")

before undertaking any "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). If the agency is unsure whether it needs to prepare an

EIS, it instead may prepare an environmental assessment ("EA"). 40 C.F.R. §§ 1501.4, 1508.9.

An EA is a less comprehensive document than an EIS, but it must nonetheless analyze the effects

of a proposed action and reasonable alternatives to the proposal. *Id.* § 1508.9(b) (requiring both

effects analysis and alternatives analysis). Should an agency determine in the EA that significant

effects may occur, it must prepare an EIS. *Id.* § 1508.9(a)(1). Otherwise, the agency proceeds to

issue a Finding of No Significant Impact ("FONSI") and Decision Record ("DR") that signals

the end of NEPA analysis for that action. *Id.* § 1508.13.

NEPA regulations encourage agencies to "tier" narrower environmental analyses to

broader environmental analyses. 40 C.F.R. §§ 1502.20, 1508.28. Tiering allows agencies to

analyze the broad effects of a proposed program or plan in a programmatic EIS, then incorporate

that analysis by reference when examining later, site-specific proposals in a site-specific EIS or

EA. *Id.* § 1508.28(a). Agencies can thus "concentrate on the issues specific to the subsequent

action." *Id.* § 1502.20.

Tiering does not alter any of NEPA's procedural requirements. It "helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe." 40 C.F.R. § 1508.28(b). But an agency must still analyze the effects of development once those effects become reasonably foreseeable.

If BLM believes that existing NEPA documentation fully considers a proposed action, it may prepare a Determination of NEPA Adequacy ("DNA") to confirm or deny this assertion. 43 C.F.R. § 46.120(c). DNAs are not NEPA documents; rather, they are worksheets completed by agency staff to document their conclusions that existing NEPA analyses are sufficient. *See Friends of Animals v. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 57 (D.D.C. 2017). If existing NEPA documents do not fully analyze the impacts of or alternatives to a project, BLM must prepare a new NEPA document to comply with its NEPA obligations before issuing any decision.

## FACTUAL BACKGROUND

### I.    OIL AND GAS DEVELOPMENT IN THE DESERT SOUTHWEST

The Southwest region of the United States has been experiencing, and is predicted to continue to experience, severe drought conditions as a result of climate change—drought driven in no small part by BLM's oil and gas leasing program. Pls.' Am. & Supp. Compl. ("Supp. Compl.") ¶¶ 56–59 (ECF No. 32).[4] Anthropogenic climate change, predominantly the result of GHG pollution, is profoundly impacting the Colorado River Basin in ways that are altering temperatures, streamflow, and the hydrologic cycle. *Id.* ¶¶ 64–65. Multiple studies have

---

[4] The allegations from SUWA's Supplemental Complaint contain citations to various scientific studies and reports, all of which SUWA submitted to BLM as attachments to its comments on the Twin Bridges Project; consequently, these studies and reports will be part of the administrative record once this case proceeds to the merits.

concluded that the Colorado River Basin has warmed more than any other region of the United States. *Id.* ¶ 66.

Oil and gas development exacerbates the hydrologic and drought crises in the Southwest. *Id.* ¶ 67. As the U.S. Government Accountability Office ("GAO") concluded in a 2014 report, "the cumulative effects of using surface water or groundwater at multiple oil and gas development sites can be significant at the local level, particularly in areas experiencing drought conditions." *Id.* ¶ 69 (quoting GAO, Freshwater, Supply Concerns Continue, and Uncertainties Complicate Planning, at 26, GAO-14-430 (May 2014)).

## II.   DEVELOPMENT OF THE SAN RAFAEL DESERT MASTER LEASING PLAN

In 2010, BLM issued Instruction Memorandum ("IM") No. 2010-117, "Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews" (hereinafter, "IM 2010-117") (attached as Ex. B). IM 2010-117 introduced a host of measures designed to better balance oil and gas leasing and development and environmental protection. Among its provisions, IM 2010-117 introduced the Master Leasing Plan ("MLP") concept. *See id.* § II. MLPs, a type of land use plan amendment, were "a mechanism for completing the additional planning, analysis, and decision-making that may be necessary for areas meeting" established criteria. *Id.* If an area of public lands satisfied the criteria, then BLM was "required" to prepare an MLP. *Id.*

In 2010, BLM determined that several MLPs were required across Utah, including for 525,000 acres of public lands in the San Rafael Desert region—the San Rafael Desert MLP area. *See* Notice of Intent to Prepare a Master Leasing Plan, Amend the Resource Management Plans for the Price and Richfield Field Offices, and Prepare an Associated Environmental Assessment, Utah, 81 Fed. Reg. 31,252-02, 31,252–54 (May 18, 2016). At that time, BLM explained "[t]he [San Rafael Desert] MLP process will provide additional planning and analysis for areas *prior to*

8

*new leasing of oil and gas resources.*" *Id.* at 31,253 (emphasis added). This planning process, when completed, would "provide a framework for determining which areas are appropriate for responsible oil and gas exploration and development." BLM, News Release, *BLM initiates Master Leasing Plan Process for the San Rafael Desert* at *1 (May 18, 2016) (attached as Ex. C).[5]

In its "fact sheet" prepared to explain the MLP process to the public, BLM explained that "MLPs are required in areas with sensitive resources, such as the San Rafael Desert." BLM, San Rafael Desert Master Leasing Plan, Fact Sheet at 1 (undated) ("MLP Fact Sheet") (attached as Ex. D). BLM identified a host of issues that required additional analysis in this area including "air quality, climate change, cultural resources, night skies, paleontological resources, recreation, riparian resources, socioeconomics, soil and water resources, special status species, vegetation, visual resources, wildlife and fisheries, and wilderness characteristics." *Id.* According to BLM, this analysis had to be prepared "*before new mineral leasing and development are allowed*" in the San Rafael Desert. BLM, San Rafael Desert Master Leasing Plan, Purpose and Need, at *2 (undated) (emphasis added) (attached as Ex. E).

In 2015, BLM began preparing NEPA analysis for the San Rafael Desert MLP, which included the following:

- A comprehensive review of potential alternatives. BLM, San Rafael Desert Master Leasing Plan, Chapter 2—Alternatives (undated) (attached as Ex. F);

- New and updated, lease stipulations and lease notices the agency determined should be applied to all new leases. BLM, San Rafael Desert Master Leasing Plan, Appendix B—Oil and Gas Stipulations and Lease Notices (undated) (attached as Ex. G);

---

[5] Pin cites to the attached exhibits are either made to the page numbers originally labeled on the documents or, when an exhibit lacks native page numbers, to the sequential page number of the PDF exhibit. Pin cites in the latter instance (such as this citation) are denoted by an asterisk.

- New and updated "best management practices" for development activities in the MLP area. BLM, San Rafael Desert Master Leasing Plan, Appendix C—Best Management Practices (undated) (attached as Ex. H); and

- The San Rafael Desert MLP RFDS (Ex. A).

Based on this information, BLM prepared a draft EA but, as explained *infra*, did not complete this analysis. BLM, San Rafael Desert Master Leasing Plan and Draft Resource Management Plan Amendments / Draft Environmental Assessment (May 2017) ("San Rafael Desert MLP EA") (attached as Ex. I).[6]

BLM also explained that it had to prepare the MLP to address new information and changed circumstances including "[a] cultural resources inventory, viewshed analysis, and historic setting analysis for the Old Spanish National Historic Trail," "[v]isual resource inventories for the Price and Richfield Field Offices," and the San Rafael Desert MLP RFDS, among other issues. *Id.* at 1-3 (Ex. I). BLM acknowledged that this new information had to be analyzed and disclosed in the EA "prior to new leasing of oil and gas within the planning area." *Id.*

BLM invited public comments on the San Rafael Desert MLP and held public open house meetings to inform the public about the need for the MLP. It received hundreds of public comments, as well as comments from the United States Environmental Protection Agency ("EPA") and the National Park Service ("NPS"). EPA explained that BLM should analyze and disclose impacts to air resources, groundwater resources, surface water resources, public

---

[6] In each of the listed documents above, as well as the San Rafael Desert MLP EA, BLM reconfirmed its long-standing position that the MLP was "required" by law and that additional NEPA analysis was necessary *before* the agency could offer new leases or authorize development in the San Rafael Desert. *See, e.g.*, San Rafael Desert MLP EA at 1-3 (Ex. I) (describing "Need" for San Rafael Desert MLP: "In response to [the MLP] policy, the State Director has determined that additional planning and analysis are warranted prior to allowing new mineral leasing and development.").

drinking water supply sources, wetlands, riparian areas and floodplains, and environmental justice, among other issues, since these issues had not been adequately analyzed in BLM's prior NEPA documents for this area. *See* EPA Letter to BLM, *Re: San Rafael Desert Master Leasing Plan, Resource Management Plan Amendment and National Environmental Policy Act Analysis Scoping Comments* (June 29, 2016) (attached as Ex. J).

