**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al*, | ) ) ) ) |
| Plaintiffs, | ) )  Case Number: 1:2020-CV-3654-RC |
| v. | ) ) |
| DAVID BERNHARDT, SECRETARY,  U.S. DEP'T OF THE INTERIOR, *et al.,* | ) ) ) |
| Federal Defendants, | ) ) |
| and | ) ) |
| PURE HELIUM, LLC, | ) ) |
| Intervenor-Defendant. | ) ) |

**INTERVENOR-DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**SECOND MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

Intervenor-Defendant Pure Helium, LLC,[1] submits this Opposition to Plaintiffs' Second

Motion for Temporary Restraining Order and Preliminary Injunction (2d TRO Mot.). ECF No.

33. The 2d TRO Motion should be denied because the only claim Plaintiffs have raised related to

any imminent activity is a weak "cumulative impacts" theory under which Plaintiffs implicitly

concede the immediately-planned activities will *not* cause significant environmental harm in and

---

[1] Pure Helium, LLC and Twin Bridges Resources, LLC are joint interest owners in the subject leases. For efficiency of understanding, this brief refers to Pure Helium when referencing the companies.

1

of themselves, but *might* bear further examination in the context of other vaguely-described future activities by other entities in the general vicinity. The Bureau of Land Management (BLM) appropriately rejected this argument in the challenged decision and there is simply nothing to justify the extraordinary relief of a continued injunction.

Plaintiffs' original Complaint and first Motion for Temporary Restraining Order and Preliminary Injunction, ECF Nos. 1, 9, raised several claims challenging the BLM's issuance of Federal Lease UTU-92713 (Bowknot federal lease), but sought to enjoin implementation of a yet-to-be issued BLM decision regarding development of the Bowknot Helium Project (the Project), which proposes to develop a valuable helium deposit located in Emery County, Utah by drilling one initial test well on Utah School and Institutional Trust Lands Administration (SITLA) lands. *Id.* Acknowledging the premature nature of Plaintiffs' attempt to enjoin a federal decision before it was issued without having made any claims regarding that federal decision, this Court crafted limited relief under the All Writs Act to allow Plaintiffs the opportunity to bring claims challenging the decision and move for further injunctive relief based on those claims before surface disturbing activity occurred. *See* Order, ECF No. 25.

Now that the BLM has issued its decision, *See* Bowknot Helium Project Decision Record (DR) at 4,[2] and Plaintiffs have amended their complaint, ECF No. 32, and filed their 2d TRO Motion, it is clear that further injunctive relief is unwarranted. The only imminent activity authorized by the BLM decision Plaintiffs seek to enjoin relates to development of Pure Helium's SITLA lease, not the Bowknot federal lease. However, Plaintiffs have not raised any claims relating to imminent Project activities justifying the extraordinary relief of an injunction. *See* Mem. in Supp. of TRO Mot. (2d TRO Mem.), ECF No. 33-1 at 20-22, 30-34.

---

[2] Found at: Final DR_Bowknot w map.pdf (blm.gov) (last visited Jan. 3, 2021).

Despite having been given the opportunity to amend their complaint to challenge the actual decision they seek to enjoin, Plaintiffs bring only a single new claim, alleging the BLM violated the National Environmental Policy Act (NEPA) and failed to adequately analyze the impacts of the Project, combined with other, theoretical projects, on water quantity. Am. Compl. ¶¶118-19. This claim fails to support the injunctive relief requested because it lacks merit and is unrelated to the harms Plaintiffs allege.

Otherwise, Plaintiffs' Amended Complaint and 2d TRO Motion recycle the same claims they previously raised regarding issuance of the federal lease, despite the fact that the BLM has not authorized any development of the federal lease. DR at 4. As explained in Pure Helium's previous TRO opposition brief, ECF No. 19, these claims are irrelevant to Pure Helium's development of its SITLA leases and, therefore, simply cannot justify the injunction sought, regardless of Plaintiffs' likelihood of success on the merits of claims regarding the issuance of the federal lease.[3] The Court should not condone Plaintiffs' continued attempts to conflate issues by making claims relating to the issuance of the federal lease to justify enjoining development of Pure Helium's SITLA leases.

---

[3] Plaintiffs' likelihood of success on the merits of their claims that the NEPA review conducted for the December 2018 lease sale was insufficient is not controversial. As Plaintiffs note, the BLM has suspended the other leases sold at the December 2018 lease sale and is currently conducting supplemental NEPA review. 2d TRO Mem. at 17. But, even if Plaintiffs show a likelihood of success on the merits of the claims challenging the Bowknot federal lease, at most this would allow Plaintiffs an injunction barring development activity relating to the federal lease. If that were the injunction Plaintiffs were actually seeking, this matter would not be before this Court. Instead, Plaintiffs seek an injunction for which they cannot demonstrate they are entitled. As set forth in detail below, Plaintiffs' likelihood of success on the merits regarding the lease sale does not justify enjoining authorizations for development of Pure Helium's leases with SITLA outside of the Labyrinth Canyon Wilderness Area.

