UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, *et al.*, | : : : | | |
| Plaintiffs, | : : | Civil Action No.: | 20-3654 (RC) |
| v. | : : | Re Document Nos.: | 9, 33, 40 |
| DAVID BERNHARDT, *et al.*, | : : | | |
| Defendants. | : : | | |
| PURE HELIUM, LLC, Defendant-Intervenor. | : : : | | |

**MEMORANDUM OPINION**

**DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**I. INTRODUCTION**

This matter comes before the Court on Plaintiffs' motion for temporary restraining order and preliminary injunction. Plaintiffs, a collection of non-profit environmental organizations, seek an order enjoining the Bureau of Land Management ("BLM") from authorizing development of public lands located near the Labyrinth Canyon Wilderness in southeastern Utah. Plaintiffs' lawsuit primarily challenges the sale of a federal oil and gas lease in the area on the grounds that BLM failed to comply with its obligations under the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). At issue in the present motion, however, is BLM's recent approval of certain right-of-way ("ROW") applications for ground disturbing work near the federal lease. Twin Bridges Resources, LLC ("Twin Bridges") and Pure Helium, LLC ("Pure Helium"), a company that has intervened in this case, jointly own the federal lease at issue but also own two nearby mineral leases issued by the Utah School of

Institutional Trust Lands Administration ("SITLA"). BLM approved ROW applications to improve an access road and to construct a well pad and pipelines that will allow the companies to perform exploratory work on one of their SITLA leases. Plaintiffs seek an injunction that prevents this work, arguing that BLM failed to analyze the cumulative impacts of water use required for this part of the project. Because the Court finds that Plaintiffs are unlikely to succeed on the merits of their claim regarding the recently approved work, and for the reasons set forth below, it denies Plaintiffs' motion for emergency injunctive relief.

## II.  BACKGROUND

### A.  Statutory and Regulatory Background

Although a web of different statutory and regulatory schemes will be relevant in this case, the Court will only describe those relevant to the present motion.

#### 1.  National Environmental Policy Act

NEPA is the country's basic national charter for the protection of the environment. *See* 40 C.F.R. § 1500.1(a). Broadly speaking, NEPA requires that federal agencies consider the environmental consequences of their actions. *See* 42 U.S.C. §§ 4321–4370(h); 40 C.F.R. § 1501.1. NEPA directs agency decisionmakers to identify and understand the environmental effects of proposed federal actions and to inform the public of those effects so that it may "play a role in both the decisionmaking process and the implementation of [the agency's] decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA thus "imposes on agencies certain procedural requirements, but it 'does not mandate particular consequences.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 8 (D.D.C. 2020) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991)).

Under NEPA, an agency must prepare an environmental impact statement ("EIS") for every "major [f]ederal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1502.3.  An EIS is a detailed study of "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided."  42 U.S.C. § 4332(C)(i)–(ii).  An EIS must examine "alternatives to the proposed action," and the action's direct, indirect and cumulative effects.[1]  42 U.S.C. § 4332(C)(iii); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.[2]  To determine whether an EIS must be prepared for a proposed action, the agency may prepare an environmental assessment ("EA").  *See* 40 C.F.R. §§ 1501.4, 1508.9.  An EA is "a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'"  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).  An EA, like an EIS, must take a "hard look" at the environmental consequences of the proposed action, *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976), including its direct, indirect, and cumulative effects, *see EarthReports, Inc. v. FERC*, 828 F.3d 949, 953 (D.C. Cir. 2016); 40 C.F.R. §§ 1508.9, 1508.25(c).  If, after preparing the EA, the agency determines that an EIS is not necessary, the agency must issue a finding of no significant impact ("FONSI") summarizing its decision.  *See* 40 C.F.R. §§ 1501.3, 1501.4, 1508.13.

---

[1] "Effects" and "impacts" are synonymous in this opinion, as they are in NEPA's implementing regulations.  40 C.F.R. § 1508.8.

[2] "Direct" environmental effects "are caused by the [agency's] action and occur at the same time and place."  40 C.F.R. § 1508.8.  "Indirect" environmental effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.*  "Cumulative" environmental effects account for "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.* § 1508.7.