NPS expressed its support for the MLP and encouraged BLM to analyze air quality and air quality related values, dark night skies, viewsheds, soundscapes, and watersheds, among other resources. *See* NPS Letter to BLM, *Scoping Comments on the Master Leasing Plan for the San Rafael Desert* (undated) (attached as Ex. K). To ensure full consideration of these concerns in the MLP, BLM and NPS entered into a memorandum of understanding "for the purposes of preparing a[n RMP] amendment and its accompanying [EA] for the development of the San Rafael Desert Master Leasing Plan (MLP)."[7]

From 2010 through mid-2017, while the MLP policy was in place, BLM did not offer a single oil and gas lease in the San Rafael Desert MLP (or in any of the other four MLP areas in Utah). As explained by BLM's Utah State Director in 2015: "BLM-Utah has deferred new leasing proposals submitted for all lands within the pending MLPs in order to preserve potential alternatives for those plans." BLM, Memorandum, *Updated Utah Master Leasing Plan (MLP) Strategy*, at 2 (Aug. 14, 2015) ("MLP Strategy Letter") (attached as Ex. M).

## III.   THE TRUMP ADMINISTRATION'S "ENERGY DOMINANCE" AGENDA

Shortly after President Trump took office in January 2017, he issued Executive Order 13783, titled "Promoting Energy Independence and Economic Growth," in which he declared a

---

[7] Memorandum of Understanding Between The Department of the Interior, Bureau of Land Management, Price and Richfield Field Offices and the National Park Service, at 1 (May 25, 2016) (attached as Ex. L).

new "energy dominance" agenda. 82 Fed. Reg. 16,093, 16,093 (Mar. 28, 2017). Executive Order

13783 required administrative agencies to "review all existing regulations, orders, guidance

documents, policies, and any other similar agency actions . . . that potentially burden the

development or use of domestically produced energy resources, with particular attention to oil

[and] natural gas." *Id.*

Soon after, then-Secretary of the Interior Ryan Zinke issued Secretarial Order No. 3354,

"Supporting and Improving the Federal Onshore Oil and Gas Leasing Program and Federal Solid

Mineral Leasing Program," to further the President's new energy agenda. Sec. of the Interior,

Order No. 3354 (July 5, 2017) (attached as Ex. N). Secretary Zinke's order required BLM to

"identify any provisions in [its] existing policy and guidance documents that would impede

BLM's plans to carry out quarterly oil and gas lease sales or its efforts to enhance exploration

and development of Federal onshore oil and gas resources." *Id.* § 4(b)(1).

In response to Executive Order 13783 and Secretarial Order 3354, BLM's headquarters

office in Washington, D.C. issued new nationwide policies to "streamline" oil and gas leasing

and development. Specifically, BLM issued IM No. 2018-34 (hereinafter, "IM 2018-34"),

entitled "Updating Oil and Gas Leasing Reform – Land Use Planning and Lease Parcel Reviews"

(Jan. 31, 2018) (attached as Ex. O). IM 2018-34 replaced BLM's longstanding oil and gas

leasing policy and established a framework for how BLM would achieve "energy dominance."

Most of the changes involved eliminating or curtailing environmental review, oversight, and

public involvement.

Among other things, IM 2018-34 directed BLM to forgo its obligation to fully analyze

site-specific impacts of leasing and development under NEPA, and instead encouraged agency

staff to look for opportunities to rely on pre-existing NEPA analyses. *See id.* § III.D (Ex. O).[8]

The IM also scrapped the MLP process, including finalization of the San Rafael Desert MLP.

Although these actions marked an abrupt reversal of agency policy and practice, BLM did not

provide a reasoned explanation for why the MLP concept (including the San Rafael Desert MLP)

was no longer required. Instead, citing to the Trump Executive Order and Zinke Secretarial

Order, BLM stated in conclusory fashion that "Master Leasing Plans . . . have created duplicative

layers of NEPA review. This policy, therefore, eliminates the use of MLPs." *Id.* § II. When BLM

ended the San Rafael Desert MLP process, it offered only the following perfunctory explanation:

"The preparation of an Environmental Assessment associated with the San Rafael [Desert]

Master Leasing Plan Amendment is no longer required, and the process is hereby terminated."

Notice of Termination of the San Rafael Swell Master Leasing Plan, Utah, 83 Fed. Reg. 32,681-

01, 32,681 (July 13, 2018).

With these perceived "burdens" on oil and gas leasing and development eliminated, BLM

proceeded to offer hundreds of oil and gas leases across the West for development, including the

Twin Bridges lease in what is now the Labyrinth Canyon Wilderness.

## IV.    DECEMBER 2018 LEASE SALE

As explained above, the Trump administration's energy dominance agenda directed BLM

to offer oil and gas leases with as little analysis as possible, as quickly as possible, and with as

little public participation as possible. BLM-Utah's December 2018 lease sale typified this

approach in two ways.

---

[8] Significant portions of IM 2018-34 have been held to be unlawful. *See, e.g.*, *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1089 (D. Idaho 2020) (enjoining BLM from relying on four sections of IM 2018-34).

First, BLM did not prepare site-specific NEPA analysis prior to selling the Twin Bridges lease at the December 2018 lease sale. Instead, BLM completed a DNA. *See* BLM, Determination of NEPA Adequacy, DOI-BLM-UT-G020-2018-0057-DNA, Price Field Office December 2018 Competitive Oil and Gas Lease Sale (Oct. 2018) ("Lease Sale DNA") (attached as Ex. P).

As noted *supra*, a DNA is not a NEPA document and does not contain NEPA analysis. *See* 43 C.F.R. § 46.120(c). Instead, a decision issued using a DNA must rely entirely on preexisting NEPA documents to analyze *all* direct, indirect, and cumulative impacts, and to evaluate reasonable alternatives to the proposed action. *See id.* Here, the Lease Sale DNA relied on a high-level programmatic land use plan and NEPA analyses prepared by BLM for *other* lease sales that encompassed *different* public lands in Utah and different resource conflicts. Specifically, the DNA relied on:

- The 2008 resource management plan prepared for the BLM's Price field office ("Price RMP") (excerpts attached as Ex. Q);

- An EA prepared for BLM's November 2015 lease sale ("November 2015 Lease Sale EA") (excerpts attached as Ex. R);

- An EA prepared for BLM's September 2018 lease sale (Price field office) ("PFO September 2018 Lease Sale EA") (excerpts attached as Ex. S); and

- An EA prepared for BLM's September 2018 lease sale (Salt Lake field office) ("SLFO September 2018 Lease Sale EA") (excerpts attached as Ex. T).

*See* Lease Sale DNA § C (Ex. P) (citing these documents as the analyses that "cover the proposed action").

Second, BLM sold the Twin Bridges lease at the December 2018 lease sale but, because new oil and gas leasing is prohibited in designated Wilderness areas, 43 C.F.R. § 3100.0-3(a)(2)(xi), it had to race to issue the lease before the President signed the John D. Dingell, Jr.

14

Conservation, Management, and Recreation Act, which created the Labyrinth Canyon Wilderness, into law. Pub. L. 116-9, 133 Stat 580, §1231(a)(7). BLM issued the lease to the company with a March 1, 2019 effective date, *after* the Dingell Act was passed by both chambers of Congress and just days before the President signed the Act into law on March 12, 2019.



Labyrinth Canyon Wilderness. The lease and development area are located in the area highlighted by the red box.

Labyrinth Canyon is one of the most remote, wild, and rugged landscapes in the nation. When BLM inventoried the area's wilderness characteristics in 1999, it wrote that the now-designated lands are "wild, remote, expansive, and rugged." BLM, Utah Wilderness Inventory at 79 (1999) (attached as Ex. U). "There are interesting geologic features, rugged and varied terrain, extensive vistas, hidden and remote grottos, incised canyons, river floating opportunities, numerous cultural sites, a number of trails, and opportunities to climb exposed rock faces." *Id.*



This map depicts the location of the Twin Bridges lease in the Labyrinth Canyon wilderness, as well as the company's state leases. Twin Bridges intends to develop its leases from the same drilling pad.