## FACTUAL BACKGROUND

Pure Helium holds three mineral leases in Emery County, Utah. *See* Twin Bridges

Bowknot Helium Project Administrative Environmental Assessment (Bowknot Helium Project

EA or EA) at 1.[4] Two leases are with SITLA, purchased in 2015 and 2016. *Id*. Pure Helium

purchased the third lease on December 11, 2018, in a BLM lease sale, which lease the BLM

issued on February 8, 2019.[5] *Id*. On February 18, 2020, Pure Helium and the BLM entered into a

Contract for Extraction and Sale of Federal Helium pursuant to its federal lease. *Id*.; *see also* 50

U.S.C. § 167.

On March 12, 2019, three months after Pure Helium purchased its federal lease, Congress

enacted the John D. Dingell, Jr. Conservation, Management, and Recreation Act (Dingell Act),

133 Stat. 580, 116 P.L. 9. The Dingell Act designated over 1.3 million acres of land as a

Wilderness Area, including the Labyrinth Canyon Wilderness. 133 Stat. 671-72. Because the

Bowknot federal lease was issued on February 8, 2019, before enactment of the Dingell Act and,

contrary to Plaintiffs' characterization of the timeline, before either chamber of Congress had

considered and voted on the Dingell Act, Pure Helium's Bowknot federal lease is a valid existing

right within this Wilderness Area. Its SITLA leases are surrounded by, but outside of the

Wilderness Area. *See id*. (designating "Certain Federal land" as wilderness).

---

[4] Found at:
https://eplanning.blm.gov/public_projects/2001542/200383490/20031798/250037997/TwinBridg
esBowknotHeliumProject_EA_Combined_508 all sigs.pdf. (last visited Jan. 3, 2021).
[5] The effective date of the Bowknot federal lease is March 1, 2019, but it was issued February 8,
2019, *see* EA at Appx. I-1, before either chamber of Congress had voted on the Dingell Act. *See*
Actions - S.47 - 116th Congress (2019-2020): John D. Dingell, Jr. Conservation, Management,
and Recreation Act | Congress.gov | Library of Congress (Feb. 12, 2019 (Senate vote); Feb. 26,
2019 (House vote)).

Pure Helium now intends to develop its valid existing rights to the SITLA leases it purchased in 2015 and 2016. Notwithstanding the access rights guaranteed to the SITLA parcels,[6] Pure Helium has gone to great lengths to carefully design a development plan that ensures no surface disturbance of the Labyrinth Canyon Wilderness Area and minimizes surface disturbance outside of the Wilderness.[7] *See* EA at G-7-8. In fact, Pure Helium delayed its Project for nearly a year while it negotiated with Plaintiff SUWA about the Project. While the negotiations did not result in a final agreement, the project configuration that Pure Helium proposed, and which the BLM approved in part, is the same project configuration SUWA previously recommended to allow for development of Pure Helium's valid existing rights while minimizing potential impacts on the wilderness. *See* Motion to Intervene, ECF No. 17, at Ex. C. *See also* EA at G-7-8 (describing project design features and mitigation measures); DR at 6-11. (same).

To access the SITLA leases and begin preliminary testing of the helium resource for Phase I of the Project, Pure Helium plans to use and make minor improvements[8] to an existing road, Emery County Spur 1025, that is outside of the Wilderness Area. EA at 8. It will use the

---

[6] *See State of Utah v. Andrus*, 486 F. Supp. 995, 1011 (D. Utah 1979) ("[T]he court holds that Utah does have a right of access to state school trust lands. That right is subject to federal regulation when its exercise requires the crossing of federal property. Such regulation cannot, however, prohibit access or be so restrictive as to make economic development competitively unprofitable.").

[7] Plaintiffs characterize the proposed development (Alternative A in the EA) as including a well pad that "would sit at the end of a cherry-stemmed road over two miles *within* the Wilderness boundary." 2d TRO Mem. at 18 (emphasis added). Any inference from this statement that the well pad is within the Labyrinth Canyon Wilderness Area would be erroneous. The cherry-stemmed road is specifically excluded from the wilderness designation. *See* EA at B-4.

[8] To minimize surface disturbance, road improvements during Phase I will be limited to grading, leveling, and curve reduction efforts. Installation of culverts is not anticipated. The road would maintain its 18-foot-wide travel surface within a 30-foot wide disturbed area. EA at G-1. The DR includes several dust mitigation measures during construction and operations. DR at 6-11.

5

already disturbed end of the spur road to construct a well pad, also outside of the Wilderness Area. The company will then drill an exploratory well targeting one of its SITLA leases. *Id*. If the exploratory well produces sufficient quality and quantity of helium-bearing gas, then as part of the Project Phase II, the company may develop up to six additional wells from the same well pad. *Id*. All of these Project activities will utilize up to four acre feet of water per year. *Id*. at 6. Three pipelines and one conduit would be installed, also along the existing county spur road and outside the Wilderness Area, during Phase II. *Id*. at 8.