## B. Oil and Gas Development Framework

Oil and gas development on federal land is typically conducted through a three-stage process governed by the Federal Land Policy and Management Act of 1976 ("FLPMA"), NEPA, and the BLM's Land Use Planning Handbook. These stages are: (1) land use planning; (2) leasing; and (3) drilling. During the land use planning stage, a BLM field office develops a resource management plan for its assigned geographic area (the "planning area"). 43 U.S.C. § 1712(a); 43 C.F.R. §§ 1601.0-5(n), 1610.1. The resource management plan determines which portions of the planning area will be open to oil and gas leasing, and under what conditions. 43 U.S.C. § 1712(a). The plan typically incorporates a reasonably foreseeable development scenario ("RFDS"), which projects the scope and pace of oil and gas development within the planning area. By regulation, a resource management plan must be accompanied by an EIS. *See* 43 C.F.R. § 1601.0-6.

If a resource management plan authorizes oil and gas development on certain land parcels, BLM must sell leases for those parcels on a quarterly basis. 30 U.S.C. § 226(b)(1)(A); 43 C.F.R. § 3120.1-2. An oil and gas lease confers "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold." 43 C.F.R. § 3101.1-2. However, BLM may impose terms and conditions on the leases, including conditions designed to protect the environment. *Id.* § 3101.1-3. At the leasing stage an EIS may be required but is not mandated by regulation.

Once a lease is sold, the lessee must apply for a permit to drill ("APD") for oil and gas on the leased parcel, subject to BLM approval. 43 C.F.R. § 3162.3-1(c). BLM may condition APD approval on the lessee's adoption of "reasonable measures," delimited by the lease and the lessee's surface use rights, to mitigate the drilling's environmental impacts. *Id.* § 3101.1-2. And

before approving an APD, BLM must confirm that the APD complies with the governing resource management plan, *see id.* § 1610.5-3, and it must undertake additional NEPA analysis, *id.* § 3162.5-1.

### C. Factual and Procedural Background

The Labyrinth Canyon Wilderness is located in the San Rafael Desert regions of southeastern Utah. Am. and Supp. Compl. ¶ 4 ("Am. Compl."), ECF No. 32. According to Plaintiffs, it is one of the "least traveled areas of federal public lands in the nation." *Id.* Congress designated the area as wilderness land, subject to protections under the Wilderness Act, *see* 16 U.S.C. § 1134–36, with passage of the John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act") in March 2019. *See* Pub. L. 116-9, 133 Stat. 580 (2019).

Pure Helium owned three leases in the Labyrinth Canyon Wilderness prior to this Congressional designation—the company purchased two leases from SITLA in 2015 and 2016 and it bought the federal lease on December 18, 2018. *See* Pure Helium Opp'n to Pls.' Renewed Mot. TRO and Prelim. Inj. at 4 ("Pure Helium Opp'n"), ECF No. 35. Pure Helium hopes to develop the leases to extract helium. To that end, Pure Helium sought approval from BLM to improve an existing access road—outside the wilderness area boundaries—that connects its SITLA lease to a main road, construct a well pad, and drill an exploratory well targeting one of its SITLA leases. *See id.* at 5–6. The project would also include installing pipelines that run alongside the road. *See id.* at 6.

Plaintiffs originally filed suit and sought emergency injunctive relief before BLM had authorized any construction work to begin. *See* Compl., ECF No. 1; Pls.' Mem. Supp. Mot. TRO and Prelim. Inj. at 1, ECF No. 9. BLM and Pure Helium argued that the Court could not grant an emergency injunction before the agency had issued a decision. *See* Order at 1, ECF No. 25. But

5

because it appeared that BLM would approve construction and that work would commence mere hours later, the Court issued a temporary injunction pursuant to the All Writs Act to prevent Plaintiffs' claims from becoming ripe and then moot nearly simultaneously. *See id.* BLM subsequently issued its Decision Record ("DR") and FONSI on December 23, 2020. *See* Notice of Agency Decision, ECF No. 27; DR for Twin Bridges Bowknot Helium Project ("DR"), ECF No. 27-1; FONSI for Twin Bridges Bowknot Helium Project, ECF No. 27-2. BLM filed the EA that formed the basis of the approval alongside its opposition to Plaintiffs' motion. *See* EA for Twin Bridges Bowknot Helium Project ("EA"), ECF No. 37-2.

In the DR, BLM deferred approval on any APD for Pure Helium's federal lease and only authorized the following: (1) "Authorization to improve Access Road"; (2) "Authorization to construct the well pad on 5.4 acres"; (3) "Authorization to construct the underground wellbore to reach the SITLA Lease"; (4) "Authorization to construct a 14" gas gathering pipeline"; (5) "Authorization to construct an 8" fluid transfer pipeline"; (6) "Authorization to construct an 8" water pipeline"; and (7) "Authorization to construct a 6" communication conduit." DR at 4. The DR discusses a number of environmental protection and mitigation measures by which Pure Helium must abide during the approved construction. *See id.* at 7–11. The DR explains that BLM determined that no environmental impact statement was required to move forward with the approved portions of the project. *Id.* at 4.