## V.      THE "ENERGY DOMINANCE" AGENDA STUMBLES AND BACKFIRES

On March 19, 2019, this Court issued its decision in *WildEarth Guardians I*, in which it held that BLM violated NEPA when it failed to fully analyze all reasonably foreseeable greenhouse gas ("GHG") emissions and climate change impacts from certain oil and gas leases in Wyoming. 368 F. Supp. 3d at 67–78. Among other things, BLM failed to: (1) quantify downstream GHG emissions from oil and gas leasing and development, and (2) analyze the GHG emissions of all past, present, and reasonably foreseeable oil and gas leasing decisions for public lands across the United States. *See id.*

The Court's *WildEarth Guardians I* decision has had important ramifications for oil and gas leasing across the West. Following that decision, BLM conceded that the NEPA analyses it prepared for hundreds of recently issued, similarly situated oil and gas leases sold in Utah were insufficient with regard to GHG emissions and climate change. *See infra.* The agency has voluntarily suspended more than 240 leases while it attempts to cure these deficiencies, including other leases sold and issued at the December 2018 lease sale that relied on the same Lease Sale DNA, *but not the Twin Bridges lease*.

BLM is in the process of preparing—but has not finalized—a new NEPA analysis for the hundreds of leases in Utah that suffer from these flaws. BLM hopes the new NEPA analysis will cure the deficiencies recognized by this Court in *WildEarth Guardians I*. *See* BLM, Draft Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, Environmental Assessment, DOI-BLM-UT-0000-2021-0001-EA, at 6 (Oct. 2020) ("Supplemental Leasing Analysis EA") (attached as Ex. V) (discussing the various administrative appeals and judicial challenges to leasing decisions based on *WildEarth Guardians I*, and explaining BLM's decision that "it was appropriate to suspend certain leases

that were issued between 2014 and 2018 and which were also subject to one of the challenges" pending curative NEPA).

In sum, BLM has conceded that the NEPA analysis it relied on to issue the Twin Bridges lease is deficient. *See id.* App. D, at 73, tbl. 20 (Ex. V) (listing the Price Field Office December 2018 lease sale—the sale at issue—among the sales being reanalyzed by the agency). However, BLM has approved the Twin Bridges Project *before* completing the curative NEPA analysis it began in direct response to this Court's *WildEarth Guardians I* decision.

## VI.     THE TWIN BRIDGES PROJECT

On June 29, 2020, Twin Bridges submitted an APD for Well 5-2, which will access the helium underlying the federal lease the company acquired at the December 2018 lease sale. BLM, Twin Bridges Bowknot Helium Project Decision Record, DOI-BLM-UT-G020-2020-0033-EA, at 1 (December 2020) ("Twin Bridges DR") (attached as Ex. W). Twin Bridges Resources also proposed alternative site-specific plans to BLM to develop the federal lease and two nearby leases the company acquired from the state of Utah's School and Institutional Trust Lands Administration.

BLM analyzed the company's development proposals in the Twin Bridges Bowknot Helium Project EA ("Twin Bridges Final EA"), DOI-BLM-UT-G020-2020-0033-EA (December 2020) (attached as Ex. X) which considered the joint development of state and federal leases from two alternative well pad locations on federal public lands. Under the proposal analyzed as Alternative A, the well pad would sit at the end of a cherry-stemmed road over two miles within the Wilderness boundary, and cause over 43 acres of surface disturbance, 33 acres of which will be on federal land. *Id.* at 7–11.

BLM issued the Twin Bridges Final EA on December 23, 2020, along with a FONSI[9] and DR authorizing the Project. In the Twin Bridges DR, BLM authorized the development plan analyzed as Alternative A, but with a last-minute change. BLM authorized most components of development—improvements to the access road, Emery County spur route 1025, construction of a 5.4 acre well pad, construction (pending a written "notice to proceed") of pipelines and conduit, and the drilling of a wellbore accessing a state lease. But BLM "decided to defer approval of the APD for the Federal lease (Well 5-2) and any other underground wellbores." Twin Bridges DR at 4 (Ex. W). By all indication, BLM deferred drilling the federal lease so the Federal Defendants could make certain arguments against SUWA's initial Motion for Temporary Restraining Order and Preliminary Injunction based on imminence of irreparable harm. *See* Decl. of Roger Bankert ¶ 25 (ECF No. 20-11); Fed. Defs. Mem. in Opp. ("Fed. Opp.") at 16 (ECF No. 20).

Though BLM goes to pains in the Twin Bridges DR to assert that, for the moment, it has only authorized rights-of-way and authorizations related to development of Twin Bridges' state lease, Twin Bridges DR at 4 (Ex. W), there is no dispute that the Twin Bridges Final EA, FONSI and DR are the only NEPA analysis and decision documents BLM intends to issue related to this seven-well drilling project. The EA's purpose and need statement makes this clear: "The purpose of the Federal action is to respond to Twin Bridges' applications for APDs and various [rights-of-way] to support the development of its three mineral leases." Twin Bridges Final EA at 3 (Ex. X). Based on information and belief, Twin Bridges and BLM have completed the other administrative tasks related to approval of the company's federal APD, such as posting the APD

---

[9] BLM, Twin Bridges Bowknot Helium Project Finding of No Significant Impact, DOI-BLM-UT-G020-2020-0033-EA (December 2020) ("Twin Bridges FONSI") (attached as Ex. Y).

19

in the local field for public review and conducting an onsite inspection). *See* Supp. Compl. ¶ 101; Twin Bridges DR at 1 (Twin Bridges submitted the APD for Well 5-2 in June 2020). *See generally* 30 U.S.C. § 226(f) (explaining an agency must post an APD for 30 days before approval); Onshore Oil and Gas Order No. 1, 72 Fed. Reg. 10,308, 10,333–34 (March 7, 2007) (this posting requirement is for informational purposes only and is not appealable). Thus, BLM has approved the surface disturbing activities necessary for Twin Bridges to develop *both* its state and federal leases, and can approve the federal APD without any further notice to the public or NEPA analysis.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent injunctive relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). As demonstrated below, all four factors weigh in favor of granting a temporary restraining order and preliminary injunction to maintain the status quo while the Court resolves the merits of the case.[10]

## I.     SUWA IS LIKELY TO SUCCEED ON THE MERITS OF ITS NEPA AND APA CLAIMS.

SUWA is likely to prevail on the merits of its claims against BLM's approval of both the Twin Bridges lease and the Twin Bridges Project. First, BLM has already recognized that the

---

[10] The viability of the D.C. Circuit's "sliding-scale test" to evaluate the injunction factors, whereby a strong showing of likelihood of success on the merits can make up for a weaker showing of irreparable harm, is uncertain following the Supreme Court's decision in *Winter*. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring). Nevertheless, as explained *infra*, the Court need not address the sliding scale test because SUWA has established that each of the four factors weighs in favor of emergency injunctive relief.

Lease Sale DNA—the document prepared to sell the Twin Bridges lease—does not comply with NEPA. BLM issued the lease without quantifying foreseeable GHG emissions, or analyzing the cumulative effects of issuing the lease together with other reasonably foreseeable oil and gas development.

Second, BLM failed to take a hard look at the cumulative impacts of both the Twin Bridges lease and Twin Bridges Project to water quantity. BLM has neither quantified water use related to drilling the wells identified in its own RFDSs, nor analyzed the cumulative impacts of such drilling in the parched Colorado River Basin.

Third, BLM unlawfully and without adequate explanation reversed course and terminated both its established MLP policy and the San Rafael Desert MLP and accompanying NEPA analysis. It did so despite determining completion of the analysis to be legally necessary before offering new leases and approving subsequent development in this exact area.

## A.    BLM's Leasing and Development Approval Decisions Violate NEPA.

NEPA imposes "'action-forcing' procedures ... requir[ing] that agencies take a hard look at environmental consequences." *Robertson*, 490 U.S. at 350 (internal quotation omitted). The "hard look" requirement ensures that the "agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 98 (1983); *see also Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988). To comply with the requirement, agencies must analyze the direct, indirect, and cumulative effects of its actions and authorizations. 40 C.F.R. §§ 1508.7, 1508.8.

"A hard look requires that BLM assess the 'reasonably foreseeable' impacts of a proposed action before an 'irretrievable commitment of resources' is made that would trigger

those impacts." *WildEarth Guardians I*, 368 F. Supp. 3d at 64 (quoting 42 U.S.C. §

4332(2)(C)(v)) (alteration marks omitted). "In determining what effects are 'reasonably

foreseeable,' an agency must engage in 'reasonable forecasting and speculation,' with

*reasonable* being the operative word." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198

(D.C. Cir. 2017) (internal quotation omitted). While an "agency 'need not foresee the

unforeseeable, [] by the same token neither can it avoid drafting an impact statement simply

because describing the environmental effects of and alternatives to particular agency action

involves some degree of forecasting.'" *Id.* (quotation marks and citation omitted).