As discussed in detail below, the Project focuses on highly time-sensitive exploration and development of a strategic resource presently in a critical international shortage, and is to the great benefit of federal, state, and local public institutions.

## STANDARD OF REVIEW

### A.  Standard for Preliminary Injunction or TRO

It is well-established that the entry of a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*. 555 U.S. 7, 22 (2008). To obtain preliminary injunctive relief, a moving party must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id*. at 20; *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). A plaintiff must satisfy all four elements. *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014). A plaintiff must make a clear showing based on substantial proof that it has suffered or will imminently suffer an irreparable injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (citation omitted); *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S.

6

968, 972 (1997) (per curiam) (requiring a "clear showing" of "substantial proof"); *Chaplaincy*, 454 F.3d at 297.

## B.  Standard under the Administrative Procedure Act

Plaintiffs' claims are brought under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and are subject to the "highly deferential" standard of review set out in the APA. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007). Under this standard, a court may invalidate a final agency decision only where it is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under this standard is narrow, and a court may not substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

"A party seeking to have a court declare an agency action to be arbitrary and capricious carries 'a heavy burden indeed.'" *Wis. Valley Improvement Ass'n v. FERC*, 236 F.3d 738, 745 (D.C. Cir. 2001) (quoting *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 714 (D.C. Cir. 2000)). "The arbitrary and capricious standard is '[h]ighly deferential,' and it 'presumes the validity of agency action.'" *Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1228 (quoting *AT&T Corp. v. FERC*, 349 F.3d 692, 698 (D.C. Cir. 2003)). The district court must uphold the agency's action where it "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000) (internal quotation and citation omitted).

4823-0154-6197\2

**ARGUMENT**

Plaintiffs have not met their burden to demonstrate any of the four factors necessary for a preliminary injunction or TRO. They have not demonstrated a likelihood of success on the merits of their claims; nor have they shown they will suffer harm, let alone imminent, irreparable harm. Plaintiffs have also failed to demonstrate that the public interest favors an injunction or that the balance of harms weighs toward issuance of such extraordinary relief. Therefore, the Court should deny Plaintiffs' motion and allow this important project to move forward.

I.      **Plaintiffs have not established any likelihood of success on the merits of their claims.**

Plaintiffs allege they are likely to succeed on the merits of claims challenging the BLM's NEPA analysis for the Bowknot Project and federal lease, and claims regarding the San Rafael Desert Master Leasing Plan.[9] The claims challenging the federal lease and master leasing plan are unrelated to the injunctive relief they seek and irrelevant to Pure Helium's imminent plans to develop its SITLA leases. Plaintiffs' only claim related to the environmental analysis for the Bowknot Helium Project lacks merit and is unlikely to succeed. The Court can, and should therefore, deny Plaintiffs' motion on this basis alone.

A.   **Plaintiffs have not demonstrated a likelihood of success on the merits of claims justifying their requested preliminary injunctive relief.**

Inherent in the likelihood of success requirement is the concept that the injunction sought must relate to a claim raised in the complaint on which there is such a likelihood. Where a complaint challenges multiple decisions, injunctive relief must be premised on a likelihood of success on the challenge to the specific decision authorizing the conduct to be enjoined. *See De*

---

[9] Pure Helium defers to Federal Defendants' arguments regarding the likelihood of success on the merits of Claims One, Two, Four, and Five.

*Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945) (preliminary injunction appropriate to grant intermediate relief of "the same character as that which may be granted finally," but inappropriate where the injunction "deals with a matter lying wholly outside the issues in the suit"); *see also Steele v. United States*, 2020 U.S. Dist. LEXIS 229629, *20-21 (D.D.C. Dec. 4, 2020) (denying plaintiff's preliminary injunction motion "because it cannot grant preliminary relief on claims not pleaded in the complaint," and holding that if a "preliminary injunction seeks temporary relief on claims not pleased in the complaint, the court will have no occasion to finally adjudicate those claims on the merits"); *Strobos v. RxBio, Inc.*, 221 F. Supp. 3d 21, 25 (D.D.C. 2016) (noting that a "preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," but that an injunction will be denied when pending adjudication of the merits is "wholly outside the issues in the suit"); *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 8-9 (D.D.C. 2014) ("As a general rule, 'a preliminary injunction may not issue when it is not of the same character as that which may be granted finally and when it deals with matter outside the issues in the underlying suit.") (citing 11A C. Wright, A. Miller, & M. Kane, Fed. Practice & Procedure: Civil § 2947 (3d ed.)).

As in their previous emergency motion, Plaintiffs now seek to enjoin "all or part" of the activity associated with development of the Bowknot Helium Project, regardless of whether it involves development of the challenged federal lease. 2d TRO Mem. at 45. And, once again, Plaintiffs' alleged harms are entirely unrelated to their arguments regarding likelihood of success on the merits.