After BLM issued its decision, Plaintiffs filed a supplemental complaint pursuant to the Court's order, *see* Am. Compl., and renewed their motion for emergency injunctive relief, *see* Pls. Mem. Supp. Renewed Mot. TRO and Prelim. Inj. ("Pls.' Mem."), ECF No. 33-1.[3] The

---

[3] The Court denies Plaintiffs' initial motion for temporary restraining order and preliminary injunction as moot.

6

Court held a hearing on January 6, 2021 to consider the parties' positions. After the hearing, Plaintiffs sought leave to file a reply in further support of their motion. *See* Mot. for Leave to File, ECF No. 40; Proposed Reply, ECF No. 40-1. The Court grants Plaintiffs' motion for leave to file and accepts the proposed reply as filed. Plaintiffs' motions are fully briefed and ripe for decision.

### III.  LEGAL STANDARD

Preliminary injunction is an "extraordinary remedy." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). When considering an application for emergency injunctive relief, courts consider four factors: "(1) whether there is a substantial likelihood that plaintiff[] will succeed on the merits, (2) whether plaintiff[] will suffer irreparable injury absent an injunction, (3) whether an injunction would harm the defendants or other interested parties (the balance of harms), and (4) whether the public interest would be furthered by an injunction." *Monument Realty LLC v. Washington Metropolitan Area Transit Authority*, 540 F. Supp. 2d 66, 74 (D.D.C. 2008). "[T]he plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an extraordinary remedy." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (internal quotations omitted). Courts in this District have described the substantial likelihood of success on the merits factor as "particularly important" because without such a showing, "there would be no justification for the court's intrusion into the ordinary process of administration and judicial review." *Hubbard v. United States*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)). "[A] failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction." *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017), *aff'd*, 897 F.3d 314 (D.C. Cir.

2018) (citing *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009) and *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006)).

## IV.  ANALYSIS

Before discussing the elements required for emergency injunctive relief, the Court must first make a broader point.  Plaintiffs' claims primarily focus on BLM's sale of the federal lease. *See* Am. Compl. ¶¶ 106–116, 120–125 (describing first, second, and fourth causes of action under NEPA and the APA all related to BLM's leasing decision).  Plaintiffs put forth their arguments about the federal lease in support of their motion for injunctive relief.  The recently issued DR, however, does not approve any construction or development of the federal lease. Instead, the DR approved construction that will allow Pure Helium to conduct exploratory drilling of its SITLA lease.  DR at 4.  If the federal lease never existed, BLM would likely still have to provide access rights to the SITLA lease under the Wilderness Act.  *See* 16 U.S.C. § 1134(a) ("[W]here State-owned or privately owned land is completely surrounded by . . . areas designated . . . as wilderness, such State or private owner shall be given such rights as may be necessary to assure adequate access"); *see also* DR at 12 (map showing SITLA lease completely surrounded by wilderness area).  As such, Plaintiffs' arguments regarding the legality of the federal leasing decision are not squarely at issue because no work has been approved on the federal lease.[4]  Given the current posture and the work approved by BLM, the Court does not consider Plaintiffs' arguments regarding the federal lease because "a proper motion for a preliminary injunction seeks to enjoin *the action that the complaint alleges is unlawful* prior to completion of the litigation." *Bird v. Barr*, No. 19-cv-1581, 2020 WL 4219784, at *2 (D.D.C.

---

[4] At this early stage of the litigation, the Court does not comment on Plaintiffs' likelihood of success on the merits on their claims related to the federal lease sale.

July 23, 2020) (emphasis in original).[5] Plaintiffs allege that the recent ROW application approvals are unlawful in just one respect: Plaintiffs claim that BLM failed to analyze the cumulative impacts of water use as required by NEPA. *See* Am. Compl. ¶ 118. Therefore, the Court limits its discussion to this claim.[6]

### A. Substantial Likelihood of Success on the Merits

Plaintiffs argue that BLM failed to analyze the cumulative effects of water consumption when it approved the ROW applications. Pls.' Mem. at 29. They suggest that BLM should have used the RFDSs for the region to determine the cumulative impact of water use that the approved work would have when added to other reasonably foreseeable projects in the area. *See id.* Plaintiffs contend that such an analysis is necessary in part because of the arid conditions of the region and "the parched Colorado River Basin." *Id.* at 21.