> 1.  *BLM failed to consider and disclose the cumulative impacts of GHG*
>     *emissions from the Twin Bridges lease.*

With regard to oil and gas leasing decisions, BLM must analyze the direct, indirect, and

cumulative effects of GHG emissions from development.[11] This Court has explained that

"because BLM cannot fully prevent GHG emissions from oil and gas drilling once leases have

been issued, BLM [is] required to assess the reasonably foreseeable impacts of drilling, at the

leasing stage." *WildEarth Guardians I*, 368 F. Supp. 3d at 64. BLM must quantify drilling-

related GHG emissions in the aggregate. *Id.* at 67–71. BLM must also analyze and disclose the

cumulative GHG emissions and climate change impacts of the agency's oil and gas leasing

program across the region and nation. *Id.* at 75–77. NEPA requires

> that BLM quantify the emissions from each leasing decision—past,
> present, or reasonably foreseeable—and compare those emissions to
> regional and national emissions, setting forth with reasonable
> specificity the cumulative effect of the leasing decisions at issue. To
> the extent other BLM actions in the region—such as other lease
> sales—are reasonably foreseeable when an EA is issued, BLM must

---

[11] The development of helium from the Twin Bridges lease will result in quantifiable GHG
emissions at the drilling and production stages. Twin Bridges Final EA at 18–20 (Ex. X).
Moreover, Twin Bridges is not precluded from producing oil or natural gas from its lease now or
at some later stage.

> discuss them as well. . . . Although BLM may determine that each
> lease sale individually has a de minimis impact on climate change,
> the agency must also consider the cumulative impact of GHG
> emissions generated by past, present, or reasonably foreseeable
> BLM lease sales in the region and nation.

*Id.* at 77.

Here, before issuing the Twin Bridges lease, BLM did not quantify foreseeable GHG

emissions from the lease nor did it analyze and disclose past, present, and reasonably foreseeable

oil and gas leasing in Utah, the region, or nation. Instead, as explained above, BLM used the

Lease Sale DNA to issue the Twin Bridges lease, which in turn relied on three previous leasing

EAs: the November 2015 Lease Sale EA (Ex. R), PFO September 2018 Lease Sale EA (Ex. S),

and SLFO September 2018 Lease Sale EA (Ex. T).[12] All three EAs contained similar analyses of

GHG emissions and climate change; analyses which are wholly insufficient under *WildEarth*

*Guardians I.*

With regard to cumulative impacts analysis, the NEPA documents BLM relied upon did

not list a single other past, present, or reasonably foreseeable leasing decision, let alone analyze

and disclose the cumulative impacts of the agency's leasing program. Instead, BLM alleged that

"given the lack of adequate analysis methods it is *not possible* to identify specific local, regional,

or global climate change impacts based on potential GHG emissions from any specific project's

incremental contributions to the global GHG burden." PFO September 2018 Lease Sale EA at 61

---

[12] The Lease Sale DNA (Ex. P) also relied on the Price RMP, BLM's governing land use plan for
the area. The Price RMP is a programmatic document that does not contain climate change
analysis, nor any site-specific analysis pertaining to any particular lease. Instead, in that
document, BLM concluded that such analysis is not possible due to "[t]he lack of scientific tools
designed to predict climate change on regional or local scales" and thus "BLM does not have an
established mechanism to accurately predict the effect of resource management-level decisions
from this planning effort on global climate change." Price RMP at 4-5 to 4-6 (Ex. Q). In
*WildEarth Guardians I*, this Court confronted and rejected BLM's reliance on similar RMPs.
368 F. Supp. 3d at 77.

(Ex. S) (emphasis added).[13] This Court has twice rejected the same argument. *See WildEarth Guardians I*, 368 F. Supp. 3d at 77 ("Without access to a data-driven comparison of GHG emissions from the leased parcels to regional and national GHG emissions, the public and agency decisionmakers had no context for the EAs' conclusions that GHG emissions from the leased parcels would represent only an 'incremental' contribution to climate change."); *WildEarth Guardians II*, 2020 WL 6701317, at *9 ("Failing to analyze the lease sales in the region, and other reasonably foreseeable lease sales in the country, renders BLM's cumulative impact analysis deficient.").[14]

Importantly, BLM itself recognizes that the analysis underlying the Lease Sale DNA is deficient. As described above, BLM has suspended hundreds of oil and gas leases in Utah while it attempts to come into compliance with this Court's decision, including leases sold and issued at the December 2018 lease sale. *See* Supplemental Leasing Analysis EA at 6 (Ex. V). The Twin Bridges Lease is the *only* challenged lease from that sale BLM has not suspended, despite the agency itself acknowledging that the NEPA analysis underlying its issuance was deficient with regards to GHG emissions and climate change.[15] SUWA is likely to prevail on the merits of this claim.

---

[13] The GHG emissions and climate change analysis in the other two leasing EAs relied on by BLM in the Lease Sale DNA contain nearly identical language as that described in the PFO September 2018 Lease Sale EA. *See* SLFO September 2018 Lease Sale EA at 37–41, 55–56 (Ex. T) (providing nearly identical statements); November 2015 Lease Sale EA at 39–42, 51–52 (Ex. R) (briefly referring to GHG emissions and climate change when discussing the potential air quality impacts from leasing and development—there is no standalone GHG emissions and climate change section in the EA). To avoid repetition, SUWA provides detailed references to only the one EA.

[14] BLM has not yet finalized its Supplemental Leasing Analysis EA and thus this case is not yet at the point in which this Court addressed BLM's supplemental analysis in *WildEarth Guardians II*.

[15] In the earlier proceedings Pure Helium argued that BLM had not suspended the Twin Bridges lease because no party had (yet) challenged the agency's leasing decision. Intervenor-Def.'s

2.      *BLM failed to calculate water quantity and to analyze and disclose the impacts of oil and gas leasing and development to that critical resource prior to leasing.*

The issuance of a non-NSO oil and gas lease such as the Twin Bridges lease marks an irretrievable commitment of resources, which triggers BLM's obligation under NEPA to analyze and disclose all reasonably foreseeable direct, indirect, and cumulative impacts of development. *See WildEarth Guardians I*, 368 F. Supp. 3d at 64–65 (citing *Peterson* and other circuit court opinions). All helium, natural gas, and oil wells require significant amounts of water during road and well pad construction, drilling, and well completion. This is true regardless of how wells are drilled (*e.g.*, vertical, directional), the drilling technique used (*e.g.*, with or without hydraulic fracturing), the depth of the targeted formation, and the targeted resource (*e.g.*, helium, natural gas). Water resource impacts, like GHG emissions and climate change impacts, are reasonably foreseeable and "do not depend on [well] placement within a parcel." *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 888 (D. Mont. 2020). For this reason, and as courts have consistently held, BLM must analyze the cumulative impacts of water usage at the leasing stage. More precisely, if BLM has the ability to quantify water usage, it must do so, then "discuss and consider the effect of such water use on the environment." *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1254 (D.N.M. 2018); *see also Ctr. for Biological Diversity v. U.S. Forest Serv.*, 444 F. Supp. 3d 832, 851–53, 860–61 (S.D. Ohio 2020) (holding that cumulative water use for fracking was reasonably foreseeable at the leasing stage, and that the failure to analyze the resulting impacts violated NEPA).

---

Opp. ("Pure Opp.") at 3 (ECF No. 19). This is entirely immaterial: BLM has acknowledged the sale and issuance of the Twin Bridges lease, like hundreds of others, violated NEPA's requirement that it analyze and disclose the cumulative impacts of GHG emissions from its oil and gas leasing decisions.

In *San Juan Citizens Alliance*, BLM attempted to analyze and disclose the impacts of leasing to water quantity using narrative descriptions of the water necessary to develop natural gas wells, but declined to estimate actual water usage because doing so would be "too speculative . . . at the leasing stage." 326 F. Supp. 3d at 1253 (quoting BLM's rationale in the record). The court there held that the agency could have, and thus was required to, quantify likely water usage and the consequent effects: "Given several other cases in which water usage was quantified prior to the [APD] stage, the Court is not persuaded by BLM's unsupported conclusion that it did not have enough information to calculate water usage." *Id.* at 1254 (citations omitted). Further, not only did BLM fail to quantify water usage, the agency "also failed to discuss and consider the effect of such water use on the environment." *Id.* The U.S. District Court for the Southern District of Ohio recently faulted BLM for the same failures. *See Ctr. for Biological Diversity*, 444 F. Supp. 3d at 865–67 (holding that Forest Service and BLM could reasonably forecast water usage from oil and gas wells at the leasing stage, and that NEPA required the analysis and disclosure of this information).