As even a cursory review of the Final EA for the Project demonstrates, Alternative A (which Pure Helium submitted to the BLM) sought authorization for surface and subsurface

rights-of-way for access to and construction of a well pad outside the Labyrinth Canyon

Wilderness Area, which would allow drilling of an initial test well that would produce from a

SITLA lease.[10] EA at 7-9. The BLM's Project DR approves actions allowing the company to

develop its SITLA lease. DR at 4. The DR defers any decisions related to the federal lease.[11] *Id.*;

*see also* 30 U.S.C. § 226(p) (allowing the BLM to defer a decision on an application for permit

to drill). Plaintiffs have not cited any evidence that the BLM's Project decision would look any

different if the federal lease did not exist. The Project decision and lease decision are each their

own separate decisions with their own separate administrative records. The federal lease is

simply not relevant to or necessary for the company's imminent plans to develop its SITLA

leases.

In fact, Pure Helium will stipulate for its federal lease to be treated the same way as the

other leases sold at the December 2018 lease sale.[12] Those leases are currently suspended,

pending further NEPA analysis.[13] When that NEPA analysis is completed,[14] if the BLM

---

[10] Alternative A also has "the least impacts on or occupancy of the Labyrinth Canyon Wilderness Area". DR at 5.

[11] Contrary to Plaintiffs' arguments, 2d TRO Mem. at 19-20; 40 n. 23, if the BLM approves the APD for the federal lease, Plaintiffs will have the opportunity to challenge the APD approval. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019) (*Diné CARES*) (challenging the BLM's approval of APDs).

[12] The BLM suspended these in response to litigation brought in the District of Utah by some of the Plaintiffs in this case. *See Friends of Cedar Mesa v. U.S. Dep't of Interior*, No. 4:19-cv-00013-DN, ECF No. 51 (March 2, 2020, order dismissing cases as moot); *Living Rivers v. Hoffman*, No. 4:19-cv-00074-DN, ECF No. 17 (March 19, 2020, notice of voluntary dismissal). The Bowknot federal lease is the only lease those plaintiffs did not challenge from the December 2018 lease sale, and it has not been suspended. *See id*.

[13] *See* Supplemental Analysis for Greenhouse Gas Emissions Related to Oil and Gas Leasing in Utah, October 2020, at 6. Uber Umbrella (blm.gov) (last visited Jan. 4, 2021) (explaining lease suspensions).

[14] Once the BLM concludes the supplemental NEPA analysis to support the December 2018 lease sale, Claims One and Two will become moot. *McBryde v. Comm. to Review*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot.").

reinstates the December 2018 leases, then Pure Helium will also stipulate to giving Plaintiffs 30 days' prior notice of any ground-disturbing activity authorized under any approved application for permit to drill (APD) to target the federal lease. If the December 2018 leases are cancelled, the company will continue with the development plans for its SITLA leases.[15] Consequently, Plaintiffs' arguments regarding likelihood of success on the merits of their leasing claims are irrelevant, as well as unrelated to their allegations of irreparable harm.

Likewise, Plaintiffs' sole claim challenging the Bowknot Helium Project approval is also untethered to the injuries they allege they will suffer. Plaintiffs argue the BLM failed to adequately analyze and disclose the cumulative impacts of the Project, "including but not limited to water quantity." Am. Compl. ¶ 118. But Plaintiffs' allegations of irreparable harm do not mention water. 2d TRO Mem. at 34-41. Instead, Plaintiffs again attempt to distract this Court from the disconnect between the claims they have raised, the alleged harms they claim they may suffer, and the injunction they have requested by asserting that they will "suffer the same harm . . . because Twin Bridges will be constructing the very same road, pipeline rights-of-way, and well pad—on the same BLM-managed lands—to drill its state lease as its federal lease." 2d TRO Mem. at 40. The Court should not condone such blatant obfuscation of the issues. The fact that the same infrastructure may be used in the future for possible development of the Bowknot federal lease has no bearing on whether Plaintiffs have demonstrated they are entitled to an injunction barring development of the SITLA leases now. Plaintiffs simply cannot demonstrate that their claims regarding the validity of the federal lease, or even their sole Project-related challenge, entitle them to the broad injunction of all Project-related activities requested.

---

[15] Contrary to Plaintiffs' baseless allegations of "gamesmanship," this is a business decision that has been in place for many months. *See* DR at 1 (APD submitted June 19, 2020); EA at 7 (describing crest of target formation under SITLA lease).

**B.   Plaintiffs have not shown any likelihood of success on the merits of their sole claim relating to the Project they seek to enjoin.**

Plaintiffs' only claim related to the Bowknot Helium Project alleges the BLM failed to adequately analyze the cumulative effects of water consumption in the Project EA. Am. Compl. ¶¶ 118-19; 2d TRO Mem. at 28-30. This argument is unlikely to succeed as the BLM reasonably determined impacts of the Project on water usage to be insignificant, both individually and cumulatively. EA at 6.