NEPA requires "an agency to evaluate 'cumulative impacts' along with the direct and indirect impacts of a proposed action." *TOMAC, Taxpayers of Michigan Against Casinos v.*

---

[5] In their proposed reply, Plaintiffs argue that the alleged harm from the initial project construction is sufficiently tethered to their legal claims to allow the Court to consider all of their arguments regarding the federal lease. *See* Proposed Reply at 1–2. Comparing this case to precedent addressing standing under NEPA, Plaintiffs state that "the Court should 'focus on the *form of relief*, rather than the *arguments* upon which that relief might be based." *Id.* at 3 (quoting *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1231 (10th Cir. 2017) (emphasis in original)). In relying on cases about standing, which do not compel any particular result in this case, Plaintiffs demonstrate why their arguments about the federal lease should not be considered at this stage. Any relief directed at the federal lease would not address the construction approved by BLM, which allows for access to the SITLA lease that lies outside of BLM's jurisdiction.

[6] Pure Helium filed a stipulation stating that it "will provide the Parties with 30 days' prior written notice of any ground-disturbing activity or surface operations authorized under any approved application for permit to drill" on the federal lease. *See* Stipulation at 1, ECF No. 42. Pure Helium further stipulated that it will provide Plaintiffs with written notice within two business days of any submission to BLM of a Notice to Proceed with "the pipelines and communication conduit described in the Project Decision Record" at page four. *Id.* at 2; *see also* DR at 4.

9

*Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006) (citing *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)). A cumulative impact is "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7. Under D.C. Circuit precedent, a NEPA cumulative impact analysis must include discussion of "other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area," "the impacts or expected impacts from these other actions," and "the overall impact that can be expected if the individual impacts are allowed to accumulate." *Grand Canyon Tr.*, 290 F.3d at 345.

The Court finds that Plaintiffs have not established a substantial likelihood of success on the merits with respect to their claim that BLM failed to analyze the cumulative effects of water consumption before approving the ROW applications. The EA states that the total water use proposed in the ROW applications would be approximately four acre feet of water annually, which represents 0.002 percent of total water use in the county and just 0.8 percent of all mining water use in the county. EA at 6. This amount, Pure Helium contends, is equivalent to about two households' water usage.[7] Pure Helium Opp'n at 12. Moreover, all required water would come from existing municipal water rights; the approved work would not further deplete any surface waters or aquifers. EA at 6. Based on the relatively small amount of proposed water use, BLM determined that "detailed direct, indirect, or cumulative impacts analysis is not necessary to assist the decisionmaker in making a determination of the context and intensity of water use impacts or in distinguishing between alternatives." *Id.* The Court finds that this

---

[7] Plaintiffs did not dispute this characterization at oral argument.

determination is reasonable in light of the relatively small amount of proposed water use. *See Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 828 (D.C. Cir. 1976) (finding agency "need not analyze de minimis or remote" impacts under NEPA); *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 214 (D.D.C. 2015) ("[A]n agency is not required to assess environmental harm that is only a remote possibility.").

The cases Plaintiffs rely on are distinguishable from the present case. First, Plaintiffs point to *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019) to support their argument that BLM should have used RFDSs to analyze the cumulative impacts of water use. *See* Pls.' Mem. at 28–29. But that case dealt with proposals to use hydraulic fracturing of nearly four thousand wells, a process that uses vast quantities of water. *See Dine Citizens*, 923 F.3d at 856–57. Plaintiffs also point to this Court's decision in *WildEarth Guardians v. Bernhardt*, No. 16-cv-1724, 2020 WL 6701317 (D.D.C. Nov. 13, 2020) to suggest that BLM had to use its RFDSs to catalogue and analyze water use for planned future development as part of a cumulative impacts analysis. *See* Pls.' Mem. at 29–30. But *WildEarth Guardians* dealt with nearly five hundred oil and gas leases that, when developed, would house wells that produce great quantities of greenhouse gases over the course of a forty-year average well life. *See* 2020 WL 6701317, at *4, 10 n.13. At bottom, the quantity of water at issue here does not compare with the quantity of water at issue in *Dine Citizens* or quantity of greenhouse gases at issue in *WildEarth Guardians*. The Court finds it was reasonable for BLM to conclude that the quantity of water consumption at issue in the ROW applications did not compel further analysis. *See Robertson*, 490 U.S. at 356 (explaining that under NEPA regulations, impacts analysis should focus on reasonably foreseeable consequences "of greatest concern to the public and of greatest relevance to the agency's decision" (citation omitted)).