Here, BLM likewise failed to conduct the required cumulative impacts analysis. On the record now available, BLM clearly had the means to calculate reasonably foreseeable water use from oil and gas development before issuing the Twin Bridges lease. At the time of the 2018 lease sale, BLM had already made a per-well forecast of water use as part of its work on the San Rafael Desert MLP. In the 2017 draft San Rafael Desert MLP EA, BLM provided the following estimation: "Within the planning area, a typical well drilled to the primary target formation would involve about 294,000 gallons of water," which is used "as a drilling medium, for mixing cement, and for various cleanup operations." San Rafael Desert MLP EA at 4-34 (Ex. I).

Also at the time of the 2018 lease sale, BLM had prepared RFDSs forecasting oil and gas development within both the Price Field Office and the San Rafael Desert. The RFDS BLM prepared in conjunction with the 2008 Price RMP predicted 1,540 wells over a 20-year period across the field office, which includes the San Rafael Desert. *See* Price RMP RFDS at 7 tbl. 3 (Ex. Z). BLM's more narrowly-focused RFDS prepared for the San Rafael Desert MLP predicted thirty wells drilled in the San Rafael Desert over a fifteen year period.

Inexplicably, BLM never used these estimates—or any other estimates—to forecast cumulative water use or disclose or analyze the cumulative effects of lease development and other reasonably foreseeable development on water. In fact, neither the Lease Sale DNA, nor the documents upon which the DNA relied (the leasing EAs and Price RMP), made any effort to calculate the water required to develop the Twin Bridges lease (or any other leases being offered for sale) or to analyze the cumulative impacts that development would have to water quantity.[16] Simply put, BLM never quantified the foreseeable water use required to develop the Twin Bridges lease and other leases offered and issued in the region, nor the cumulative impacts of the Twin Bridges leasing decision when viewed with other past, present and reasonably foreseeable leasing and development.

BLM's failure here is a far more egregious version of those in *San Juan Citizens Alliance* and *Center for Biological Diversity*. In those cases, the agencies conducted at least *some* leasing stage analysis of the cumulative effects of water usage. The courts took issue with the agency's failure to base its analysis on quantifiable forecasts of reasonably foreseeable development. In

---

[16] *See* November 2015 Lease Sale EA at 15–20, 52–53 (Ex. R) (briefly mentioning water quality, with no discussion of water quantity); PFO September 2018 Lease Sale EA, App. F, at 185–89 (Ex. S) (same); SLFO September 2018 Lease Sale EA, App. D, at 144–46 (Ex. T) (same); Price RMP at 3-9 to 3-18, 4-9 to 4-20 (Ex. Q) (same).

this case, BLM not only failed to quantify water use in this manner, but it failed to consider cumulative impacts from water use *at all*, regardless of methodology. Thus, SUWA is likely to succeed on its claim that BLM's failure to analyze water quantity prior to selling and issuing the Twin Bridges lease violated NEPA.

      3.     *BLM failed to analyze the cumulative effects of water consumption in the Twin Bridges Final EA.*

BLM's obligation to consider the cumulative effects of water consumption also applies to its decision to authorize site-specific development. This is particularly so when, as explained above, BLM has never analyzed the cumulative impacts to water quantity from the levels of development anticipated in its own RFDSs. The Tenth Circuit addressed this very issue in *Diné CARE*, 923 F.3d 831. There, the court held that the preparation of a RFDS makes it reasonably foreseeable that all of the wells identified therein *will* be drilled—that is, the wells are "reasonably foreseeable future actions" for purposes of NEPA analysis. *Id.* at 853–54 (quoting 40 C.F.R. § 1508.7). The court concluded that BLM was required to quantify water use at the drilling stage, and to analyze the accompanying cumulative environmental impacts for the wells identified in the agency's own RFDS, even if "no operator ha[d] proposed to drill all of those wells." *Id.* at 854 (internal quotation omitted). BLM's failure to conduct this analysis at the RMP or leasing stage meant it was required to do so in the NEPA analysis prepared at the drilling stage, and the failure to do so violated NEPA. *See id.* at 856-57.

BLM committed the same error here. Though the Twin Bridges Final EA predicts that project operations will consume 4 acre-feet per year (more than 1.4 million gallons of water[17]), *see* Twin Bridges Final EA at 6 (Ex. X), it entirely fails to analyze the cumulative impacts of this

---

[17] One acre-foot of water is equivalent to 325,851 gallons.

project alongside other reasonably foreseeable development. Indeed, BLM concluded that *no* cumulative impacts analysis was necessary for water quantity purportedly because the project—when viewed on its own—will not use much water when compared to the total water use in the county encompassing the project area. *Id.* at 6. *See also id.* at B-11 (stating that significant impacts to water quantity "were not expected" and thus "detailed analysis is not required").[18]

This assertion is completely at odds with BLM's obligation to consider "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. These "impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

As this Court explained in *WildEarth Guardians II*, BLM "must consider" RFDSs or, alternatively, "explain why some other methodology might better predict future development." 2020 WL 6701317, at *8 n.9. Here, BLM ignored its RFDSs and never quantified cumulative water use, let alone analyzed and disclosed the cumulative impacts of the reasonably foreseeable wells. BLM also provided no explanation for why some other methodology might better predict

---

[18] BLM also disclaims its obligation to consider cumulative impacts from water use because Twin Bridges would use water from the City of Green River's municipal water rights. Twin Bridges Final EA at 6. As BLM sees it, Twin Bridges "does not propose any action that would further deplete surface waters, aquifers, or otherwise contribute to issues with water use and availability." *Id.* But BLM ignores the obvious fact that the City of Green River, which is within the same watershed as the Project (the city sits upstream of the Project on the same river), draws its water from surface waters or aquifers. Additionally, "[w]here an agency action may implicate water quantity, NEPA requires the analysis of the environmental impacts of the action, regardless of whether water rights are established and controlled by a state" or, as here, a city. *San Juan Citizens All.*, 326 F. Supp. 3d at 1253 n.12.

future development. The water use for these wells is substantial (especially when confronted with the ongoing climate crisis in the arid Colorado River Basin) and the environmental impacts of such use are likely significant. SUWA is likely to prevail on the merits of this claim as well.

      **B.**      **BLM Violated the APA When It Arbitrarily Abandoned the San Rafael Desert MLP.**

BLM's leasing decision is arbitrary and capricious for an additional reason. The agency abandoned the San Rafael Desert MLP without justification, and without completing the environmental analysis the agency itself stated was necessary before it offered and sold any new oil and gas leases on the public lands in the MLP area, including the Twin Bridges lease.

"Congress passed the [APA] to ensure that agencies follow constraints even as they exercise their powers. One of these constraints is the duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009). Here, BLM failed to provide a "reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. As discussed *supra*, BLM determined that an MLP was "required" for the San Rafael Desert, including the public lands encompassing the Labyrinth Canyon Wilderness and the Twin Bridges lease, *before* any new leases could be sold and development of those leases approved. MLP Fact Sheet at 1 (Ex. D). Consequently, BLM did not offer any oil and gas leases in the San Rafael Desert during the approximately six-year MLP planning process for the area, "in order to preserve potential alternatives for" the eventual MLP. *See* MLP Strategy Letter at 2 (Ex. M). And every leasing alternative BLM formulated for the San Rafael Desert MLP would have either designated the lands encompassing the Twin Bridges Lease as closed or subject to NSO restrictions—that is, the lease would *not* have been issued as it exists in its current form, and the approved development could *not* have taken place under any of the

30

proposed action alternatives. *See* BLM, San Rafael Desert Master Leasing Plan, Preliminary

Alternatives at *9–10 (undated) (attached as Ex. AA).

Despite this years-long effort, countless statements that the San Rafael Desert MLP was

"required" and "warranted" before new leasing could be approved, and thousands of pages of

analysis and information to support this position, BLM abruptly abandoned the MLP concept

shortly after the 2016 Presidential election. *See* Part III, Factual Background, *supra*. BLM

provided only a few sentences of "explanation" for this abrupt reversal of policy:

> The BLM conducted the review required by Executive Order 13783
> and Secretarial Order 3354 and determined that Master Leasing
> Plans (MLPs) have created duplicative layers of NEPA review. This
> policy, therefore, eliminates the use of MLPs. The MLP procedures
> in Chapter V of BLM Handbook H-1624-1, *Planning for Fluid
> Minerals Resources*, are hereby rescinded. The BLM will not
> initiate any new MLPs or complete ongoing MLPs under
> consideration as land use plan amendments.