The BLM disclosed in the Bowknot Helium Project EA that the Project will use approximately four acre feet of water per year (AFY)—three for well operations and one for dust suppression. *Id.* Water will come from a previously-existing municipal water right in nearby Green River City. *Id.* This small amount of water is the equivalent of about *two* households' water usage in Emery County. *See* UT Div. of Water Res., Utah's 2019 Municipal and Industrial Water Use Data Mapping Application.[16] The BLM explained that four AFY is equivalent to 0.002 percent of total water use and 0.8 percent of all mining use in Emery County. EA at 6. The BLM determined that such minimal water usage for the Project was not significant and therefore there was no need to analyze the impacts in further detail in the cumulative impacts portion of the EA. *Id.*; *id.* at J-21-22.

The BLM's decision here was reasonable. Plaintiffs do not argue the impacts to water quantity from the Project alone are significant, nor do they allege any error in the BLM's calculation of water usage for the Project. Plaintiffs only argue the BLM should have undertaken an analysis of the insignificant impacts of this Project, combined with other projects, on water

---

[16] Found at: <u>Utah's 2019 Municipal and Industrial Water Use Data Mapping Application (arcgis.com)</u> (last visited Jan. 3, 2021) (showing the average water use of 0.6 AFY per person in Emery County).

usage. TRO Mem. at 28-30. NEPA does not require this kind of unnecessary analysis. Rather, NEPA requires the agency to consider direct and indirect foreseeable future effects of the project under review. 40 C.F.R. § 1508.25(c); *see also Concerned about Trident v. Rumsfeld*, 555 F.2d 817, 829 (D.C. Cir. 1977) (per curiam) ("NEPA does not mandate that every conceivable possibility which someone might dream up must be explored in an EIS."); *Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191, 214 (D.D.C. 2015) ("[A]n agency is not required to assess an environmental harm that is only a remote possibility, or examine a risk that is merely conceivable, but not reasonably foreseeable."); *Theodore Roosevelt Conservation P'ship v. Salazar*, 605 F. Supp. 2d 263, 274 (D.D.C. 2009) (requiring consideration of only the "reasonably foreseeable environmental effects of the action rather than every conceivable possibility"). "Reasonable foreseeability" does not include "highly speculative harms" that "distort[] the decision making process" by emphasizing consequences beyond those of "greatest concern to the public and of greatest relevance to the agency's decision." *Robertson v Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989).

Citing *Diné CARES*, 923 F.3d 831, Plaintiffs argue the BLM should have analyzed the cumulative impacts of the Project combined with reasonably foreseeable development scenarios. 2d TRO Mem. at 28. But that case is easily distinguished from the facts in the instant case. At issue in *Diné CARES* was a challenge to the BLM's grant of over 300 APDs for horizontal, multi-stage hydraulically fractured wells in New Mexico. *Id*. at 836. The agency's reasonably foreseeable development scenario estimated that full development of the area would result in 3,960 new wells. *Id*. at 837. The EAs authorizing those permits did not analyze the cumulative impacts of water use associated with full field development of 3,960 wells, and previous environmental analysis had estimated water use using traditional drilling techniques, not the

much more water intensive hydraulic fracture drilling techniques used. *Id*. at 856 (comparing

283,500 gallons for a traditional well to 1,020,000 gallons for a hydraulically fractured well).

The court held the BLM violated NEPA because it had failed to analyze the cumulative impacts

of developing 3,960 wells and using billions of gallons of water when it conducted site-specific

EAs for over 300 APDs. *Id*. at 859.

Here, the Bowknot Helium Project is vastly different in both scale and drilling

methodology. The Project involves imminent plans to drill only one well (with up to six

additional wells possible), EA at 7, rather than the thousands at issue in *Diné CARES*. And

despite Plaintiffs' attempt to confuse the issue, *see* Am. Compl. ¶ 70, the EA clearly discloses no

fewer than six times that Project wells will be drilled using traditional drilling methods, not

hydraulic fracturing. EA at 6; G-3; H-4; H-10; J-21-22. Water for the Project will come from an

existing municipal water right and no new water will need to be appropriated for the Project.[17]

EA at 6. In other words, "[t]he Project does not include any action that would further deplete

surface waters, aquifers, or otherwise contribute to cumulative impacts beyond the[] existing

water rights." EA at J-22. Plaintiffs do not contest the BLM's finding that obtaining water for the

Project from existing water rights will not affect cumulative water consumption. Thus, further

analysis in the Project EA of water consumption from other projects would not have aided in

reasoned decisionmaking.

---

[17] Plaintiffs' citation to *San Juan Citizens' Alliance v. BLM*, 326 F. Supp. 3d 1227, 1253 n.12
(D.N.M. 2018) is inapposite. 2d TRO Mem. at 29 n.18. In that case, the court criticized "the
BLM's apparent disavowal of any independent responsibility to consider whether hydraulic
fracturing of horizontal wells may result in groundwater depletion in the San Juan Basin." *Id*.
Here, the BLM made no such "disavowal." Instead, the agency determined, in its expert opinion,
that the relatively small amount of water used for the Project was not significant for the Project
alone or when combined with other projects. EA at 6; *id*. at J-21-22. The source of the water
right is relevant here because it demonstrates the water had already been appropriated.