11

Plaintiffs' failure to demonstrate a substantial likelihood of success on the merits is fatal to their motion for emergency injunctive relief. *See Archdiocese of Washington*, 281 F. Supp. 3d at 99 (citing *Ark. Dairy*, 573 F.3d at 832 and *Apotex*, 449 F.3d at 1253–54). Nevertheless, although the Court's ruling on this factor is sufficient to deny relief, the Court briefly discusses the remaining elements required for a preliminary injunction.

### B. Irreparable Harm and Balance of Equities

To obtain a preliminary injunction, Plaintiffs must demonstrate they would suffer irreparable harm absent the requested relief that is "beyond remediation." *Nat'l Fair Housing All. v. Carson*, 330 F. Supp. 3d 14, 62 (D.D.C. 2018). The Court appreciates Plaintiffs' arguments that the approved work will change the character of the area and result in damage to soil and vegetation. *See* Pls.' Mem. at 35–38. The Court takes very seriously any permanent alterations to the natural environment. But the Court is not completely convinced that any harm resulting from the approved work will be entirely beyond remediation. The Court expects strict compliance with the mitigation and reclamation measures outlined in the DR to ensure that damage is minimized to the extent possible and that the area is repaired as required after project completion. *See* DR at 6–11.[8]

Moreover, the approved construction will involve limited ground disturbance that occurs entirely outside the wilderness area. The Labyrinth Canyon Wilderness "includes 54,643-acres

---

[8] The Court also understands BLM's argument that the Dingell Act contemplated development of land adjacent to the wilderness areas and did "not intend for the designation of the wilderness areas to create protective perimeters or buffer zones around the wilderness areas." BLM's Mem. Opp'n Pls.' Renewed Mot. TRO and Prelim. Inj. at 8 ("BLM's Mem."), ECF No. 38 (quoting 16 U.S.C. § 1232(e)(1)). The access road Pure Helium plans to improve does not carry a wilderness area designation. It is BLM's role, rather than the Court's, to make judgments, after considering the environmental impacts as required by NEPA, about what development is appropriate in such circumstances.

of BLM-administered lands." EA at 2. The approved road improvements will "result in 9.9 acres of surface disturbance" alongside the "5.4-acre well pad."[9] EA at 8. The approved work thus represents a small fraction of the wilderness area. The Court also notes that the access road subject to the approved improvements already represents disturbed ground and that the well pad will be constructed at an existing "circular roundabout" at the terminus of the access road. *See id.*; *see also* DR at 12 (map depicting proposed well pad at terminus of access road). Both the access road and the circular roundabout were excluded from the Labyrinth Canyon Wilderness Area. EA at 8; *see also* DR at 5 (explaining that under the approved plan "no surface disturbance of the Wilderness Area would occur"). And depending on if the authorized underground wellbore to the SITLA lease, which will not result in ground disturbance, produces a sufficient quantity of helium-bearing gas, Pure Helium may or may not construct additional pipelines and wells, all of which would be subject to additional authorizations from BLM. *See* DR at 4; EA at 8.[10] Any additional wells would be drilled from the approved well pad and would not result in additional ground disturbance. EA at 8. Given the relatively limited scope of the ground disturbing work, the required mitigation and reclamation measures, and the unclear future of the project, the Court is not convinced that Plaintiffs have established irreparable harm. *See Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, No. 15-cv-1582, 2016 WL 420470, at *11 (D.D.C. Jan. 22, 2016) (finding no irreparable harm for mining operations on small parcel subject to reclamation measures).

---

[9] The EA explains that the area of ground disturbance associated with the well pad would be reduced to 2.4 acres after initial reclamation measures. EA at 30.

[10] Pure Helium represented at oral argument that any work beyond that approved by BLM is not imminent and would not occur before the fall.

With respect to the third and fourth elements required for a preliminary injunction, which merge when the government is the defendant, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), the Court understands the interests identified by the parties. The public undoubtedly has an interest in preservation of the environment. However, the Court credits BLM's argument that helium is a critical resource in short supply globally. *See* BLM's Mem. at 32. Given the relatively limited scope of the approved work and the country's need for this resource, the balance of equities tips slightly towards denial of injunctive relief.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motions for temporary restraining order and preliminary injunction (ECF Nos. 9, 33) are **DENIED**. Plaintiffs' motion for leave to file (ECF No. 40) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 12, 2021                                         RUDOLPH CONTRERAS
                                                                 United States District Judge