IM 2018-34 § II (Ex. O). And:

> The preparation of an Environmental Assessment associated with
> the San Rafael [Desert] Master Leasing Plan Amendment is no
> longer required, and the process is hereby terminated.
> . . .
> Since the publication of the [Notice of Intent to prepare the San
> Rafael Desert MLP], the BLM issued Washington Office Instruction
> Memo 2018-034, which terminates the Master Leasing Process.

83 Fed. Reg. at 32,681.

These conclusory statements, each of which entirely lack supporting evidence (let alone

any analysis of governing law), are not "reasoned explanations" but were instead about-faces to

orient BLM with the Trump administration's "energy dominance" agenda.[19] Courts have

---

[19] As discussed *supra*, Executive Order 13783 and Secretarial Order 3354—the energy
dominance orders—led to BLM's issuance of IM 2018-34, which eliminated the MLP concept,
including the San Rafael Desert MLP.

repeatedly held that similar unexplained reversals are arbitrary. *See, e.g.*, *Am. Wild Horse Preserv. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska I*"), 381 F. Supp. 3d 1127, 1143 (D. Alaska 2019); *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt* ("*Friends of Alaska II*"), 463 F. Supp. 3d 1011, 1022 (D. Alaska 2020); *Indigenous Envtl. Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 584 (D. Mont. 2018); *Natural Res. Defense Council, Inc. v. U.S. Envtl. Prot. Agency*, 438 F. Supp. 3d 220, 231–33 (S.D.N.Y 2020).

For example, in *Friends of Alaska I*, the court held that the Interior Department ("DOI") failed to provide a reasoned explanation for reversing its position on whether to allow construction of a road through the Izembek National Wildlife Refuge. 381 F. Supp. 3d at 1136-43. DOI had, on several occasions and over many years, previously declined to authorize the road construction, citing the potential for irreversible damage. This long-standing position was based on years of studies, data, and information. *Id.* at 1136. However, soon after a change in Presidential administration, DOI reversed its position by entering into a two-page Exchange Agreement with local officials in Alaska to facilitate construction of the road. *Id.* at 1140.

The Exchange Agreement failed to acknowledge DOI's prior position, or the agency's prior contrary findings. *Id.* The court explained that "[w]hile an agency is certainly permitted to rebalance relevant factors to arrive at a new policy, [the Supreme Court and appellate courts] make clear . . . that even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Id.* at 1141 (quotation and citation omitted). Thus, the court concluded DOI's unexplained change in position violated the APA. *Id.* at 1143 (DOI's decision violated the APA because "[t]he Exchange Agreement does not contain any acknowledgment that [DOI's] decision to enter into that agreement constitutes a fundamental

change in agency policy"). Another district court judge subsequently rejected DOI's revised Exchange Agreement, stating that DOI had to provide "more substantial justification" for the change—that is, "'further justification' is needed when the agency 'disregards facts and circumstances that underlay or were engendered by the prior policy.'" *Friends of Alaska II*, 463 F. Supp. 3d at 1018–19 (quotation and alteration marks omitted).[20]

Here, there is no reasoned explanation for BLM's decision to abandon the San Rafael Desert MLP process. BLM's two conclusory statements regarding the about-face failed to explain or recognize, among other things, that: (1) for nearly seven years the agency did not offer a single oil and gas lease for development in MLP areas, and (2) BLM repeatedly concluded that "additional planning and analysis are warranted prior to allowing new mineral leasing and development." *See* 81 Fed. Reg. at 31,253.

BLM's brief statements provide no explanation or evidence for how MLPs—including the San Rafael Desert MLP—constitute "duplicative layers" of NEPA analysis or are "no longer warranted." The agency has a "duty to reasonably explain its about-face." *Am. Wild Horse Preserv. Campaign*, 873 F.3d at 924. And it fails to satisfy this duty when, as is the case here, it merely "whistle[s] past [the] factual graveyard" and reverses without explanation its "established pattern of agency conduct and formalized positions." *Id.* at 927. This duty "cannot be evaded." *Id.* SUWA is likely to succeed on this claim.

---

[20] The revised Exchange Agreement, unlike its predecessor, made an effort to provide some justification for DOI's changed position. *Friends of Alaska II*, 463 F. Supp. 3d at 1018-19. However, DOI's posited justifications contradicted—without explanation—its prior findings and determinations. *Id.* at 1019–20.

## II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

In a case such as this, "[w]hen a procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009). SUWA has demonstrated above that BLM violated NEPA and the APA, and will suffer irreparable procedural harm from these violations.[21] As discussed below, SUWA will also suffer both irreversible environmental and aesthetic injuries during the pendency of this case which warrant emergency injunctive relief.

### A.     The Twin Bridges Project Will Cause Immediate Irreparable Environmental Harm.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco*, 480 U.S. at 545; *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 875 (D.D.C. 1991) ("Environmental harms are rarely . . . remediable by relief other than an injunction.").

The environmental harm here is not in dispute. BLM has approved development in furtherance of the state and federal leases in accordance with the plan analyzed as "Alternative A" in the Twin Bridges Final EA. *See* Twin Bridges DR at 12 (Ex. W) (map of development approved in Alternative A, though not depicting downhole locations of up to five additional wells). In the Final EA, BLM recognizes the immediate and long-lasting damage construction of

---

[21] Although the D.C. Circuit has held that procedural harm *alone* is not enough to warrant a preliminary injunction, it still weighs in favor of injunctive relief. "The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur. If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury." *Brady Campaign*, 612 F. Supp. 2d at 24 (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985)) (alteration omitted).

the drill pad and rights of way and clearing of the access road will cause to soil, vegetation, and wilderness values. The soil in the project area, "is sensitive and is considered saline and highly erodible." Twin Bridges Final EA at 29 (Ex. X). The project area also has a "high potential" for biological soil crusts. *Id.* Disturbance of these soil types leads to "soil compaction, increased susceptibility to soil erosion, mixing of soil horizons, changes in soil function due to soil exposure from vegetation removal, and loss of soil productivity (ability to support vegetation)." *Id.* at 30. These soil types can "be especially vulnerable to impacts and *harder to reclaim or restore after disturbance*." *Id.* at 29 (emphasis added).

The soils support a variety of native plant species, including Mormon tea, blackbrush, spiny hopsage, and sand sagebrush. *Id.* at 32, 38 (Ex. X). As with soils, these plant species are especially vulnerable to surface disturbances from project construction:

> Effects to vegetation from the Project would consist of damage to or loss of individual plants and could, as a result, include changes to community composition (species composition and plant density) on a localized basis. Clearing would remove protective vegetative cover in a sparsely vegetated landscape and could increase soil erosion and the transport of sediment. Grading, excavation, and backfilling could result in the mixing of topsoil with subsoil and in loss and alteration of seed banks, which could result in long-term reduction of productivity and introduction of noxious and invasive weeds.

*Id.* at 33.

The damage to soils and vegetation will be substantial. Construction of the well pad will entail clearing 5.4 acres of all vegetation and topsoil to a depth of six inches. *Id.* at G-2 (Ex. X). With the addition of road improvements and the pipeline rights-of-way, the project will disturb a total of 33.1 acres of federal land. *Id.* at 10 tbl. 2-1. *See also id.* (explaining that an additional 10 acres of state land will be disturbed for the gas processing plant, bringing the total acres disturbed to 43.1).

This damage will also be irreparable, since much of it is "beyond remediation," even in BLM's estimation. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). According to BLM, the selected alternative will permanently damage or destroy soils and vegetation on 22.3 of the 41.3 disturbed acres even *after* restoration work. Twin Bridges Final EA at 33 (Ex. X). And this calculation may well underestimate the severity of the damage. While BLM deems some disturbance "temporary" due to anticipated restoration efforts, it acknowledges those efforts may not work: "[r]estoration treatments for soil and vegetation in the drylands of the southwestern United States can be time-consuming and expensive *with low success*. . . . Because of the highly saline and erodible nature of the soil, combined with the arid climate, successful reclamation would be difficult, and the acres of vegetation loss *may essentially be permanent, even with the proposed reclamation*." *Id.* at 30 (emphasis added).