The BLM complied with its NEPA obligations when it determined water usage for the Project to be individually and cumulatively insignificant and the Court should defer to this reasoned expertise. *See Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001) ("[F]ull, fair, bona fide compliance with NEPA does not authorize the courts to fly speck" a NEPA document.). In sum, Plaintiffs are unlikely to succeed on this claim and the Court should deny any preliminary relief for this reason alone.

**II.    Plaintiffs have failed to establish they will suffer imminent, irreparable harm.**

To obtain a preliminary injunction, "[t]he moving party must show the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297 (emphasis in original) (internal quotation marks and citation omitted). Plaintiffs have not demonstrated they are likely to suffer imminent, irreparable harm in the absence of preliminary relief.

Notably, Plaintiffs do not argue they will be harmed at all, let alone imminently or irreparably, from water consumption associated with the Project. Instead, Plaintiffs argue they will suffer irreparable harm from road and well pad construction due to loss of soils and plants. 2d TRO Mem. at 35-37. But Plaintiffs' arguments fail to meet the high burden necessary for a preliminary injunction because the alleged harms are not irreparable and mostly not imminent. The roadwork and well pad construction will take place in areas of existing disturbance, outside of the Labyrinth Canyon Wilderness Area. *See* EA at 62 (noting presence of abandoned tanks in cherry-stemmed area); 71 (same); G-1. Any soil disturbance related to installation of pipelines is not imminent, as pipelines will be installed as part of Phase II (if at all). EA at G-3-4. Likewise, construction of the helium processing facility, on SITLA-owned lands, is not imminent because

it too would be part of a second phase, assuming successful completion of initial well testing. EA at G-4.

In any event, these alleged harms are not irreparable, as Plaintiffs claim. The DR includes many remediation measures that Pure Helium must undertake during and following completion of the Project. DR at 6-11. For example, the company must preserve any top soil removed and redistribute it and re-contour lands at an interim point, and upon completion of the Project. *Id*. at 10-11. A BLM-recommended native seed mix must be used to replant the area. *Id*. at 10; Apx. C. The company will alter road and pipeline construction methods to minimize direct impacts to known locations of special status plant species. DR at 7.

Courts in this circuit have previously rejected allegations of harms to soils as insufficient to meet the showing of imminent irreparable harm required for a preliminary injunction. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) ("Plaintiffs' sound and fury regarding the land that must be cleared and the wetlands that may be altered does not signify that any of these environmental effects will be permanent or irreversible, as the preliminary injunction standard requires."); *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, 15-cv-1582-APM, 2016 U.S. Dist. LEXIS 9322, *32-34 (D.D.C. Jan. 22, 2016) (concluding that even though an eight-foot drop of mined land would take a "long time to reclaim," it did not constitute irreparable harm as the land in question was only .001 percent of the protected lands in question and the EA included mitigation requirements, and "[a]lthough these environmental improvements will not come to fruition immediately, and will not fully mitigate the loss of the eight feet of soil, they do diminish the harm of which Plaintiff complains"); *see also S. Utah Wilderness All. v. Office of Surface Mining Reclamation & Enforcement*, 2:07 CV678 DAK, 2007 U.S. Dist. LEXIS 89617, *23-25 (D. Utah Dec. 5, 2007) (acknowledging mining activity

"might cause some irreparable harm to the trees, shrubs, grasses, and cryptobiotic soil in the area," but finding plaintiffs failed to show harm would "truly be irreparable" and where replanting was required). Likewise here, the small amount of soil disturbance, combined with the extensive remediation measures required, show Plaintiffs' claims of irreparable harm to be insufficient to justify a preliminary injunction.

Plaintiffs' arguments regarding alleged environmental and aesthetic injuries to the wilderness are equally unpersuasive. 2d TRO Mem. at 37-41. Congress was clear in enacting the Dingell Act that it intended to protect valid existing rights and it did not intend to create a protective area around the wilderness within which exercise of valid existing rights would be prohibited:

> Congress does not intend for the designation of the wilderness areas to create protective perimeters or buffer zones around the wilderness areas. . . . The fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness area shall not preclude the conduct of those activities or uses outside the boundary of the wilderness area.

133 Stat. 580, 673, 116 P.L. 9 (March 12, 2019). Pure Helium will also undertake several precautions to mitigate any impacts from the development of its SITLA leases on the nearby Wilderness Area. DR at 6-11. For example, the company will use acoustic mitigation on all rotating equipment to reduce auditory impacts. *Id*. at 7. It will paint all permanent equipment to blend in with the natural surroundings. *Id*. It will minimize the use of lighting and apply down lighting to reduce visual impacts. *Id*. It will implement dust suppression for all phases of the Project. *Id*. at 7-8. And the company will mark the Wilderness Area boundaries with temporary fencing or flagging and monitor all activities to ensure that surface disturbance occurs outside of the Wilderness Area. *Id*. at 7.