Additionally, significant harm to soils and vegetation will occur immediately. At the Court's December 22, 2020 hearing, counsel for the Federal Defendants and Pure Helium downplayed the amount of surface disturbance from initial "phase 1" of project construction. But the fact of the matter is the road will be transformed from "a simple two-track primitive route that travels through areas of deep sand and slickrock sandstone," *id.* at 70 (Ex. X), to a graded, levelled, and straightened road with new, non-native gravel surface. *Id.* at G-1. The road, which in its current condition is approximately nine to fourteen feet wide, *see* Decl. of Oliver Wood ¶¶ 4–9 & Figs. 1–6 (Ex. BB), "would be maintained at an 18-foot-wide travel surface within a 30-foot-wide disturbed area." Twin Bridges Final EA at G-1 (Ex. X). The Final EA is clear: these *initial* road improvements alone (not including additional rights-of-way for pipeline construction) will "result in 9.9 acres of surface disturbance." *Id.* at 8.

Well pad construction will add an additional 5.4 acres of surface disturbance. *Id.* (Ex. X). While the EA states the well pad will be built "in an area of existing disturbance," *id.*, the area is composed of undisturbed soils, including biological soil crusts, and vegetation, save for a primitive two-track loop. *See* Decl. of Oliver Wood ¶¶ 11–16 & Figs. 7–9 (Ex. BB); Twin Bridges Final EA at 62 (noting "[s]urface disturbance from Spur Road 1025 and other evidence of human activity along Spur Road 1025 (a cattle stock tank and an abandoned tank) represent existing disturbance"). Simply put, this existing minimal disturbance is nothing like a cleared and graded 5.4 acre well pad.

These acres of soil and vegetation loss constitute significant irreparable harm. In the Final EA, BLM quantifies the amount of soil and vegetation loss as miniscule percentage figures—for example, "0.00004% of the analysis area," *id.* at 31. But these percentages only speaks to the massive scope of the four-watershed, 529,837.05 acre analysis area (for comparison, the entire Labyrinth Canyon Wilderness is approximately a tenth this size). *Id.* Moreover, courts have rejected arguments that conservation groups did not suffer irreparable harm because a challenged project represented a de minimis fraction of a larger forest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). "This argument proves too much. Its logical extension is that a plaintiff can never suffer irreparable injury resulting from environmental harm in a forest area as long as there are other areas of the forest that are not harmed." *Id.* at 1135; *see also Monumental Task Comm. v. Foxx*, 157 F. Supp. 3d 573, 583 (E.D. La. 2016) ("The focus of this inquiry is not so much the magnitude but the irreparability of the threatened harm.").

### B.   The Twin Bridges Project Will Cause Immediate Irreparable Environmental Harm to the Naturalness and Solitude of the Labyrinth Canyon Wilderness.

In addition to destroying soils and vegetation, construction of the Twin Bridges Project will also cause irreparable damage to the Labyrinth Canyon Wilderness and Plaintiffs' interests

in the Wilderness. *See* Part II.C, Argument, *infra*. The Wilderness starts in the west as a high desert plateau, then breaks into steep canyons dropping to the east, to the Labyrinth Canyon section of the Green River. The area is remote, rugged, and retains a wild and natural character. While "[h]uman impacts are present in the form of reclaiming seismic lines and range improvements," those impacts are largely unnoticeable. Twin Bridges Final EA at H-25 (Ex. X). "Naturalness is enhanced by topographic screening from deep canyons, rugged terrain, and the natural revegetation of disturbed areas, which obscures most intrusions in the predominantly blackbrush communities." *Id.* All told, "[s]teep and rugged topography, as well as the extensive side canyons, cliffs, and other topographical features maintain the area's natural character and also provide outstanding opportunities for solitude." *Id.*

The Project will industrialize the surrounding Wilderness. Twin Bridges will immediately upgrade a narrow dirt road to the well pad that follows a cherry-stemmed path over two and a half miles through the Wilderness. *Id.* at 8 (Ex. X); *see also id.* at F-2. The road will be transformed from a primitive desert two-track to a graded, levelled, and straightened gravel road with a new, non-native road base measuring up to double the current width and within a 30-foot disturbed area—which will be visible from miles away. *Id.* at 71; G-1. The well pad itself will be built atop a canyon rim deep within the Wilderness boundary, and will also be visible from many vantage points in the Wilderness. *See id.* at F-2 (Map). To build the well pad, Twin Bridges will remove topsoil and vegetation using a front-end loader, bulldozer, and dump truck. *Id.* at G-2. The pad will be graded and filled to support a 400-ton and 150-foot-tall drilling rig, as well as up to five single-wide mobile homes for temporary worker housing. *Id.* Should Twin Bridges find sufficient helium, the company will build permanent infrastructure on the well pad, including "holding tanks, transfer pumps, separators, vessels, flowlines, and safety equipment." *Id.* at G-3.

38

BLM acknowledges the harm this development will cause to the surrounding Wilderness. With regard to naturalness, BLM is clear:

> [v]isual impacts and surface disturbance from the introduction of the road improvements, well pad, stockpile areas, and side cut and fill slopes to the landscape would have direct impacts on areas visible from the Labyrinth Canyon Wilderness Area within the analysis area. Specifically, the proposed action would increase the levels of trammeling and human development adjacent to and visible from within the wilderness.

*Id.* at 71 (Ex. X). The project will also irreparably harm the area's solitude. "Outstanding opportunities for solitude would be indirectly impacted by the presence of trucks and heavy equipment during construction and drilling of the well pad." *Id. See also id.* at G-2 (explaining 20 days of round-the-clock drilling and an additional 10 to 14 days for drill rig "mobilization and de-mobilization").[22]

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297. The harm "must be both certain and great" and "actual and not theoretical." *Wis. Gas Co.  v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). It must also be "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (internal quotations omitted; emphasis in original).

The environmental harm, and harm to SUWA's aesthetic interests described *infra*, meets and exceeds the D.C. Circuit's standard. The effects of development will be actual, certain, and

---

[22] In their oppositions to SUWA's December 18 Motion for Temporary Restraining Order and Preliminary Injunction, the Federal Defendants and Pure Helium cite language in the Dingell Act allowing non-wilderness activities on adjacent lands to argue SUWA cannot suffer injury from these impacts. Fed. Opp. at 25; Pure Opp. at 10 n.9 (citing Pub. L. 116-9, 133 Stat. 580). To the contrary, nothing in the Act prevents SUWA from demonstrating that construction and drilling will cause immediate and irreparable harm to its aesthetic and environmental interests in the Wilderness area.

irreparable. Project construction will destroy soil and vegetation on well over 33 acres of federal public lands within and surrounded by the Labyrinth Canyon Wilderness; BLM acknowledges that much of the destruction will be permanent. More broadly, the project will change the undeveloped character of the Labyrinth Canyon Wilderness. Harm to the area's naturalness and solitude will extend past the project's boundaries and last for generations.

These harms are also acutely imminent. This is not a case where construction will take place "years in the future and subject to further government approval." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 337 (D.D.C. 2017). Initial road and well pad construction alone will destroy over fifteen acres of soil and vegetation and degrade the naturalness and solitude of the surrounding Wilderness. And BLM has already authorized all surface disturbing activity necessary for drilling the state *and federal* leases. Twin Bridges DR at 4 (Ex. W). Pure Helium will be constructing the very same road, pipeline rights-of-way, and well pad-—*on the same BLM-managed lands*—to drill its state lease as its federal lease.[23] Thus, the only way for the Court to preserve the status quo is to continue its injunction against surface disturbing activities connected with the Twin Bridges Project. Once the first "phase" of the Project proceeds, SUWA will suffer immediate and irreparable harm to soils, vegetation, and the Wilderness.

---

[23] BLM's deferred approval of Twin Bridges' federal APD reflects gamesmanship, not a normal course of agency conduct. Moreover, approval of the federal APD is form over substance: BLM will not prepare any more NEPA analysis prior to approving development of the federal lease. An agency "is not required to repeat its [NEPA] analysis simply because the agency makes subsequent discretionary choices in implementing the program." *Mayo v. Reynolds*, 875 F.3d 11, 21 (D.C. Cir. 2017). And BLM can likely approve APD without any further notice to the public. *See* Part VI, Factual Background, *supra* (discussing APD notice requirements under 30 U.S.C. § 226(f)).