Plaintiffs have failed to make a "clear showing" based on "substantial proof" they will imminently suffer any irreparable injury in the absence of a preliminary injunction and the Court should deny Plaintiffs' motion for this reason alone. *Monsanto*, 561 U.S. at 156-57 (2010); *Mazurek*, 520 U.S. at 972.

**III.     The public interest weighs against an injunction.**

Plaintiffs have not met their burden of showing that a preliminary injunction is in the public interest. The public interest standard is a separate consideration in determining whether to grant equitable relief. *Mazurek*, 520 U.S. at 972; *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). A federal court must deny a preliminary injunction, even where irreparable injury to the movant exists, if the injunction is contrary to the public interest. *See Winter*, 555 U.S. at 22 (holding that even though plaintiffs showed a "near certainty" of irreparable injury to marine mammals resulting from the Navy's use of mid-frequency active sonar, that harm was outweighed by the public interest in facilitating effective naval training exercises); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("[W]here an injunction is asked which will adversely affect a public interest . . . the court may in the public interest withhold relief . . . though the postponement may be burdensome to the plaintiff.") (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)). Here, Plaintiffs have failed to demonstrate that the public interest favors issuance of a preliminary injunction.

Plaintiffs' sole argument that a preliminary injunction is in the public interest is that "[t]he public has a strong public interest in preservation of the natural environment[,] in protecting its public lands," and in "compliance with the law by public officials." 2d TRO Mem. at 44. As discussed above, the alleged environmental harms about which Plaintiffs complain are disconnected from their claims that the BLM failed to comply with NEPA in issuing the federal

lease. And the Plaintiffs' only Project-related claim about water quantity is unlikely to succeed on the merits. *See supra* at I.B. Thus, Plaintiffs have failed to meet their burden to show a preliminary injunction is in the public interest. In fact, for the reasons explained below, the public interest weighs against any preliminary injunctive relief and in favor of allowing the Project to move forward.

Federal courts often look to acts of Congress to determine where the public interest lies. *See, e.g.*, *Amoco*, 480 U.S. at 545-46. Congress has expressly provided for development of federal helium resources. *See* Helium Stewardship Act of 2013, 113 P.L. 40, 127 Stat 534 (2013). The federal government has recognized a global shortage of helium, and listed helium as a critical resource. *See* Executive Order 13817, 83 Fed. Reg. 23,296-01 (May 18, 2018). The Federal Lands Policy and Management Act allows for multiple uses of federal lands. 43 U.S.C. § 1732(a). And Congress expressly addressed activities adjacent to wilderness areas, such as development of Pure Helium's SITLA leases:

> Congress does not intend for the designation of the wilderness areas to create protective perimeters or buffer zones around the wilderness areas. . . . The fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness area shall not preclude the conduct of those activities or uses outside the boundary of the wilderness area.

133 Stat. 580, 673, 116 P.L. 9 (March 12, 2019). Taking steps to develop helium resources, therefore, is consistent with Congressional intent and satisfies the public interest prong.

The public interest prong is also satisfied through the benefits the Project will bring to the local economy and the State of Utah. During the construction, drilling, well completion, and well testing phase, Pure Helium anticipates using approximately 250 contract workers (on- and off-site), many of which will be hired from the local area, and paid hourly or daily, based on expected annual salaries well above the annual median salary in Emery County, Utah. *See* Dec.

19

of Kirby Carroll, ECF No. 19-1 ¶¶ 20-26. The Project will also employ approximately 14 full-

time employees, eight of which will be hired from the local region, paid hourly or daily based on

annual salaries of $55,000 to $85,000—two or three times the annual median salary in Emery

County. *Id*.; EA at 89.

The public also has a strong interest in the approximately $36,000,000 to $182,000,000 in

royalties the Project will bring to the federal government, State of Utah, and SITLA. Carroll

Decl. ¶ 32; EA at 89. The State of Utah uses these royalties to fund public planning,

infrastructure, and scientific research. *See* Utah Code Ann. §§ 35A-8-305; 59-21-1. SITLA

deposits revenues from leases of its lands into endowment funds for beneficiaries such as the

Utah Permanent School fund, higher education institutions, schools for the deaf and blind, and

other public institutions. *See* Utah Code Ann. Title 53C. The public will also receive up to

approximately $116,000,000 in income and sales tax revenues from the Project. Carroll Decl.

¶32; EA at 89.

Finally, the public also has a strong interest in securing a more reliable domestic supply

of helium, given global helium shortages and the rapidly diminishing domestic helium supply.[18]

Helium has a wide variety of beneficial public uses including scientific research,[19] rocket

engines, magnetic resonance imaging machines, medical respiratory equipment, quantum

computing, cryogenics, and national defense. As the BLM has acknowledged, the United States

---

[18] Big Push Into Helium Could Have the World on Russia's String - The New York Times
(nytimes.com) (last visited Dec. 31, 2020) (discussing political risks and price manipulation).
[19] Helium users are at the mercy of suppliers: Physics Today: Vol 72, No 4 (scitation.org) (last
visited Dec. 31, 2020) (discussing university research "in a crisis mode."); The Science Of
Helium And Why Global Supplies Are Running Low : Short Wave : NPR (last visited Dec. 31,
2020) ("unless the price volatility can be brought under control, research in a variety of
important areas will be curtailed or even abandoned").