**C.      The Twin Bridges Project Will Cause Irreparable Aesthetic Harm.**

In tandem with environmental harm, SUWA and its members face imminent, irreparable injury to their aesthetic interests. Attached to this Motion is the declaration of Mr. Ray Bloxham, an employee and member of the Southern Utah Wilderness Alliance and a member of the other Plaintiff organizations. *See* Decl. of Ray Bloxham (attached as Ex. CC).[24] Mr. Bloxham has made dozens of trips to the project area since first visiting "more than two decades ago," for purposes of "camping, hiking, landscape photography, sightseeing, and viewing the area's wildlife." *Id.* ¶¶ 11, 22. He has visited and has definite plans to return to both the precise site of planned development approved by BLM in the Twin Bridges DR, as well as many other surrounding areas from which development will be visible. *Id.* ¶¶ 23–25, 30–36. Mr. Bloxham values the area because it "is entirely devoid of signs of industrial development, including light pollution, visual obstructions, and noise." *Id.* ¶ 15; *see also id.* ¶¶ 30–36 (explaining his appreciation of the untrammeled soils and vegetation).

Mr. Bloxham explains that the development proposal "will transform a wild, untrammeled landscape, degrade the area's scenery, and destroy the area's solitude." *Id.* ¶ 28 (Ex. CC). He further explains that "[c]onstruction and drilling . . . will forever degrade my experience when visiting these areas. The introduction of industrial development will mar the area's world class scenery and destroy the peace, tranquility, and aesthetic appreciation I experience when I visit." *Id.* at ¶ 29; *see also id.* ¶¶ 30–36. These injuries to Mr. Bloxham's aesthetic interests, like harm to the environment, are certain, concrete, imminent, and irreversible in the absence of an injunction.

---

[24] Mr. Bloxham's declaration includes two relevant attachments (numbers 1 and 3), each of which is a viewshed map. The maps, and how they were created, are discussed in detail in the attached declaration of Mr. Creed Murdock (attached as Ex. DD).

### III.   THE BALANCE OF EQUITIES WEIGHS DECIDEDLY IN PLAINTIFFS' FAVOR.

In this case, where some of the most wild, scenic, and remote federal public lands in the lower 48 states face unavoidable, irreparable harm from industrial activity, the balance of harm weighs heavily in favor of maintaining the status quo until the Court can address this case at summary judgment. Without an injunction, Pure Helium will immediately commence earthmoving activities on roads and well pads, destroying sensitive soils and vegetation and permanently altering the natural character of the surrounding Wilderness lands. The disturbance will lie immediately adjacent to the Wilderness area, be plainly visible and audible from the area, and occur on lands that while not designated Wilderness, are equally spectacular and important to SUWA's members. Bloxham Decl. ¶¶ 17–20, 27–36 (Ex. CC). In a situation such as this, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545.

In contrast, BLM will suffer no cognizable harm from granting SUWA this temporary relief. And while an injunction may cause Pure Helium some financial harm from project delays, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. And any financial harm from an injunction will be short-lived, lasting only until the Court can resolve the case on the merits. The helium underneath Pure Helium's lease, if it exists, is at no risk of disappearing.

Additionally, any harm to Pure Helium is self-inflicted. Twin Bridges bid on and acquired the lease with full knowledge of the then-pending Wilderness legislation, with the Dingell Act signed into law only eleven days after the lease's effective date. As such, Twin Bridges was well aware of the controversial nature of developing an oil and gas lease in

Wilderness, as well as the legal flaws of its lease, and thus accepted the risks that accompany such a lease sale. *See* Parts IV & V, Factual Background, *supra*.

Likewise, Twin Bridges' rushed effort to secure BLM approval and immediately begin surface disturbing activities—which it coordinated at the highest levels of the Interior Department—were a transparent effort to force through all construction activities before this Court can issue any meaningful relief to avoid irreversible harm to the environment. The fact that the company might "now [be] pressed for time" or have "invested a great deal of effort and money is a problem of their own making and does not weigh in their favor." *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1121 (S.D. Cal. 2010); *see also Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) (state entities "'jumped the gun' on the environmental issues by entering into contractual obligations that anticipated a pro forma result," and were "largely responsible for their own harm"), *abrogated on other grounds by Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).

Moreover, the balance of harms tips even further in SUWA's favor now than it did when SUWA first filed for an injunction on December 18, 2020. Pure Helium's declarant, Mr. Kirby Carroll, stated that project operations—road construction, drilling, well completion, and well testing—will take sixty-six days to complete. *See* Declaration of Kirby Carroll at ¶¶ 13–17 (ECF No. 19-1). According to Mr. Carroll, "[i]f Pure Helium is unable to commence operations on or before December 24, 2020, it will be unable to complete all the necessary phases of the Project through well testing before the seasonal work restrictions begin on March 1, 2021, and the Project could be delayed by as long as nine months." *Id.* at 28. The company further asserts that that a delay in well testing could prevent it from "negotiate[ing] long-term helium contracts at currently favorable market prices." Pure Opp. at 14 (citing Carroll Decl. ¶ 34).

Given that the December 24 commencement date has passed, Pure Helium can no longer complete well testing by February 28, 2021. Pure Helium's claims of financial harm based on the terms of less-favorable helium contracts are now null, and cannot weigh against a further injunction.

In sum, the balance of harms tips decidedly in SUWA's favor and supports the issuance of emergency injunctive relief to preserve the status quo in this remarkable public landscape.

## IV.   AN INJUNCTION IS IN THE PUBLIC INTEREST.

Emergency injunctive relief will serve the public interest. The public has a strong interest in "preservation of the natural environment" and in protecting its public lands. *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977). This interest is particularly strong in this case where the impacts of development will be felt in some of the nation's most prized public lands recognized for their wilderness quality and remote and sublime nature. *See High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 643 (9th Cir. 2004).

Likewise, there is a "strong public interest in meticulous compliance with the law by public officials." *Fund for Animals v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993); *see also Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("Courts have not hesitated to enjoin an agency action that was taken in violation of NEPA."). An order issuing emergency injunctive relief in this case would ensure that BLM complies with NEPA as Congress intended by taking into account the serious environmental impacts of development before surface operations commence. *See Citizen's Alert Regarding the Env't v. U.S. Dep't of Justice*, No. 95-CV-1702 (GK), 1995 WL 748246, at *12 (D.D.C. 1995) ("Issuance of a preliminary injunction here would thus directly serve the public interest by ensuring that federal agencies thoroughly consider the environmental consequences of their actions as mandated by

NEPA."). In sum, "[t]here is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely." *Brady Campaign*, 612 F. Supp. 2d at 26.

On the other side of the scale, a temporary restraining order and preliminary injunction will not harm the public. At most, such an injunction will only delay development on these lands for, at most, nine months. Decl. of Kirby Carroll ¶ 28; *see Massachusetts v. Watt*, 716 F.2d 946, 953 (1st Cir. 1983) (finding the integrity of the NEPA process outweighed any short delay in oil production) *abrogated on other grounds by Marsh*, 490 U.S. at 377 n.23.[25]

## CONCLUSION

Because SUWA meets all four factors to obtain a temporary restraining order and preliminary injunction, SUWA respectfully requests that this Court temporarily restrain and preliminary enjoin BLM from authorizing all or part the Twin Bridges Project until further order of the Court.

Respectfully submitted this 30th day of December, 2020.

*/s/ Landon Newell*
Landon Newell (*pro hac vice*)
Stephen H.M. Bloch (*pro hac vice*)
Joseph J. Bushyhead (*pro hac vice*)

Southern Utah Wilderness Alliance
425 East 100 South
Salt Lake City, UT 84111

---

[25] Should the Court issue a further injunction, Plaintiffs—all nonprofit organizations—respectfully request that the Court not require a bond or, at most, impose only a nominal bond. Because of their chilling effect on litigation to protect the environment and the public interest, federal courts often dispense with the security requirement for public interest environmental plaintiffs, or require only a nominal bond. *See, e.g.*, *Sierra Club v. Block*, 614 F. Supp. 488, 494 (D.D.C. 1985) (ordering a $20 bond); *Nat. Res. Def. Council v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971) (ordering $100 bond).

(801) 486-3161
steve@suwa.org
landon@suwa.org
joe@suwa.org

*Counsel for Plaintiffs Southern Utah*
*Wilderness Alliance, Center for*
*Biological Diversity and Living*
*Rivers*

William S. Eubanks II
DC Bar No. 987036

William N. Lawton
DC Bar No. 1046604

Eubanks & Associates, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
(970) 703-6060
bill@eubankslegal.com
nick@eubankslegal.com

Sharon Buccino
D.C. Bar No. 432073

Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
(202) 289-6868
sbuccino@nrdc.org

*Counsel for Plaintiff*
*Natural Resources Defense Council*

46