"has important economic and national security interests in ensuring a reliable supply of helium."[20]

In light of these significant economic benefits to the community and the Congressional interest of allowing multiple uses on federal land, including helium development, Plaintiffs have failed to demonstrate the public interest favors injunctive relief.

### IV.   Plaintiffs have failed to establish the balance of harms weighs in favor of a preliminary injunction.

Plaintiffs cannot demonstrate that a preliminary injunction may issue because they have failed to establish an imminent threat to the environment that outweighs Pure Helium's legitimate business interests and the public interests in favor of the Project.

Plaintiffs argue any harm to the company is "self-inflicted" because the company knew about the pending Dingell Act legislation when it acquired the federal lease.[21] 2d TRO Mem. at 42. This argument ignores the fact that the company purchased its SITLA leases in 2015 and 2016—long before the Dingell Act was enacted, and it is the SITLA leases (not the federal lease) for which Pure Helium has imminent development plans. EA at 7-8; DR at 4; *see also* ECF No. 17-4 at ¶ 9. Thus, Plaintiffs' allegations attacking the harm Pure Helium will suffer to its legitimate business interests if a further injunction is issued are without merit.

---

[20] About Helium | Bureau of Land Management (blm.gov) (last visited Dec. 31. 2020).
[21] On the other hand, Plaintiffs could have challenged the Bowknot lease two years ago when some of these same plaintiffs challenged *every other lease* sold in the BLM's December 2018 lease sale *except* for the Bowknot lease. *See supra* n.12. Instead, Plaintiffs waited until the eleventh hour to bring the instant case. *See Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1989) ("Whatever irreparable harm Plaintiffs face . . . is very much the result of their own procrastination.").

Moreover, additional delay in Pure Helium's ability to begin work to test its SITLA leases will mean it will be unable to complete well testing before the lease's seasonal work restrictions begin on March 1, 2021. EA at 55; DR at 7. The company may then be forced to wait until as late as September 1, 2021, to begin important well testing. *Id*. If the current injunction is lifted, the company should be able to complete some well testing by February 28, 2021, and if the well testing is successful, the company will likely be able to negotiate long-term helium contracts at currently favorable market prices. Carroll Decl. ¶ 34. If Pure Helium is forced to delay, it could suffer significant financial harm. *Id*. ¶35. Meanwhile, Russia and Qatar are expected to begin exporting large quantities of helium in 2021, which will likely decrease helium prices by 10-40% and raise geopolitical risks to the steeply declining domestic supply in the United States, with potential national security implications. *Id*. ¶ 34; *see also supra* n. 18-19. Delays could, therefore, cause approximately $113,000,000 to $564,000,000 in financial losses to Pure Helium. *Id*. ¶ 35.

Importantly, courts have repeatedly held that concrete losses to business interests can be weighed in the balance of harms. *See, e.g.*, *Amoco*, 480 U.S. at 545 (holding the district court properly denied motion for preliminary injunction because injury to the environment "was not at all probable" and outweighed by the economic investment of third parties relying on the agency action challenged); *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (considering harm to local economy and companies in balancing harms).

As in *Amoco*, Plaintiffs have not met the balance of harms requirement for preliminary injunctive relief. Plaintiffs have failed to satisfy any of the equitable considerations required for

preliminary injunctive relief, let alone all of them. Therefore, the Court should deny Plaintiffs' motion.[22]

## CONCLUSION

The Court should deny Plaintiffs' Motion for TRO and Preliminary Injunction. Plaintiffs have failed to carry their heavy burden to demonstrate any of the four factors required to obtain injunctive relief. Plaintiffs' arguments regarding likelihood of success on the merits are mostly unrelated to their claims of alleged irreparable injury, and the only Project-related claim is unlikely to succeed. Plaintiffs have not demonstrated they will suffer imminent, irreparable harm. Plaintiffs have also failed to show that the equities favor injunctive relief or that the public interest would be served by halting this Project. The Court, therefore, should deny Plaintiffs' motion for TRO and preliminary injunction.

 DATED this 4th day of January, 2021.

Attorney of Record for Pure Helium, LLC

By:   */s/ Alison D. Garner*_____
     Alison D. Garner (D.C. Bar No. 983858)
     garner.alison@dorsey.com
     Mark Benjamin Machlis (*pro hac vice*)
     machlis.ben@dorsey.com
     DORSEY & WHITNEY LLP
     111 S. Main Street, Suite 2100
     Salt Lake City, UT 84111
     Telephone:  (801) 933-7360
     Facsimile:  (801) 933-7373

---

[22] Should the Court grant Plaintiffs' motion for TRO or preliminary injunction, Pure Helium renews its request for the Court to impose a security bond as required by Fed. R. Civ. P. 65(c). *See* ECF No. 19 at 15-16.

4823-0154-6197\2